## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| TATONKA CAPITAL CORPORATION, a Colorado corporation,  )  )  )  ) | |
| Plaintiff,  )  ) | **CIVIL ACTION** |
| v.  )  )  ) | **NO. _____** |
| MOSAICA EDUCATION, INC., a Delaware corporation; MICHIGAN EDUCATIONAL FACILITIES, LLC, a Delaware limited liability company; ASI TEXAS, LLC, a Delaware limited liability company; EFA COMPANY, LLC, a Michigan limited liability company; LORAIN-LEAVITT PROPERTIES, LLC, a Georgia limited liability company; WARREN-ELM FACILITIES, LLC, a Georgia limited liability company; and COLUMBUS-MORSE PROPERTIES, LLC, a Georgia limited liability company,  )  )  )  )  )  )  )  )  )  )  )  )  )  )  )  )  )  )  ) | |
| Defendants.  )  ) | |

## COMPLAINT FOR BREACH OF CONTRACT AND
## FOR APPOINTMENT OF A RECEIVER

### SUMMARY OF CASE

Mosaica ("MEI") operates charter schools in multiple states with more than

10,000 students actively enrolled in American classroom schools.   MEI is in

substantial default on its now matured approximately $20 million of indebtedness to its primary lender Tatonka.  Tatonka holds a first lien on substantially all of MEI's operating assets.  MEI is also in default on other financial obligations. Tatonka could foreclose, but foreclosure would adversely affect thousands of schoolchildren, teachers, others, and the going concern value of the business.

Tatonka has chosen to seek the appointment of a receiver in order to keep the schools operating without shutting down, even for a day.  This is one of Tatonka's express contractual remedies.  This permits MEI's most valuable assets, its teachers, to continue to work without interruption.  Meanwhile, MEI's finances can be restructured and the schools can continue to operate throughout that period and thereafter.

## INTRODUCTION

**COMES NOW**, plaintiff Tatonka Capital Corporation ("Tatonka"), and for its complaint seeking the payment of contractual debt, recovery of collateral, and for the appointment of a receiver (this "Complaint") against defendants Mosaica Education, Inc. ("MEI"), and the wholly-owned subsidiaries of MEI as follows: Michigan Educational Facilities, LLC, a Delaware limited liability company, ASI Texas, LLC, a Delaware limited liability company, EFA Company, LLC, a Michigan limited liability company, Lorain-Leavitt Properties, LLC, a Georgia limited liability company, Warren-Elm Facilities, LLC, a Georgia limited liability

company, and Columbus-Morse Properties, LLC, a Georgia limited liability company (collectively, the "Subsidiaries," and along with MEI, the "Defendants"). As support for this Complaint, together with *Tatonka's Submission of Documentary Evidence* ("Evidentiary Submission"), filed contemporaneously herewith, Tatonka states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Tatonka is a Colorado corporation with its principal place of business in Denver, Colorado.

2.      MEI is a Delaware corporation with its principal place of business in Atlanta, Georgia, or in New York City, New York.

3.      Michigan Educational Facilities, LLC is a Delaware limited liability company whose sole member/owner is MEI.

4.      ASI Texas, LLC is a Delaware limited liability company whose sole member/owner is MEI.

5.      EFA Company, LLC is a Michigan limited liability company whose sole member/owner is MEI.

6.      Lorain-Leavitt Properties, LLC is a Georgia limited liability company whose sole member/owner is MEI.

7.      Warren-Elm Facilities, LLC is a Georgia limited liability company whose sole member/owner is MEI.

8.     Columbus-Morse Properties, LLC is a Georgia limited liability company whose sole member/owner is MEI.

9.     The amount in controversy, exclusive of interest and costs, between Tatonka and each of the Defendants exceeds $75,000.

10.    This Court has original jurisdiction of this case pursuant to 28 U.S.C. § 1332.

11.    Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

## I. MEI'S EDUCATION MODEL

12.    MEI was founded in 1997 as a response to the growing desire for alternatives to traditional public education.  After opening the first elementary school in September of 1997, MEI continued to grow its educational institutions and services.  In 2001, MEI acquired Advantage Schools, Inc., increasing its schools to sixteen.  This growth continued as the organization began the development of independent charter schools throughout the United States.  As a part of its business and mission, MEI works with local governmental entities, community groups, and nonprofit organizations to integrate its educational program within a diversity of localized needs.

13.    Today, MEI manages K-12 schools and provides education services both domestically and internationally.    At present, MEI manages over thirty preschool, elementary, middle, and high school programs in the United States. MEI's website states that, as of February 2014, it served approximately 25,000 students in these jurisdictions and through their online programs.    More than 10,000 of these students attend classroom schools in the United States.    The services offered by MEI include, but are not limited to:

- Whole school management services;
- Whole school operations;
- Consulting and training services for underperforming schools;
- Online courses and virtual schools; and
- Comprehensive curriculum design, support, development and licensing

14.    As an important part of its curriculum services, MEI developed its Paragon© curriculum.    MEI asserts that this curriculum provides a hands-on approach seeking to tailor the curriculum to students' varied intelligences and learning styles, is aligned to national and state education standards, and is research-based and classroom-tested with fifteen years of success.    Paragon© is web-based and utilizes the strengths of interactive whiteboard technology.    It also provides overviews and comprehensive support materials for teachers.    It helps connect students in various jurisdictions across the curriculum.

