# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **TATONKA CAPITAL CORPORATION, a Colorado corporation,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | |
| **MOSAICA EDUCATION, INC., a Delaware corporation; MICHIGAN EDUCATIONAL FACILITIES, LLC, a Delaware limited liability company; ASI TEXAS, LLC, a Delaware limited liability company; EFA COMPANY, LLC, a Michigan limited liability company; LORAIN-LEAVITT PROPERTIES, LLC, a Georgia limited liability company; WARREN-ELM FACILITIES, LLC, a Georgia limited liability company; and COLUMBUS-MORSE PROPERTIES, LLC, a Georgia limited liability company,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **CIVIL ACTION NO.** _____ |
| **Defendants.** | ) ) | |

## MOTION FOR APPOINTMENT OF RECEIVER

**COMES NOW** plaintiff Tatonka Capital Corporation, a Colorado corporation ("Tatonka"),[1] and pursuant to Rule 66 of the Federal Rules of Civil Procedure, moves this Court (this "Motion") for entry of an order substantially in the form of the proposed order attached hereto as **Exhibit 1** (the "Proposed

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Complaint.

Order"), appointing Katie S. Goodman and GGG Partners, LLC, as receiver over defendants Mosaica Education, Inc., a Delaware corporation ("MEI"), and the wholly-owned subsidiaries of MEI as follows:  Michigan Educational Facilities, LLC, a Delaware limited liability company, ASI Texas, LLC, a Delaware limited liability company, EFA Company, LLC, a Michigan limited liability company, Lorain-Leavitt Properties, LLC, a Georgia limited liability company, Warren-Elm Facilities, LLC, a Georgia limited liability company, and Columbus-Morse Properties, LLC, a Georgia limited liability company (collectively, the "Subsidiaries," and along with MEI, the "Defendants" or "Companies").

In support of this Motion, Tatonka relies on its Complaint in this action, the *Brief in Support of Motion for Appointment of Receiver* (the "Brief"), and *Tatonka's Submission of Documentary Evidence* (the "Evidentiary Submission"), all filed contemporaneously herewith; the Affidavit of Tatonka principal Carol S. Hansen in support of the Proposed Receiver (the "Hansen Affidavit in Support of Proposed Receiver"), attached as **Exhibit 2**; and the Affidavit of the Proposed Receiver (the "Receiver Affidavit"), attached as **Exhibit 3.**  In support thereof, Tatonka shows unto the Court as follows:

## SUMMARY OF CASE

Mosaica ("MEI") operates charter schools in multiple states with more than 10,000 students actively enrolled in American classroom schools. MEI is in substantial default on its now matured approximately $20 million of indebtedness to its primary lender Tatonka. Tatonka holds a first lien on substantially all of MEI's operating assets. MEI is also in default on other financial obligations. Tatonka could foreclose, but foreclosure would adversely affect thousands of schoolchildren, teachers, others, and the going concern value of the business.

Tatonka has chosen to seek the appointment of a receiver in order to keep the schools operating without shutting down, even for a day. This is one of Tatonka's express contractual remedies. This permits MEI's most valuable assets, its teachers, to continue to work without interruption. Meanwhile, MEI's finances can be restructured and the schools can continue to operate throughout that period and thereafter.

## RELIEF REQUESTED

1.     In this Motion, Tatonka seeks either of two alternative remedies: the entry of the attached order appointing a receiver with broad powers to run the Companies' business and eventually sell or restructure the business as a going concern.

## STATEMENT OF FACTS

2.     The Statement of Facts contained herein is substantially similar to the Statement of Facts in the Complaint, which are verified by the Hansen Affidavit in Support of Proposed Receiver attached hereto.

## I.  MEI'S EDUCATION MODEL

3.     MEI was founded in 1997 as a response to the growing desire for alternatives to traditional public education.  After opening the first elementary school in September of 1997, MEI continued to grow its educational institutions and services.  In 2001, MEI acquired Advantage Schools, Inc., increasing its schools to sixteen.  This growth continued as the organization began the development of independent charter schools throughout the United States.  As a part of its business and mission, MEI works with local governmental entities, community groups, and nonprofit organizations to integrate its educational program within a diversity of localized needs.

