IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| TATONKA CAPITAL CORPORATION, a Colorado corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| MOSAICA EDUCATION, INC., a Delaware corporation; MICHIGAN EDUCATIONAL FACILITIES, LLC, a Delaware limited liability company; ASI TEXAS, LLC, a Delaware limited liability company; EFA COMPANY, LLC, a Michigan limited liability company; LORAIN-LEAVITT PROPERTIES, LLC, a Georgia limited liability company; WARREN-ELM FACILITIES, LLC, a Georgia limited liability company; and COLUMBUS-MORSE PROPERTIES, LLC, a Georgia limited liability company, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO. _____ |
| Defendants. | ) ) | |

## AFFIDAVIT OF CAROL S. HANSEN

STATE OF COLORADO      )

COUNTY OF DENVER      )

    **Carol S. Hansen**, being duly sworn, deposes and states as follows:

1.     I am Carol S. Hansen, Chief Executive Officer of Tatonka Capital Corporation, a Colorado corporation ("Tatonka").  I am over the age of twenty-one (21) years and competent to testify to the matters contained herein.

2.     I am one of the persons who has custody and control of Tatonka's business records related to Tatonka's relationship with Mosaica Education, Inc. ("MEI").  These records were made at or near the time of the events recorded by a person with knowledge of the events and charged with the responsibility for recording such events.  These records are kept in the ordinary course of Tatonka's regularly conducted business activity, which is Tatonka's customary practice.  I have reviewed Tatonka's file on this matter, which leads me to the summary which is set forth below.  All facts set forth herein are either (a) facts of which I have personal knowledge, (b) an accurate summary of Tatonka's business records as set forth above, or (c) statements made by senior principals of MEI.

3.     I have contemporaneously executed another affidavit in this case which is to be filed with *Tatonka's Submission of Documentary Evidence* (the "Evidentiary Submission").    That affidavit is intended to authenticate the transaction documents filed therewith.  Capitalized terms not defined herein are defined in my other affidavit filed with the Evidentiary Submission. This affidavit addresses other facts that generally relate to MEI's non-payment to Tatonka of

21517470 v3

amounts due and its substantial and continuing defaults under the terms of the loan documents between the parties.

## I. MEI'S EDUCATION MODEL

4.      MEI was founded in 1997 as a response to the growing desire for alternatives to traditional public education.  After opening the first elementary school in September of 1997, MEI continued to grow its educational institutions and services.  In 2001, MEI acquired Advantage Schools, Inc., increasing its schools to sixteen.  This growth continued as the organization began the development of independent charter schools throughout the United States.  As a part of its business and mission, MEI works with local governmental entities, community groups, and nonprofit organizations to integrate its educational program within a diversity of localized needs.

5.      Today, MEI manages K-12 schools and provides education services both domestically and internationally.  At present, MEI manages over thirty preschool, elementary, middle, and high school programs in the United States. MEI's website states that, as of February 2014, it served approximately 25,000 students in these jurisdictions and through their online programs.  More than 10,000 of these students attend classroom schools in the United States.  The services offered by MEI include, but are not limited to:

21517470 v3

- Whole school management services;
- Whole school operations;
- Consulting and training services for underperforming schools;
- Online courses and virtual schools; and
- Comprehensive curriculum design, support, development and licensing

6.     As an important part of its curriculum services, MEI developed its Paragon© curriculum.    MEI asserts that this curriculum provides a hands-on approach seeking to tailor the curriculum to students' varied intelligences and learning styles, is aligned to national and state education standards, and is research-based and classroom-tested with fifteen years of success.   Paragon© is web-based and utilizes the strengths of interactive whiteboard technology.   It also provides overviews and comprehensive support materials for teachers.   It helps connect students in various jurisdictions across the curriculum.

7.     MEI typically operates by either: (i) creating management contracts with new charter schools in academic emergency areas, or (ii) taking over the management of failing schools.   In the case of failing schools, typically students are behind standard grade level.   Performance varies greatly, but MEI claims that it generally raises the education level of students about 1.5 years for every 1.0 years of instruction.

4

## II.   MEI'S BUSINESS OPERATIONS

8.     MEI has contracts to operate and manage charter schools (and is actively running these charter schools) in several states, including, but not limited to, Ohio, Michigan, Pennsylvania, and Arizona.   These schools are owned by corporations or other non-profit organizations qualified under Section 501(c)(3) of the Internal Revenue Code, and usually have their own board of directors.   These non-profit organizations contract with MEI to operate and manage the schools.