15.    MEI typically operates by either: (i) creating management contracts with new charter schools in academic emergency areas, or (ii) taking over the

management of failing schools.  In the case of failing schools, typically students are behind standard grade level.  Performance varies greatly, but MEI claims that it generally raises the education level of students about 1.5 years for every 1.0 years of instruction.

## II.   MEI'S BUSINESS OPERATIONS

16.    MEI has contracts to operate and manage charter schools (and is actively running these charter schools) in several states, including, but not limited to, Ohio, Michigan, Pennsylvania, and Arizona.  These schools are owned by corporations or other non-profit organizations qualified under Section 501(c)(3) of the Internal Revenue Code, and usually have their own board of directors.  These non-profit organizations contract with MEI to run the schools.

17.    MEI's business is operated out of offices located in Atlanta, Georgia.

18.    The leadership personnel for each school operated by MEI reports to MEI personnel in metropolitan Atlanta.

19.    The founders Gene and Dawn Eidelman, two of MEI's three principals who hold the majority interest of the common stock in MEI, reside and work in the Atlanta metropolitan area.  CEO, Mike Connelly, the third principal holds a minority interest and resides and works in New York City.  Mike Connelly, Dawn Eidelman, and John Murphy constitute the Board of MEI.

Murphy also resides in New York, but other than being a board member, he plays no active role in MEI.

20.   MEI and all of its American subsidiaries each formally assert that their headquarters are in New York.  The majority of MEI's employees who are not affiliated with a particular school live and work in Georgia, while about seven employees live and work in New York.  MEI currently operates no schools in New York or Georgia.

21.   Gene Eidelman, the President and interim Chief Financial Officer of MEI is based out of Georgia.  In addition, the educational leadership of MEI operates from its Georgia offices.

22.   The Subsidiaries do not operate schools or any active business.  Rather, they hold real estate that was obtained for the purpose of operating a school.  These real estate holdings are the sites for the charter schools managed by MEI, although some of the real estate is presently vacant.

23.   MEI also operates multiple online schools in various states.  Since their inception, the online schools have operated with fewer students than anticipated.

24.   The Paragon© curriculum is unique to MEI and distinguishes MEI from other non-traditional school choices.  Paragon© tends to attract capital and operating contracts.

25.   MEI operates schools in other countries through separate legal entities.  Tatonka has elected in this action not to sue MEI's subsidiaries organized in other countries due to cross-border concerns.

### III. MEI'S RECENT FINANCIAL DISTRESS

26.   MEI has long been in substantial financial and covenant default to Tatonka.   MEI has not made a regularly scheduled payment to Tatonka since July 2013.  As shown below, MEI's finances have recently worsened.

27.   Over the last few years MEI invested heavily in an online school. MEI's online school has relatively few students, far less than the amount anticipated.   The online school has operated at a net loss of approximately a million dollars a year for a multiple years.

28.   With regard to its real estate assets, MEI has vacant properties and unimproved land generating no income.  MEI has made few attempts to monetize these assets and has allowed listings for these real estate assets to expire.

29.   MEI opened and operated several schools in Abu Dhabi and Qatar for more than five years before shutting down the schools.  Yet for approximately a year after closing, MEI maintained staff at these sites, causing an extra $500,000 cash drain.

30.   MEI also opened schools in Arizona.  Due to a few years of declining enrollment, one of the schools could not make its rental and management fee

payments to MEI.  As a result, MEI defaulted on its loan obligations to its lender and the lender eventually foreclosed on the property and evicted the school.  Prior to foreclosure, MEI advanced additional funds to the school, resulting in a multi-million dollar receivable from the school which is uncollectable at this time.  MEI also made the decision to lease new property for the school with a reduced enrollment base from the prior location, resulting in further financial losses.

31.   One of MEI's more recent business mistakes comes from MEI's decisions regarding a school in Muskegon Heights, Michigan.  The first year MEI managed the school it maintained an enrollment of 1200 students.  After that year, enrollment declined to 800 students, a decline of over thirty percent.  At that time, MEI unwisely chose to advance additional funds to the school, even though the school's financial situation was such that MEI had not even been paid its management fee.  This was a significant cash drain on MEI that exacerbated an already bad financial situation and caused a $2 million write off.

32.   MEI has made a series of bad business decisions.  Its major problem is that it makes investments into failing operations, throwing good money at bad situations.   In addition to Arizona and Muskegon Heights investments, MEI has repeatedly invested in a new curriculum development project and its online school despite the negative cash flow created by those enterprises.  MEI is unwilling or

unable to make the necessary changes to operate as a profitable business. This continuous failure has immediate consequences.

33.   During MEI's fiscal year 2014, Tatonka waited while MEI was supposed to implement various cost saving and revenue growing projects. Despite this effort, MEI failed to successfully execute on these opportunities.