4.     Today, MEI manages K-12 schools and provides education services both domestically and internationally.  At present, MEI manages over thirty preschool, elementary, middle, and high school programs in the United States. MEI's website states that, as of February 2014, it served approximately 25,000 students in these jurisdictions and through their online programs.  More than

10,000 of these students attend classroom schools in the United States.   The services offered by MEI include, but are not limited to:

- Whole school management services;
- Whole school operations;
- Consulting and training services for underperforming schools;
- Online courses and virtual schools; and
- Comprehensive curriculum design, support, development and licensing

5.   As an important part of its curriculum services, MEI developed its Paragon© curriculum.   MEI asserts that this curriculum provides a hands-on approach seeking to tailor the curriculum to students' varied intelligences and learning styles, is aligned to national and state education standards, and is research-based and classroom-tested with fifteen years of success.   Paragon© is web-based and utilizes the strengths of interactive whiteboard technology.   It also provides overviews and comprehensive support materials for teachers.   It helps connect students in various jurisdictions across the curriculum.

6.   MEI typically operates by either: (i) creating management contracts with new charter schools in academic emergency areas, or (ii) taking over the management of failing schools.   In the case of failing schools, typically students are behind standard grade level.   Performance varies greatly, but MEI claims that it

generally raises the education level of students about 1.5 years for every 1.0 years of instruction.

## II.    MEI'S BUSINESS OPERATIONS

7.    MEI has contracts to operate and manage charter schools (and is actively running these charter schools) in several states, including, but not limited to, Ohio, Michigan, Pennsylvania, and Arizona.   These schools are owned by corporations or other non-profit organizations qualified under Section 501(c)(3) of the Internal Revenue Code, and usually have their own board of directors.   These non-profit organizations contract with MEI to operate and manage the schools.

8.    MEI's business is operated out of offices located in Atlanta, Georgia.

9.    The leadership personnel for each school operated by MEI reports to MEI personnel in metropolitan Atlanta.

10.    The founders Gene and Dawn Eidelman, two of MEI's three principals who hold the majority interest of the common stock in MEI, reside and work in the Atlanta metropolitan area.   CEO, Mike Connelly, the third principal holds a minority interest and resides and works in New York City.  Mike Connelly, Dawn Eidelman, and John Murphy constitute the Board of MEI.   Murphy also resides in New York, but other than being a board member, he plays no active role in MEI.

11.    MEI and all of its American subsidiaries each formally assert that their headquarters are in New York.  The majority of MEI's employees who are not affiliated with a particular school live and work in Georgia, while about seven employees live and work in New York.  MEI currently operates no schools in New York or Georgia.

12.    Gene Eidelman, the President and interim Chief Financial Officer of MEI is based out of Georgia.   In addition, the educational leadership of MEI operates from its Georgia offices.

13.    The Subsidiaries do not operate schools or any active business.  Rather, they hold real estate that was obtained for the purpose of operating a school.  These real estate holdings are the sites for the charter schools managed by MEI, although some of the real estate is presently vacant.

14.    MEI also operates multiple online schools in various states.  Since their inception, the online schools have operated with fewer students than anticipated.

15.    The Paragon© curriculum is unique to MEI and distinguishes MEI from other non-traditional school choices.  Paragon© tends to attract capital and operating contracts.

16.    MEI operates schools in other countries through separate legal entities.  Tatonka has elected in this action not to sue MEI's subsidiaries organized in other countries due to cross-border concerns.

### III.   MEI'S RECENT FINANCIAL DISTRESS

17.    MEI has long been in substantial financial and covenant default to Tatonka.   MEI has not made a regularly scheduled payment to Tatonka since July 2013.  As shown below, MEI's finances have recently worsened.

18.    Over the last few years MEI invested heavily in an online school. MEI's online school has relatively few students, far less than the amount anticipated.   The online school has operated at a net loss of approximately a million dollars a year for a multiple years.

19.    With regard to its real estate assets, MEI has vacant properties and unimproved land generating no income.  MEI has made few attempts to monetize these assets and has allowed listings for these real estate assets to expire.