9.     MEI's business is operated out of offices located in Atlanta, Georgia.

10.    The leadership personnel for each school operated by MEI reports to MEI personnel in metropolitan Atlanta.

11.    The founders Gene and Dawn Eidelman, two of MEI's three principals who hold the majority interest of the common stock in MEI, reside and work in the Atlanta metropolitan area.   CEO, Mike Connelly, the third principal holds a minority interest and resides and works in New York City.   Mike Connelly, Dawn Eidelman, and John Murphy constitute the Board of MEI.   Murphy also resides in New York, but other than being a board member, he plays no active role in MEI.

12.    MEI and all of its American subsidiaries each formally assert that their headquarters are in New York.   The majority of MEI's employees who are not

5

affiliated with a particular school live and work in Georgia, while about seven employees live and work in New York. MEI currently operates no schools in New York or Georgia.

13.     Gene Eidelman, the President and interim Chief Financial Officer of MEI is based out of Georgia. In addition, the educational leadership of MEI operates from its Georgia offices.

14.     The Subsidiaries do not operate schools or any active business. Rather, they hold real estate that was obtained for the purpose of operating a school. These real estate holdings are the sites for the charter schools managed by MEI, although some of the real estate is presently vacant.

15.     MEI also operates multiple online schools in various states. Since their inception, the online schools have operated with fewer students than anticipated.

16.     The Paragon© curriculum is unique to MEI and distinguishes MEI from other non-traditional school choices. Paragon© tends to attract capital and operating contracts.

17.     MEI operates schools in other countries through separate legal entities. Tatonka has elected in this action not to sue MEI's subsidiaries organized in other countries due to cross-border concerns.

6

### III.   MEI'S RECENT FINANCIAL DISTRESS

18.    MEI has long been in substantial financial and covenant default to Tatonka.   MEI has not made a regularly scheduled payment to Tatonka since July 2013.  As shown below, MEI's finances have recently worsened.

19.    Over the last few years MEI invested heavily in an online school. MEI's online school has relatively few students, far less than the amount anticipated.   The online school has operated at a net loss of approximately a million dollars a year for multiple years.

20.    With regard to its real estate assets, MEI has vacant properties and unimproved land generating no income.  MEI has made few attempts to monetize these assets and has allowed listings for these real estate assets to expire.

21.    MEI opened and operated several schools in Abu Dhabi and Qatar for more than five years before shutting down the schools.   Notwithstanding these closures, MEI maintained staff at these sites for approximately one year after closing, which resulted in an additional $500,000 cash drain.

22.    MEI also opened schools in Arizona.  Due to a few years of declining enrollment, one of the schools could not make its rental and management fee payments to MEI.  As a result, MEI defaulted on its loan obligations to its lender and the lender eventually foreclosed on the property and evicted the school.  Prior

7

to foreclosure, MEI advanced additional funds to the school, resulting in a multi-million dollar receivable from the school which is uncollectable at this time. MEI also made the decision to lease new property for the school with a reduced enrollment base from the prior location, resulting in further financial losses.

23.    One of MEI's more recent business mistakes comes from MEI's decisions regarding a school in Muskegon Heights, Michigan. The first year MEI managed the school it maintained an enrollment of 1200 students. After that year, enrollment declined to 800 students, a decline of over thirty percent. At that time, MEI unwisely chose to advance additional funds to the school, even though the school's financial situation was such that MEI had not even been paid its management fee. This was a significant cash drain on MEI that exacerbated an already bad financial situation and caused a $2 million write off.

24.    MEI has made a series of bad business decisions. Its major problem is that it makes investments into failing operations, throwing good money at bad situations. In addition to Arizona and Muskegon Heights investments, MEI has repeatedly invested in a new curriculum development project and its online school despite the negative cash flow created by those enterprises. MEI is unwilling or unable to make the necessary changes to operate as a profitable business. This continuous failure has immediate consequences.

21517470 v3

25.    During MEI's fiscal year 2014, Tatonka waited while MEI was supposed to implement various cost saving and revenue growing projects.  Despite this effort, MEI failed to successfully execute on these opportunities.

26.    In August 2014, Tatonka setoff approximately $300,000 of MEI's money to pay debts owing to Tatonka.  This decision to setoff was made after numerous conversations between Tatonka and MEI.

27.    I am informed and believe that a few other creditors either have or are in the process of obtaining substantial judgments by default against MEI and some of its Subsidiaries.  MEI is generally not even appearing, let alone defending, these lawsuits.

28.    I am informed and believe that MEI's financial distress is becoming widely known to at least the school boards, school administrators, teachers, and creditors.