34.   In August 2014, Tatonka setoff approximately $300,000 of MEI's money to pay debts owing to Tatonka. This decision to setoff was made after numerous conversations between Tatonka and MEI.

35.   A few other creditors either have or are in the process of obtaining substantial judgments by default against MEI and some of its Subsidiaries. MEI is generally not even appearing, let alone defending, these lawsuits.

36.   MEI's financial distress is becoming widely known to at least the school boards, school administrators, teachers, and creditors.

37.   MEI's constituencies need to be assured that the schools will be open for the near term and long term.

38.   MEI has in excess of $86 million in net operating losses over its years of operation.

## IV. <u>MEI'S FINANCIAL OBLIGATIONS TO TATONKA</u>

### A.    <u>The Loans</u>

39.    Tatonka has had a longstanding financial relationship with MEI and its subsidiaries.  Tatonka has financed MEI for more than ten years.  During this time, Tatonka, as MEI's senior secured lender, has obtained a senior perfected security interest in almost all of MEI's assets, including its Paragon© curriculum (collectively, the "<u>Collateral</u>"), as described in further detail below.  In connection with this longstanding financial relationship, from time to time, Tatonka made certain revolving and term loans to MEI and some of its subsidiaries (collectively, the "<u>Loans</u>"), as further described below.

### i.    <u>The 2007 Loan</u>

40.    On or about February 28, 2007, Tatonka made a loan to MEI in the stated principal amount of $10,000,000.00, as evidenced by that certain Amended and Restated Credit Agreement dated February 28, 2007 between Tatonka and MEI (as amended or modified from time to time, the "<u>2007 Loan Agreement</u>").  The 2007 Loan Agreement evidences a line of credit available to MEI pursuant to which Tatonka agreed, from time to time, to make advances of the principal amount to MEI and certain of its wholly-owned subsidiaries for the purchase and ownership of real estate and the construction, renovation, leasing and operating of charter schools on such real estate, secured by mortgages or deeds of trust on the

real estate and by guaranties from MEI (collectively, the "2007 Loan").
*Evidentiary Submission*, Ex. 2.

41.   Pursuant to the terms of the 2007 Loan Agreement, on or about December 27, 2007, Tatonka advanced a loan to Michigan Educational Facilities, LLC ("MEF"), a wholly-owned subsidiary of MEI, in the original principal amount of $2,934,288.00 (the "MEF Loan"), as evidenced by: (i) that certain Loan Agreement dated December 27, 2007 between MEF and Tatonka (as amended or modified from time to time, the "MEF Loan Agreement"); and (ii) that certain Replacement Promissory Note dated December 27, 2007 from MEF to Tatonka (the "MEF Note").   The MEF Loan is secured by: (i) that certain Mortgage, Security Agreement, Financing Statement, and Assignment of Rents and Leases dated December 27, 2007 from MEF to Tatonka recorded with the Register of Deeds of Wayne County, Michigan, in Liber 47097, Pages 319-351 on March 31, 2008 (the "MEF Mortgage"), and (ii) that certain Guaranty Agreement dated December 27, 2007 from MEI to Tatonka (the "MEF Guaranty").   The MEF Mortgage, MEF Guaranty, MEF Note, MEF Loan Agreement, together with any and all instruments evidencing and/or securing or relating to the MEF Loan, are referred to herein as the "MEF Loan Documents." *Evidentiary Submission*, Exs. 3-6.

42.   Pursuant to the terms of the 2007 Loan Agreement, on or about December 27, 2007, Tatonka advanced a loan to EFA Company, LLC ("EFA"), a wholly-owned subsidiary of MEI, in the original principal amount of $3,000,000.00 (the "EFA Loan"), as evidenced by: (i) that certain Loan Agreement dated December 27, 2007 between EFA and Tatonka (as amended or modified from time to time, the "EFA Loan Agreement") and; (ii) by that certain Promissory Note dated December 27, 2007 from EFA to Tatonka ("EFA Note"). The EFA Loan is secured by: (i) that certain Mortgage, Security Agreement, Financing Statement and Assignment of Rents and Leases dated February 1, 2008 from EFA to Tatonka recorded with the Register of Deeds of Wayne County, Michigan in Liber, 47026, Page 1456-1488 on February 28, 2008, as amended by First Amendment to Mortgage, Security Agreement, Financing Statement and Assignment of Rents and Leases dated April 13, 2011, recorded with said Register of Deeds in Liber 49157, Pages 437-540 on April 25, 2011 (as amended, the "EFA Mortgage"), and (ii) that certain Guaranty Agreement dated December 27, 2007 by MEI in favor of Tatonka ("EFA Guaranty").   The EFA Mortgage, EFA Guaranty, EFA Note, EFA Loan Agreement, together with any and all instruments evidencing and/or securing or relating to the EFA Loan, are referred to herein as the "EFA Loan Documents." *Evidentiary Submission*, Exs. 7-10.