20.    MEI opened and operated several schools in Abu Dhabi and Qatar for more than five years before shutting down the schools.  Notwithstanding these closures, MEI maintained staff at these sites for approximately one year after closing, which resulted in an additional $500,000 cash drain.

21.     MEI also opened schools in Arizona.  Due to declining enrollment, one of the schools could not make its rental and management fee payments to MEI. As a result, MEI defaulted on its lease and loan obligations to its lender and the lender eventually foreclosed on the property and evicted the school.  Prior to foreclosure, MEI advanced additional funds to the school, resulting in a multi-million dollar receivable from the school which is uncollectable at this time. Despite the enrollment concerns, MEI also made the decision to lease new property for the school, resulting in further financial losses.

22.     One of MEI's more recent business mistakes comes from MEI's decisions regarding a school in Muskegon Heights, Michigan.  The first year MEI managed the school it maintained an enrollment of 1200 students.  After that year, enrollment declined to 800 students, a decline of thirty percent.  At that time, MEI unwisely chose to advance additional funds to the school, even though the school's financial situation was such that MEI had not even been paid its management fee. This was a significant cash drain on MEI that exacerbated an already bad financial situation and caused a $2 million write off.

23.     MEI has made a series of bad business decisions.  Its major problem is that it makes investments into failing operations, throwing good money at bad situations.   In addition to Arizona and Muskegon Heights investments, MEI has

repeatedly invested in a new curriculum development project and its online school despite the negative cash flow created by those enterprises.  MEI is unwilling or unable to make the necessary changes to operate as a profitable business.  This continuous failure has immediate consequences.

24.     In August 2014, Tatonka setoff approximately $300,000 of MEI's money to pay debts owing to Tatonka.  This decision to setoff was made after numerous conversations between Tatonka and MEI.

25.     A few other creditors either have or are in the process of obtaining substantial judgments by default against MEI and some of its Subsidiaries.  MEI is generally not even appearing, let alone defending, these lawsuits.

26.     MEI's financial distress is becoming widely known to at least the school boards, school administrators, teachers, and creditors.

27.     MEI's constituencies need to be assured that the schools will be open for the near term and long term.

28.     MEI has in excess of $86 million in net operating losses over its years of operation.

## IV.   MEI'S FINANCIAL OBLIGATIONS TO TATONKA

29.     Tatonka has had a longstanding financial relationship with MEI and its subsidiaries.  Tatonka has financed MEI for more than ten years.  During this

time, Tatonka, as MEI's senior secured lender, has obtained a senior perfected security interest in almost all of MEI's assets, including its Paragon© curriculum (collectively, the "<u>Collateral</u>"), as described in great detail in the Complaint and in the authenticated documents included in the Evidentiary Submission.

30.    The Loans are all cross defaulted and cross secured.

## V.    <u>MEI'S DEFAULTS</u>

31.    Tatonka and MEI executed an instrument entitled Agreement and Acknowledgement dated as of September 23, 2013 (the "<u>Forbearance Agreement</u>"), whereby MEI acknowledged that it was then in default with respect to the Loan Documents and Tatonka agreed to forbear temporarily from exercising its rights and remedies under the Loan Documents, with respect to certain specified defaults MEI during a time period that would end no later than December 5, 2013 (the "<u>Forbearance Termination Date</u>"). *Evidentiary Submission*, Ex. 83.

32.    The maturity date for each of the Loan Documents was on or prior to July 1, 2014 (the "<u>Loan Maturity Date</u>"). *Evidentiary Submission*, Exs. 2, 16, 20, and 34.

33.    Both the Forbearance Termination Date and the Loan Maturity Date have passed and MEI remains in continuing and substantial default in several regards with respect to the Loan Documents.  First, MEI failed to pay the amounts

owing under the Loan Documents when due.  Second, MEI failed to comply with certain reporting requirements under Loan Documents.  Third, MEI failed to allow Tatonka to examine its books and records, as is required under various provisions of the Loan Documents.  Fourth, MEI failed to honor certain financial covenants as required under the Loan Documents.  All of these failures constitute events of default, as defined in the Loan Documents (the "Defaults").