29.    MEI's constituencies need to be assured that the schools will be open for the near term and long term.

30.    MEI has in excess of $86 million in net operating losses over its years of operation.

21517470 v3

## IV.   MEI'S FINANCIAL OBLIGATIONS TO TATONKA

### A.   The Loans

31.   Tatonka has had a longstanding financial relationship with MEI and its subsidiaries.  Tatonka has financed MEI for more than ten years.  Tatonka has complied with its obligations under the Loan Documents.  During this time, Tatonka, as MEI's senior secured lender, has obtained a senior perfected security interest in almost all of MEI's assets, including its Paragon© curriculum (collectively, the "Collateral"), as described in further detail below in the authenticated documents including with the Evidentiary Submission.

## V.   MEI'S DEFAULTS

32.   As the various loan agreements related to the Loans were executed, MEI and Tatonka entered into provisions to ensure that the Loan Documents contained provisions related to cross default with other obligations owed to Tatonka.  The Collateral is also cross secured.

33.   Tatonka and MEI executed an instrument entitled Agreement and Acknowledgement dated as of September 23, 2013 (the "Forbearance Agreement"), whereby MEI acknowledged that it was then in default with respect to the Loan Documents and Tatonka agreed to forbear temporarily from exercising its rights and remedies under the Loan Documents, with respect to certain specified

10

defaults MEI during a time period that would end no later than December 5, 2013 (the "Forbearance Termination Date"). This Forbearance Agreement was the last Forbearance Agreement between the parties. The parties continued to negotiate other agreements, but these negotiations were unsuccessful. *Evidentiary Submission,* Ex. 83.

34.     The maturity date for each of the Loan Documents was on or prior to July 1, 2014 (the "Loan Maturity Date"). *Evidentiary Submission*, Exs. 2, 16, 20, and 34.

35.     Both the Forbearance Termination Date and the Loan Maturity Date have passed and MEI remains in continuing and substantial default in several regards with respect to the Loan Documents. First, MEI failed to pay the amounts owing under the Loan Documents when due. Second, MEI failed to comply with certain reporting requirements under Loan Documents. Third, MEI failed to honor certain financial covenants as required under the Loan Documents. All of these failures constitute events of default, as defined in the Loan Documents (the "Defaults").

36.     Specifically, in addition to payment default, the Defaults under the Revolver Loan Agreement include, but are not limited to, the following covenant defaults:

(i)    cross default with other obligations owed to Tatonka under Section 9.1(d);

(ii)   judgment in excess of $100,000.00 under Section 9.1(h);

(iii)  the failure to deliver audited financial statements within 120 days of year end under Section 5.6(d);

(iv)   the failure to satisfy net income covenant under Section 7.1.1; and

(v)    failure to satisfy EBITDA to Debt Service covenant under Section 7.1.3.

*Evidentiary Submission*, Ex. 16.

37.    In addition to payment default, the Defaults under the 2007 Loan Agreement include, but are not limited to, the following covenant defaults:

(i)    judgment in excess of $100,000.00 under Section 7.1(j);

(ii)   cross default with other obligations owed to Tatonka under Section 7.1(k);

(iii)  failure to deliver audited financial statements within 180 days of the year's end under Section 6.8;

(iv)   failure to satisfy net income covenant set forth in Section 6.13(a), as required in Section 7.1(h).

*Evidentiary Submission*, Ex. 2.

38.    In addition to payment default, the Defaults under the Project Loan Agreement include, but are not limited to, the following covenant defaults:

(i)    failure to satisfy net income covenant set forth in Section 7.17(a), as required in Section 6.1(h);

12

21517470 v3

(ii)   failure to satisfy EBITDA to Debt Service covenant under Section 6.1(h);

(iii)   judgment in excess of $100,000.00 under Section 6.1(j);

(iv)   cross default with other obligations owed to Tatonka under Section 6.1(l); and

(v)   failure to deliver audited financial statements within 180 days of the year's end under Section 5.8(h).

*Evidentiary Submission*, Ex. 20.

39.    In addition to payment default, the Defaults under the 2012 Loan Agreement include, but are not limited to, the following covenant default: (i) cross default with other obligations owed to Tatonka under Section 6.1(h). *Evidentiary Submission*, Ex. 34.

40.    The Defaults are continuing and have not been cured by MEI.

41.    As stated above, the Loans are cross defaulted. Accordingly, each of the above-referenced Defaults constitutes an event of default under the other Loan Documents.