43.    Pursuant to the terms of the 2007 Loan Agreement, on or about July 24, 2007, Tatonka advanced a loan to Lorain-Levitt Properties, LLC ("L-LP"), a wholly-owned subsidiary of MEI, in the original principal amount of $411,500.00 (the "L-LP Loan"), as evidenced by: (i) that certain Loan Agreement dated July 24, 2007 from L-LP to Tatonka (as amended or modified from time to time, the "L-LP Loan Agreement"); and (ii) that certain Replacement Promissory Note dated July 24, 2007 from L-LP to Tatonka (the "L-LP Note"). The L-LP Loan is secured by: (i) that certain Mortgage, Security Agreement, Financing Statement and Assignment of Leases and Rents dated July 24, 2007 from L-LP to Tatonka recorded with the Recorder of Lorain County Ohio, as File No. 2007-0216075 on July 31, 2007, as assigned by that certain Assignment of Mortgage, Security Agreement, Financing Statement and Assignment of Leases and Rents from Tatonka Funding, LLC, to Tatonka, dated May 1, 2012 and recorded with said recorded as File No. 2012-0414117 (as assigned, the "L-LP Mortgage"), and (ii) that certain Guaranty Agreement dated July 24, 2007 from MEI to Tatonka (the "L-LP Guaranty"). The L-LP Mortgage, the L-LP Guaranty, L-LP Note, L-LP Loan Agreement, together with any and all instruments evidencing and/or securing or relating to the L-LP Loan, are referred to herein as the "L-LP Loan Documents." *Evidentiary Submission*, Exs. 11-14.

44.   Also in connection with the 2007 Loan Agreement, MEI executed and delivered to Tatonka that certain Fee Agreement dated July 1, 2011 from MEI to Tatonka (as amended or modified from time to time, the "July 1, 2011 Fee Agreement"), which provided an inducement for Tatonka to enter into an amendment to the 2007 Loan Agreement. *Evidentiary Submission*, Ex. 15.

45.   The 2007 Loan Agreement, MEF Loan Agreement, EFA Loan Agreement, LLP Loan Agreement, together with all documents evidencing or securing the 2007 Loan, MEF Loan, EFA Loan, LLP Loan, shall hereinafter be referred to as the "2007 Loan Documents").

ii.   The Revolver Loan

46.   On or about October 30, 2007, Tatonka made a loan to MEI in the stated principal amount of $10,000,000.00, as evidenced by that certain Revolver Loan and Security Agreement dated October 30, 2007 between Tatonka and MEI (as amended or modified from time to time, the "Revolver Loan Agreement"). The Revolver Loan Agreement evidences a line of credit available to MEI pursuant to which Tatonka agreed to, from time to time, make advances of the principal amount to MEI, in accordance with the terms of that agreement (collectively, the "Revolver Loan"). *Evidentiary Submission*, Ex. 16.

47.   In accordance with the Revolver Loan Agreement, MEI executed and delivered to Tatonka that certain Revolver Promissory Note dated October 30,

2007 in the stated principal amount of $10,000,000.00 from MEI payable to Tatonka (as amended from time to time, the "Revolver Note"). *Evidentiary Submission*, Ex. 17.

48.    As additional security for the payment and performance of the obligations under the Revolver Agreement, MEI also executed and delivered to Tatonka: (i) that certain Collateral Assignment of Promissory Notes dated October 30, 2007 from MEI to Tatonka, (ii) that certain Collateral Assignment of Promissory Notes dated October 30, 2007 from ASI Texas, LLC, to Tatonka, and (iii) that certain Collateral Assignment of Security Interest dated July 2, 2013 and recorded on July 10, 2013 with the Clerk of Superior County of Fulton County, Georgia in Deed Book 52876, Page 292 (together, the "October 2007 Assignments"). *Evidentiary Submission*, Ex. 18.

49.    Also in connection with the Revolver Loan Agreement, MEI executed and delivered to Tatonka that certain Fee Agreement dated in 2011 from MEI to Tatonka (the "Revolver Fee Agreement"), which provided an inducement for Tatonka to enter into an amendment to the Revolver Loan Agreement. *Evidentiary Submission*, Ex. 19.

50.    The Revolver Loan Agreement, together with all documents evidencing or securing the Revolver Loan shall hereinafter be referred to as the ("Revolver Loan Documents").

iii.   The Project Loan

51.   On or about April 13, 2011, Tatonka made a loan to MEI in the stated principal amount of $8,000,000.00, as evidenced by that certain 2011 Credit Agreement dated April 13, 2011 between MEI and Tatonka (as amended or modified from time to time, the "Project Loan Agreement").  The Project Loan Agreement evidences a line of credit available to MEI pursuant to which Tatonka agreed to, from time to time, make advances of the principal amount to MEI and certain of its wholly-owned subsidiaries for the purchase and ownership of real estate and the construction, renovation, leasing and operating of charter schools on such real estate, secured by mortgages or deeds of trust on the real estate and by guaranties from MEI (the "Project Loan").  *Evidentiary Submission*, Ex. 20.