34.    Specifically, in addition to payment default, the Defaults under the Revolver Loan Agreement include, but are not limited to, the following covenant defaults:

(i)     cross default with other obligations owed to Tatonka under Section 9.1(d);

(ii)    judgment in excess of $100,000.00 under Section 9.1(h);

(iii)   the failure to deliver audited financial statements within 120 days of year end under Section 5.6(d);

(iv)   the failure to satisfy net income covenant under Section 7.1.1; and

(v)    failure to satisfy EBITDA to Debt Service covenant under Section 7.1.3.

*Evidentiary Submission*, Ex. 16.

35.    In addition to payment default, the Defaults under the 2007 Loan Agreement include, but are not limited to, the following covenant defaults:

(i)     judgment in excess of $100,000.00 under Section 7.1(j);

    (ii)    cross default with other obligations owed to Tatonka under Section 7.1(k);

    (iii)    failure to deliver audited financial statements within 180 days of the year's end under Section 6.8;

    (iv)    failure to satisfy net income covenant set forth in Section 6.13(a), as required in Section 7.1(h).

*Evidentiary Submission*, Ex. 2.

36.    In addition to payment default, the Defaults under the Project Loan Agreement include, but are not limited to, the following covenant defaults:

    (i)    failure to satisfy net income covenant set forth in Section 7.17(a), as required in Section 6.1(h);

    (ii)    failure to satisfy EBITDA to Debt Service covenant under Section 6.1(h);

    (iii)    judgment in excess of $100,000.00 under Section 6.1(j);

    (iv)    cross default with other obligations owed to Tatonka under Section 6.1(l); and

    (v)    failure to deliver audited financial statements within 180 days of the year's end under Section 5.8(h).

*Evidentiary Submission*, Ex. 20.

37.    In addition to payment default, the Defaults under the 2012 Loan Agreement include, but are not limited to, the following covenant default: (i) cross default with other obligations owed to Tatonka under Section 6.1(h).  *Evidentiary Submission*, Ex. 34.

38.    The Defaults are continuing and have not been cured by MEI.

39.    The principal amount outstanding pursuant to the Loan Documents as of August 31, 2014, exclusive of expenses of collection, attorneys' fees and the costs of this action, is $22,119,831.46.  Interest accrues daily at the default rate provided in the Loan Documents.  Attorneys' fees and other costs of collection also continue to accrue.  The principal amounts due, the unpaid interest, attorneys' fees and costs of collection are hereinafter collectively referred to as the "Outstanding Indebtedness."

## VI.    TATONKA'S REMEDIES UNDER THE LOAN DOCUMENTS

40.    Tatonka has had numerous conversations and communications with MEI in an attempt to resolve their differences.  MEI made it clear during these discussions that, despite the maturity of the various loans and Tatonka's requests for payment, it is presently unable to pay the Outstanding Indebtedness.  Those discussions have not resulted in an agreement.

41.    The Defaults entitle Tatonka to exercise other rights and remedies under the Loan Documents, including the right to the appointment of a receiver.

42.    Under the Revolver Loan Agreement, 2007 Loan Agreement, Project Loan Agreement, and 2012 Loan Agreement, MEI expressly and unequivocally agreed to the appointment of a receiver upon default, without prior notice.  Each of

these agreements contain language authorizing the appointment of a receiver. For example, Section 6.2 of the Project Loan Agreement provides that:

> Tatonka at its election may (but shall not be obligated to), without notice, do any one or more of the following:
>
> …
>
> (d)   exercise any and all rights and remedies afforded by this Agreement or any Facility Loan Documents, or under law, equity or otherwise, including obtaining appointment of a receiver.

Substantially similar language is used in the Revolver Loan Agreement, 2007 Loan Agreement, Project Loan Agreement, and 2012 Loan Agreement, each of which support the appointment of a receiver in this case.

43.   As stated above, MEI is in substantial and continuing payment and covenant default to its senior secured lender Tatonka for the Outstanding Indebtedness.