42.    The principal amount outstanding pursuant to the Loan Documents as of August 31, 2014, exclusive of expenses of collection, attorneys' fees, late fees, and the costs of this action, is $19,061,475.44. Interest accrues daily at the default rate provided in the Loan Documents. Attorneys' fees and other costs of collection also continue to accrue. The principal amounts due, the unpaid interest, attorneys'

21517470 v3

fees and costs of collection are hereinafter collectively referred to as the "Outstanding Indebtedness."

## VI.   TATONKA'S REMEDIES UNDER THE LOAN DOCUMENTS

43.    Tatonka has had numerous conversations and communications with MEI in an attempt to resolve their differences.  MEI made it clear during these discussions that, despite the maturity of the various loans and Tatonka's requests for payment, it is presently unwilling to pay the Outstanding Indebtedness.  Those discussions have not resulted in an agreement.

44.    The Defaults entitle Tatonka to exercise other rights and remedies under the Loan Documents, including the right to the appointment of a receiver.

45.    Under the Revolver Loan Agreement, 2007 Loan Agreement, Project Loan Agreement, and 2012 Loan Agreement, MEI expressly and unequivocally agreed to the appointment of a receiver upon default, without prior notice.  Each of these agreements contain language authorizing the appointment of a receiver. For example, Section 6.2 of the Project Loan Agreement provides that:

> Tatonka at its election may (but shall not be obligated to), without notice, do any one or more of the following:
>
> …
>
> (d)    exercise any and all rights and remedies afforded by this Agreement or any Facility Loan Documents, or under law, equity or otherwise, including obtaining appointment of a receiver.

14

Substantially similar language is used in the Revolver Loan Agreement, 2007 Loan Agreement, Project Loan Agreement, and 2012 Loan Agreement, each of which support the appointment of a receiver in this case.

46.    As stated above, MEI is in substantial and continuing payment and covenant default to its senior secured lender Tatonka for the Outstanding Indebtedness.

## VII.  **THE NEED FOR A RECEIVER**

47.    Tatonka has the right under the Loan Documents and applicable law to take possession of the Collateral (all assets of MEI) and effectively cease MEI's operations.  However, Tatonka prefers not to take this self-help action because it would: (i) negatively impact the schoolchildren served by MEI during the pendency of the school year; and (ii) it would eliminate the going concern value of MEI, which would displace many teachers and other employees in addition to the students.

48.    Moreover, MEI's operations would likely have already been closed and its cash flow extinguished, but for Tatonka's repeated cooperation as MEI's senior secured lender.

49.    Tatonka wants the schools to continue to provide quality education to the students, while operating under a stable, fiscally responsible business model

21517470 v3

that will allow the debt to Tatonka to be repaid.   At present, MEI's financial condition is unstable and untenable.   MEI has not recently provided Tatonka information from which Tatonka could determine an accurate financial picture with certainty, but MEI is clearly not paying many of its debts as they come due.

50.   The Collateral (which is essentially all of the assets of MEI) has been mismanaged, resulting in injury to, and waste of, the Collateral.   In order for the Collateral to remain viable and sustain its value and to prevent potential harm to the schoolchildren, parents, teachers, and employees, a receiver is necessary to manage the schools which comprise most of the Collateral.   Additionally, a receiver is needed to market the Collateral for a potential sale or sales to maximize the value of the Collateral as a going concern.   Without a receiver to oversee the Collateral, MEI's financial inability to fulfill its responsibilities will continue to negatively impact the viability of the schools and the value of the Collateral to the detriment of Tatonka and others.   The full extent of the problems will likely not be discovered until the receiver is granted full access to the Collateral.

51.   Without a receiver to manage the Collateral, Tatonka will continue to suffer substantial damages as the Collateral will decline in value.

52.     The Collateral has earnings potential, but a receiver is necessary to stop the further deterioration of the value of the Collateral and to turn around MEI's financial condition.

53.     The highest and best value of the Collateral appears to be as a going concern.

54.     MEI was, is, and remains unwilling to cure the substantial and continuing Defaults to Tatonka and others.

55.     Accordingly, it is imperative that the receiver have authority and control of all of the aspects of the Collateral in order to fully preserve the going concern value of the schools and the Collateral, and Tatonka's rights under the Loan Documents, all with due regard to the rights of creditors, students, parents, teachers, and the school boards.

Carol S. Hansen, Affiant

Subscribed and sworn to before me in the county of

_____Douglas_____, State of Colorado, this _18_

Day of _____September_____, 2014.

_____
(Notary's official signature)
____09 / 01 / 2015____
(Commission Expiration)

My commission expires: 09/01/2015

[Affix notarial seal]

[Notary Seal]
THOMAS C. McLAREN
NOTARY PUBLIC
STATE OF COLORADO
My Commission Expires 09/01/2015

18

21517470 v3