52.   Pursuant to the terms of the Project Loan Agreement, on or about April 13, 2011, Tatonka advanced to Columbus-Morse Properties, LLC ("CMP"), a wholly owned subsidiary of MEI, a loan in the original principal amount of $4,434,261.72 (the "CMP Loan"), as evidenced by: (i) that certain Promissory Note dated April 13, 2011 from CMP to Tatonka (the "CMP Note"); and (ii) that certain Loan Agreement dated April 13, 2011 between CMP and Tatonka (as amended or modified from time to time, the "CMP Loan Agreement").  The CMP Loan is secured by: (i) that certain Guaranty Agreement dated April 13, 2011 from MEI to Tatonka ("CMP Guaranty"); (ii) that certain Mortgage and Security

Agreement dated April 13, 2011 from CMP and MEI to Tatonka recorded with the Recorder of Franklin County, Ohio as Instrument Number 201104280055471 on April 28, 2011.   *Evidentiary Submission*, Exs. 21-24.

53.   Pursuant to the terms of the Project Loan Agreement, on or about May 24, 2011, Tatonka advanced to ASI Texas, LLC ("ASI"), a wholly owned subsidiary of MEI, a loan in the original principal amount of $1,000,000.00 (the "ASI Loan"), as evidenced by: (i) that certain Promissory Note dated May 24, 2011 from ASI to Tatonka (the "ASI Note"); and (ii) that certain Amended and Restated Loan Agreement dated May 24, 2011 from ASI to Tatonka.   The ASI Loan is secured by: (i) that certain Guaranty Agreement dated May 24, 2011 from MEI to Tatonka ("ASI Guaranty"); and (ii) that certain Deed of Trust, Security Agreement, Financing Statement and Assignment of Leases and Rents dated March 1, 2009 from ASI to Tatonka, recorded with the Clerk of Midland County, Texas as Instrument Number 2009-7516 on April 20, 2009, as amended by that certain First Amendment Deed of Trust, Security Agreement, Financing Statement and Assignment of Leases and Rents dated May 31, 2009, recorded in said Clerk's office as Document Number 2009-16137 on July 31, 2009 (the "ASI Deed of Trust").   *Evidentiary Submission*, Exs. 25-28.

54.   Pursuant to the terms of the Project Loan Agreement, on or about May 24, 2011, Tatonka advanced to Warren-Elm Facilities, LLC ("Warren"), a wholly

owned subsidiary of MEI, a loan in the original principal amount of $2,565,738.28 (the "Warren Loan"), as evidenced by: (i) that certain Restated Promissory Note dated May 24, 2011 from Warren to Tatonka (the "Warren Note"); and (ii) that certain Amended and Restated Loan Agreement dated May 24, 2011 from Warren to Tatonka (as amended or modified from time to time, the "Warren Loan Agreement").   The Warren Loan is secured by: (i) that certain Guaranty Agreement dated May 24, 2011 from MEI to Tatonka ("Warren Guaranty"); and (ii) that certain Mortgage, Security Agreement, Financing Statement and Assignment of Leases and Rents dated March 1, 2009 from Warren to Tatonka, recorded with the Recorder of Trumball County, Ohio as Instrument Number 200906150011676 on June 15, 2009, as amended by that certain First Amendment Mortgage, Security Agreement, Financing Statement and Assignment of Leases and Rents dated May 24, 2011 (the "Warren Mortgage").  *Evidentiary Submission*, Exs. 29-32.

55.   Also in connection with the Project Loan Agreement, MEI executed and delivered to Tatonka that certain Fee Agreement dated April 13, 2011 from MEI to Tatonka (as amended or modified from time to time, the "April 13, 2011 Fee Agreement"), which provided an inducement for Tatonka to enter into an amendment to the Project Loan Agreement.   *Evidentiary Submission*, Ex. 33.

56.   The Project Loan Agreement, the CMP Loan Agreement, the ASI Loan Agreement, the Warren Loan Agreement, together with all documents evidencing or securing the Project Loan, the CMP Loan, the ASI Loan, and the Warren Loan shall hereinafter be referred to as the "<u>Project Loan Documents</u>").

iv.   <u>2012 Loan Agreement</u>

57.   On or about August 14, 2012, Tatonka made a loan to MEI in the stated principal amount of $700,000.00 (the "<u>2012 Loan</u>"), as evidenced by that certain Loan Agreement dated August 14, 2012 between Tatonka and MEI (as amended or modified from time to time, the "<u>2012 Loan Agreement</u>") and by that certain Promissory Note dated August 14, 2012 from MEI to Tatonka.  The 2012 Loan is secured by that certain Collateral Assignment of Promissory Notes dated August 14, 2012 from MEI to Tatonka ("<u>2012 Collateral Assignment</u>"), assigning $929,124.00 Promissory Note dated June 30, 2009 from Space, Technology and Arts Academy ("<u>STAR Academy</u>") payable to MEI and $300,000.00 Promissory Note dated July 1, 2009 from STAR Academy payable to MEI.  The 2012 Loan Agreement, together with all documents evidencing or securing the 2012 Loan, shall hereinafter be referred to as the "<u>2012 Loan Documents</u>").  *Evidentiary Submission*, Exs. 34-36.

v.     Assignment of Notes and Accounts Receivable

58.    Due to ongoing defaults under the Loan Documents (as defined herein) and in exchange for Tatonka's promise to forbear on its right to foreclose, on or about April 11, 2014, MEI, along with certain of its wholly owned subsidiaries, assigned to Tatonka all of right, title, and interest in: (i) certain promissory notes payable to MEI, and (ii) certain accounts receivable of MEI (the "April 11 Transaction"). *Evidentiary Submission*, Exs. 37-46.

vi.     Guaranties

59.    From to time, MEI, certain of MEI's wholly-owned subsidiaries and the principals of MEI executed Guaranties to secure the various obligations under the Loan Documents (the "MEI Guaranties"). *Evidentiary Submission*, Exs. 47-49.