## VII.   THE NEED FOR A RECEIVER

44.   Tatonka has the right under the Loan Documents and applicable law to take possession of the Collateral (all assets of MEI) and effectively close MEI's operations.   However, Tatonka prefers not to take this self-help action because it would: (i) negatively impact the schoolchildren served by MEI during the pendency of the school year; and (ii) it would eliminate the going concern value of

MEI, which would displace many teachers and other employees in addition to the students.

45.     MEI's operations and cash flow would likely have already been closed, but for Tatonka's repeated cooperation as MEI's senior secured lender.

46.     Tatonka wants the schools to continue to provide quality education to the students, while operating under a stable, fiscally responsible business model that will allow the debt to Tatonka to be repaid.   At present, MEI's financial condition is unstable and untenable.   MEI has not recently provided Tatonka information from which Tatonka could determine an accurate financial picture with certainty, but MEI is clearly not paying many of its debts as they come due.

47.     The Collateral (which is essentially all of the assets of MEI) has been mismanaged, resulting in injury to, and waste of, the Collateral.   In order for the Collateral to remain viable and sustain its value and to prevent potential harm to the schoolchildren, parents, teachers, and employees, a receiver is necessary to manage the schools which comprise most of the Collateral.

48.     Additionally, a receiver is needed to market the Collateral for a potential sale or sales to maximize the value of the Collateral as a going concern. Without a receiver to oversee the Collateral, MEI's financial inability to fulfill its responsibilities will continue to negatively impact the viability of the schools and

the value of the Collateral to the detriment of Tatonka and others.  The full extent of the problems will likely not be discovered until the receiver is granted full access to the Collateral.

49.   Without a receiver to manage the Collateral, Tatonka will continue to suffer substantial damages as the Collateral will decline in value.

50.   The Collateral has earnings potential, but a receiver is necessary to stop the further deterioration of the value of the Collateral and to turn around MEI's financial condition.

51.   The highest and best value for most of the Collateral appears to be as a going concern.

52.   MEI was, is, and remains unable to cure the substantial and continuing Defaults to Tatonka and others.

53.   Accordingly, it is imperative that the receiver have authority and control of all of the aspects of the Collateral in order to fully preserve the going concern value of the schools and the Collateral, and Tatonka's rights under the Loan Documents, all with due regard to the rights of creditors, students, parents, teachers, and the school boards.

## ARGUMENT

54.    The  argument  is  included  in  the  Brief  filed  contemporaneously herewith.

## THE PROPOSED RECEIVER

55.    Katie  S.  Goodman  ("Goodman")  is  a  managing  partner  of  GGG Partners, LLC ("GGG," and together with Goodman, the "Proposed Receiver"), a firm  specializing  in  providing  turnaround,  crisis  management,  and  restructuring services  for  public  and  private  companies,  lenders,  equity  holders,  and  impartial constituents (such as examiners or trustees), which maintains its principal offices at 5883 Glenridge Drive NE, Suite #160, Atlanta, GA 30328.

56.    GGG  has  worked  in  the  turnaround,  crisis  management,  and restructuring industry for over 50 years.  Over this time it has worked in  many industries and with many companies.  The firm and its partners act as restructuring advisor, liquidation advisor, receiver, and assignee.

57.    Goodman  has  more  than  12  years  of  experience  in  the  practice  of turnarounds and restructuring.  She has worked with GGG since 2001 and acts as Receiver, Assignee in general assignments for the benefit of creditors, and Chief Restructuring  Officer  ("CRO")  in  matters  filed  under  Chapter  11  of  the  United States Bankruptcy Code ("Chapter 11").

58.   Goodman has worked in, and is familiar with, the field of K-12 education, as well as post-secondary education.   She has served as financial advisor to schools in Colorado, Florida, and Georgia.   In addition, members of her firm served as the Director of Reorganization and Interim CFO of Life University in Marietta, GA, and following restructuring served as the Interim Director of Marketing and Interim CTO.

59.   Goodman has worked as a receiver in a number of matters including, by way of example, TOC, Inc. (a minority engineering firm for federal, state, and minority contracts), Wise Media, Inc. (FTC receivership for phone slamming), and Stonewall Packaging, Inc. (corrugated box facility).