**B.**    **Stock Owned by Tatonka Affiliates**

60.    In 2007, in connection with the execution of the 2007 Loan Agreement and the making of the 2007 Loan by Tatonka to MEI, MEI issued to six purchasers affiliated with and/or employed by Tatonka (the "Tatonka Affiliates") a total of 30,000 shares of MEI common stock as well as common stock purchase warrants for the purchase of another 10,000 shares of MEI common stock. Also in 2007, MEI issued to these six affiliate purchasers warrants for the purchase of another 100,000 shares of common stock (the "2007

Stock Purchase Transaction").  The warrants provided an exercise price of $55.00 per share.  The purchasers paid a $55.00 per share purchase price for the shares by delivering to MEI nominal cash payments ($0.01 per share) and non-recourse promissory notes ($54.99 per share).  The promissory notes were secured by pledges of the purchased shares of common stock.  The sole recourse and remedy for an event of default under the notes was for MEI to take possession of the pledged purchase shares.  The Tatonka Affiliates have no personal liability with respect to the notes. *Evidentiary Submission*, Exs. 50-58.

61.    On July 14, 2010, the Tatonka Affiliates and MEI entered into that certain Warrant Repurchase Agreement (the "Warrant Repurchase Agreement"), pursuant to which the Tatonka Affiliates agreed to sell the 10,000 common stock purchase warrants back to MEI at a price of $10.00 per warrant, for an aggregate price of $100,000.00.  Thus, Tatonka Affiliates presently own the 30,000 shares of common stock and warrants for the purchase of 100,000 shares of common stock.  The shares of common stock are non-voting and have no value. *Evidentiary Submission*, Ex. 59.

C.    **UCC Filings**

62.    Appropriate financing statements covering the personal property collateral are also filed with the various filing offices (the "UCC Financing Statements"). *Evidentiary Submission*, Exs. 60-82.

63.    The UCC Financing Statements, 2012 Loan Documents, Project Loan Documents, 2007 Loan Documents, Revolver Loan Documents, together with all other documents and instruments evidencing and/or securing or relating to the Loans, are referred to herein as the "Loan Documents".

### D.    **Existing Defaults**

64.    Tatonka and MEI executed an instrument entitled Agreement and Acknowledgement dated as of September 23, 2013 (the "2013 Forbearance Agreement"), whereby MEI acknowledged that it was then in default with respect to the Loan Documents and Tatonka agreed to forbear temporarily from exercising its rights and remedies under the Loan Documents, with respect to certain specified defaults MEI during a time period that would end no later than December 5, 2013 (the "Forbearance Termination Date").   This Forbearance Agreement was the last Forbearance Agreement between the parties.   The parties continued to negotiate other agreements, but these negotiations were unsuccessful. *Evidentiary Submission*, Ex. 83.

65.    The maturity date for each of the Loan Documents was on or prior to July 1, 2014 (the "Loan Maturity Date").   *Evidentiary Submission*, Exs. 2, 16, 20, and 34.

66.    Both the Forbearance Termination Date and the Loan Maturity Date have passed and MEI remains in continuing and substantial default in several

regards with respect to the Loan Documents.  First, MEI failed to pay the amounts owing under the Loan Documents when due.  Second, MEI failed to comply with certain reporting requirements under Loan Documents.  Third, MEI failed to allow Tatonka to examine their books and records, as is required under various provisions of the Loan Documents.  Fourth, MEI failed to honor certain financial covenants as required under the Loan Documents.  All of these failures constitute events of default, as defined in the Loan Documents (the "Defaults").

67.  Specifically, in addition to payment default, the Defaults under the Revolver Loan Agreement include, but are not limited to, the following covenant defaults:

(i)   cross default with other obligations owed to Tatonka under Section 9.1(d);

(ii)   judgment in excess of $100,000.00 under Section 9.1(h);

(iii)   the failure to deliver audited financial statements within 120 days of year end under Section 5.6(d);

(iv)   the failure to satisfy net income covenant under Section 7.1.1; and

(v)   failure to satisfy EBITDA to Debt Service covenant under Section 7.1.3.

*Evidentiary Submission*, Ex. 16.

68.   In addition to payment default, the Defaults under the 2007 Loan Agreement include, but are not limited to, the following covenant defaults:

(i)      judgment in excess of $100,000.00 under Section 7.1(j);

(ii)     cross default with other obligations owed to Tatonka under Section 7.1(k);

(iii)    failure to deliver audited financial statements within 180 days of the year's end under Section 6.8;

(iv)    failure to satisfy net income covenant set forth in Section 6.13(a), as required in Section 7.1(h).