60.   Goodman has also acted as an assignee in general assignments for the benefit of creditors in Florida, Georgia, Alabama, Tennessee, and Louisiana.   The companies involved in these actions include Supersonic Services (FL, defense contractor), Optim Products (FL, wholesale supply), Todd Duncan Group (publishing), GARCO (GA, office furniture), Progressive Turn (GA, fertilizer), and BulldogIT (hospital software).

61.   Goodman has also been retained to work with over 50 companies in Chapter 11 bankruptcies.   Most recently, in August 2013, she was appointed CRO of Designline, Inc., and Designline, USA LLC, an electric bus manufacturer that

filed Chapter 11 bankruptcy in the state of Delaware (and later transferred to North Carolina).   She ran a skeletal operating crew and sold the business under Section 363 of the Bankruptcy Code in November 2013.

62.   In February 2012, Goodman was appointed CRO of the Cliffs Golf and Country Clubs ("The Cliffs"), a group of seven luxury golf courses based in North and South Carolina that filed for Chapter 11 bankruptcy protection.  She ran the companies and auctioned the rights to act as a plan sponsor.   The Cliffs successfully reorganized under a plan and emerged from Chapter 11 bankruptcy in August 2012.

63.   In May 2013, Goodman was appointed Chapter 11 trustee of Trendset, Inc., a freight bill and audit company based in Greenville, SC where $68 million of customer funds was missing.  She stabilized, ran, and sold the company six (6) weeks after her appointment and continues to work on a settlement with former owners and officers.

64.   GGG will bill its standard hourly rates to act as the Receiver in the above captioned matter.  These rates are $350 per hour for Managing Partner and $275 to $325 per hour for Partner.   The compensation is consistent with, and typical of, arrangements entered into by GGG.

65.    GGG will also charge for its direct expenses incurred. These expenses and charges include normal and customary expenses such as car rental/mileage, airfare, and hotel.   GGG will not charge incidental expenses.

66.    To the best of Goodman's knowledge, except as disclosed in the Receiver Affidavit, and based solely upon information publicly available, neither GGG, Goodman, nor any employee of GGG, has any connection with MEI or Tatonka, any of their affiliates, subsidiaries, officers, or shareholders, nor to the best of Goodman and GGG's knowledge at this time, any of their creditors or any other party in interest herein.  To the best of Goodman and GGG's knowledge and except as disclosed herein, neither GGG, Goodman, nor any employees of GGG, represent any interest adverse to MEI or Tatonka.  To the extent GGG or Goodman discover any such relationship, GGG or Goodman will make appropriate disclosures to the Court and other parties of interest in a supplemental affidavit.

67.    GGG has received no retainer from any party in relation to its potential retention as Receiver in this matter.

**WHEREFORE**, premises considered, Tatonka requests that the Court enter an order substantially in the form of the Proposed Order attached hereto as **Exhibit 1**, which, among other things, appoints Katie S. Goodman and GGG Partners, LLC to manage Collateral and to take possession and comprehensive control of the

business and related assets of MEI and the Subsidiaries, pending a final resolution of this action.

Dated this the 19th day of September, 2014.

s/Graham H. Stieglitz
Graham H. Stieglitz
Georgia  Bar No. 682047

Attorney for Plaintiff
TATONKA CAPITAL
CORPORATION

OF COUNSEL:

BURR & FORMAN LLP
171 Seventeenth Street, N.W., Suite 1100
Atlanta, Georgia  30363
(404) 815-3000
Email:  gstiegli@burr.com

A copy of this Motion is to be served along with a copy of the Summons and Complaint, the Brief, the Evidentiary Submission, and Tatonka's *Motion for Expedited Hearing of Motion for Appointment of Receiver* via personal service on the defendants:

Mosaica Education, Inc.
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

Michigan Educational Facilities, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

ASI Texas, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

EFA Company, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

Lorain-Leavitt Properties, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

Warren-Elm Facilities, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

Columbus-Morse Properties, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

*With a courtesy copy via email to:*

William F. Gray, Jr.
Allison Bauer
Counsel for MEI
Torys, LLP
1114 Avenue of the Americas
23rd Floor
New York, NY 10036-7703
(212) 880-6336
Email:  wgray@torys.com
        abauer@torys.com