*Evidentiary Submission*, Ex. 2.

69.   In addition to payment default, the Defaults under the Project Loan Agreement include, but are not limited to, the following covenant defaults:

(i)      failure to satisfy net income covenant set forth in Section 7.17(a), as required in Section 6.1(h);

(ii)     failure to satisfy EBITDA to Debt Service covenant under Section 6.1(h);

(iii)    judgment in excess of $100,000.00 under Section 6.1(j);

(iv)    cross default with other obligations owed to Tatonka under Section 6.1(l); and

(v)    failure to deliver audited financial statements within 180 days of the

year's end under Section 5.8(h).

*Evidentiary Submission*, Ex. 20.

70.    In addition to payment default, the Defaults under the 2012 Loan

Agreement include, but are not limited to, the following covenant default: (i) cross

default with other obligations owed to Tatonka under Section 6.1(h).  *Evidentiary*

*Submission*, Ex. 34.

71.    The Defaults are continuing and have not been cured by MEI.

72.    As stated above, the Loans are cross defaulted.  Accordingly, each of

the above-referenced Defaults constitutes an event of default under the other Loan

Documents.

73.    The principal amount outstanding pursuant to the Loan Documents as

of August 31, 2014, exclusive of expenses of collection, attorneys' fees, late fees,

and the costs of this action, is $19,061,475.44.  Interest accrues daily at the default

rate provided in the Loan Documents.   Attorneys' fees and other costs of

collection also continue to accrue.  The principal amounts due, the unpaid interest,

attorneys' fees and costs of collection are hereinafter collectively referred to as the

"Outstanding Indebtedness."

## V. **TATONKA'S REMEDIES UNDER THE LOAN DOCUMENTS**

74.    Tatonka and its attorneys have had numerous conversations and communications with MEI and its attorneys in an attempt to resolve their differences.  MEI made it clear during these discussions that, despite the maturity of the various loans and Tatonka's requests for payment, they are presently unwilling to pay the Outstanding Indebtedness.  Also, during those discussions, the parties seriously discussed the appointment of a chief restructuring officer with full authority ("CRO").  Those discussions have not resulted in an agreement.

75.    The Defaults entitle Tatonka to exercise other rights and remedies under the Loan Documents, including the right to the appointment of a receiver.

76.    Under the Revolver Loan Agreement, 2007 Loan Agreement, Project Loan Agreement, and 2012 Loan Agreement, MEI expressly and unequivocally agreed to the appointment of a receiver upon default, without prior notice.  Each of these agreements contain language authorizing the appointment of a receiver. For example, Section 6.2 of the Project Loan Agreement provides that:

> Tatonka at its election may (but shall not be obligated to), without notice, do any one or more of the following:
>
> …
>
> (d)    exercise any and all rights and remedies afforded by this Agreement or any Facility Loan Documents, or under law, equity or otherwise, including obtaining appointment of a receiver.

*Evidentiary Submission*, Ex. 20.   Substantially similar language is used in the Revolver Loan Agreement, 2007 Loan Agreement, Project Loan Agreement, and 2012 Loan Agreement, each of which support the appointment of a receiver in this case. *Evidentiary Submission*, Exs. 2, 16, 20, and 34.

77.   As stated above, MEI is in substantial and continuing payment and covenant default to its senior secured lender Tatonka for the Outstanding Indebtedness.

## VI. <u>THE NEED FOR A RECEIVER</u>

78.   Tatonka has the right under the Loan Documents and applicable law to take possession of the Collateral (all assets of MEI) and effectively cease MEI's operations.   However, Tatonka prefers not to take this self-help action because it would: (i) negatively impact the schoolchildren served by MEI during the pendency of the school year; and (ii) it would eliminate the going concern value of MEI, which would displace many teachers and other employees in addition to the students.

79.   Moreover, MEI's operations would likely have already been closed and its cash flow extinguished, but for Tatonka's repeated cooperation as MEI's senior secured lender.

80.   Tatonka wants the schools to continue to provide quality education to the students, while operating under a stable, fiscally responsible business model

that will allow the debt to Tatonka to be repaid.   At present, MEI's financial condition is unstable and untenable.   MEI has not recently provided Tatonka information from which Tatonka could determine an accurate financial picture with certainty, but MEI is clearly not paying many of its debts as they come due.

81.   It is apparent that the Collateral (which is essentially all of the assets of MEI) has been mismanaged, resulting in injury to, and waste of, the Collateral. In order for the Collateral to remain viable and sustain its value and to prevent potential harm to the schoolchildren, parents, teachers, and employees, a receiver is necessary to manage the schools which comprise most of the Collateral. Additionally, a receiver is needed to market the Collateral for a potential sale or sales to maximize the value of the Collateral as a going concern.   Without a receiver to oversee the Collateral, MEI's financial inability to fulfill its responsibilities will continue to negatively impact the viability of the schools and the value of the Collateral to the detriment of Tatonka and others.   The full extent of the problems will likely not be discovered until the receiver is granted full access to the Collateral.

82.   Without a receiver to manage the Collateral, Tatonka will continue to suffer substantial damages as the Collateral will decline in value.

83.   The Collateral has earnings potential, but a receiver is necessary to stop the further deterioration of the value of the Collateral and to turn around MEI's financial condition.

84.   The highest and best value of the Collateral appears to be as a going concern.

85.   MEI was, is, and remains unable to cure the substantial and continuing Defaults to Tatonka and others.

86.   A few other creditors either have or are in the process of obtaining substantial judgments by default against MEI and some of its Subsidiaries.  MEI is generally not even appearing, let alone defending, these lawsuits.  *Evidentiary Submission*, Ex. 84-86.

87.   Accordingly, it is imperative that the receiver have authority and control of all of the aspects of the Collateral in order to fully preserve the going concern value of the schools and the Collateral, and Tatonka's rights under the Loan Documents, all with due regard to the rights of creditors, students, parents, teachers, and the school boards.

## COUNT ONE - BREACH OF CONTRACT

88.   Tatonka incorporates and realleges the preceding paragraphs as if fully set forth herein.

89.   The Defendants are in default on their obligations to Tatonka to pay in full all amounts due and owing under the Loan Documents, including interest, attorneys' fees and costs, and all other charges thereunder.

90.   The Defendants have further failed to comply with certain financial covenants as required under the terms of the Loan Documents.

91.   The Outstanding Indebtedness remains due and owing.

**WHEREFORE,** Tatonka demands judgment against the Defendants for the Outstanding Indebtedness and costs, as well as such other, further, and different relief to which Tatonka may be entitled and is just and proper in this action.

## COUNT TWO: APPOINTMENT OF RECEIVER IN EQUITY

92.   Tatonka incorporates and realleges all preceding paragraphs as if fully set forth herein.

93.   In addition to Tatonka's express contractual right to the appointment of a receiver at law, there are additional equitable considerations which support the appointment of a receiver in equity to manage and operate the Collateral.  In light of the Defendants' ongoing payment default, it is clear that the Defendants do not have sufficient funds to pay the amounts due and owing under the Notes. Accordingly, if the Collateral is not preserved, Tatonka and all other creditors of the Defendants will be left with no adequate legal remedy to redress the harm arising from the Defendants' breach of the Loan Documents.  The potential harm

to Tatonka, as well as the schools, students and MEI's other creditors, outweighs any conceivable harm to the Defendants.

94.    In addition, MEI's inability to pay its debts as they come due at some point will harm quality of education at the charter schools.  The Court needs to supervise the charter schools through the appointment of a receiver in equity to ensure that education standards continue unabated and perhaps even advanced through the appointment of a receiver.

95.    Tatonka offers to do equity.

96.    In the event Tatonka is not entitled to the appointment of a receiver as a legal remedy, then Tatonka would have no adequate remedy at law.

**WHEREFORE**, Tatonka demands judgment against the Defendants for the appointment of a receiver in equity, under terms substantially similar to those in the proposed order attached to the Motion for Receiver filed contemporaneously herewith, as well as such other, further, and different relief to which Tatonka may be entitled and is just and proper in this action.

## COUNT THREE: APPOINTMENT OF A RECEIVER AT LAW

97.    Tatonka incorporates and realleges all preceding paragraphs as if fully set forth herein.

98.   In addition to Tatonka's right to have a receiver appointed as a matter of equity, Tatonka has the right to the appointment of a receiver at law through its contractual rights. *Evidentiary Submission*, Ex. 2, 16, 20, and 34.

99.   The Defendants are in default on its obligations under the Loan Documents and multiple Events of Default (as defined in the Loan Documents) exists.  Thus, Tatonka is contractually entitled to the immediate appointment of a receiver.

**WHEREFORE**, Tatonka demands judgment against the Defendants for the appointment of a receiver at law, under terms substantially similar to those in the proposed order attached to the Motion for Receiver filed contemporaneously herewith, as well as such other, further, and different relief to which Tatonka may be entitled and is just and proper in this action.

s/Graham H. Stieglitz
Graham H. Stieglitz
Georgia  Bar No. 682047

Attorney for Plaintiff
TATONKA CAPITAL
CORPORATION

OF COUNSEL:

BURR & FORMAN LLP
171 Seventeenth Street, N.W., Suite 1100
Atlanta, Georgia  30363
(404) 815-3000
Email:  gstiegli@burr.com

21538305 v10                                    33

**DEFENDANTS' ADDRESSES:**

Mosaica Education, Inc.
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

Michigan Educational Facilities, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

ASI Texas, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

EFA Company, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

Lorain-Leavitt Properties, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

Warren-Elm Facilities, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

Columbus-Morse Properties, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092


*With a courtesy copy via email to:*

William F. Gray, Jr.
Allison Bauer
Counsel for MEI
Torys, LLP
1114 Avenue of the Americas
23rd Floor
New York, NY 10036-7703
(212) 880-6336
Email:  wgray@torys.com
            abauer@torys.com