# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| TATONKA CAPITAL CORPORATION, a Colorado corporation,<br><br>                Plaintiff,<br><br>v.<br><br>MOSAICA EDUCATION, INC., a Delaware corporation; MICHIGAN EDUCATIONAL FACILITIES, LLC, a Delaware limited liability company; ASI TEXAS, LLC, a Delaware limited liability company; EFA COMPANY, LLC, a Michigan limited liability company; LORAIN-LEAVITT PROPERTIES, LLC, a Georgia limited liability company; WARREN-ELM FACILITIES, LLC, a Georgia limited liability company; and COLUMBUS-MORSE PROPERTIES, LLC, a Georgia limited liability company,<br><br>                Defendants. | Civil Action File No.: 14-cv-3017 |

## DEFENDANTS' RESPONSE TO MOTION FOR APPOINTMENT OF RECEIVER

Defendants Mosaica Education, Inc., Michigan Educational Facilities, LLC, ASI Texas, LLC, EFA Company, LLC, Lorain-Leavitt Properties, LLC, Warren-Elm Facilities, LLC, and Columbus-Morse Properties, LLC (collectively, "Defendants" or "Mosaica"), by and through their undersigned counsel, hereby respond to the ***Motion for Appointment of Receiver*** as follows:

## I.  <u>INTRODUCTION</u>

Plaintiff Tatonka Capital Corporation ("Tatonka") seeks one of the harshest remedies available under the law.  A receivership is appropriate only under the most extreme circumstances.  It is inappropriate here.  Plaintiff has not shown that its alleged collateral is being fraudulently hidden, transferred, or imminently decreasing in value.  Rather, Plaintiff has simply alleged that Mosaica owes it money.  Further, although Mosaica's assets are not currently decreasing in value, the appointment of a receiver would seriously harm the value of those assets. For these reasons, the Motion for Appointment of Receiver should be denied.

## II.  <u>STATEMENT OF FACTS</u>

Mosaica is an international education services company founded in 1997. (Declaration of M. Connelly, at ¶ 2.)  Mosaica provides a variety of services, including managing and operating entire schools, consulting and training school teachers and administrators, offering online educational coursework and virtual

schooling, and providing curriculum design, support, development and licensing. Mosaica also leases school facilities and finances charter schools. (*Id.* at ¶ 4.) As part of its school management services, Mosaica enters into management agreements with charter schools. Under these agreements, Mosaica provides administrative, human resources, accounting, and educational services. In exchange, charter schools pay Mosaica management fees. (*Id.* at ¶ 5.) Each charter school must be licensed or "chartered" by the appropriate government agency. (*Id.* at ¶ 6.) That agency has broad discretion to revoke charters or place conditions upon charter schools' operations. (*Id.*)

Currently, Mosaica operates approximately 77 preschool, elementary, middle, and high-school programs in the United States, serving approximately 10,000 students. (*Id.* at ¶ 7.) Mosaica also operates six international schools in India and the United Kingdom and provides curriculum services to six additional schools in India. These international schools serve more than 6,000 students. (*Id.* at ¶ 8.) In total, Mosaica has approximately 1,800 employees. (*Id.* at ¶ 11.)

A.    MOSAICA'S RELATIONSHIP WITH TATONKA

In or about 1999, Mosaica began a business relationship with Tatonka. (*Id.* at ¶ 14.) From time to time, Mosaica and Tatonka entered into certain revolving and term loan agreements to provide operating capital for Mosaica (the "Loans").

(*Id.* at ¶ 16.)  Pursuant to the Loans, Mosaica granted Tatonka a security interest in certain of Mosaica's assets, including notes, accounts receivable, and real property. (*Id.* at ¶ 17.)   Over the course of this 15 year relationship, Mosaica has paid Tatonka, on average, approximately $3 million per year in interest and fees, for a total of approximately $25 million.  (*Id.* at ¶ 15.)  Further, Mosaica has made Tatonka aware of all Mosaica's major expenditures and investments, including Mosaica's investments in online and digital initiatives, international schools, and various charter school projects in the United States.  (*Id.* at ¶ 18.)

In April 2014, in response to demands by Tatonka, Mosaica assigned to Tatonka certain notes and accounts receivable from five charter schools (the "Transferred Collateral").  (*Id.* at ¶ 21.)  The Transferred Collateral comprised a substantial portion of the collateral securing the Loans.  The Transferred Collateral has a face value of approximately $17.2 million and a book value of approximately $15.2 million.  (*Id.*, & Ex. A.)

B.   MOSAICA'S FINANCES

Since 2004, Mosaica has achieved aggregate profitability of approximately $3.5 million.  (*Id.* at ¶ 32.)   Mosaica's assets, consisting primarily of notes, accounts receivable, real estate, school-management contracts, copyrighted curriculum and professional development modules and other intellectual property,

- 3 -

employee workforce in place, and other intangible assets, have a value of approximately $110 million.  (*Id.* at ¶¶ 35 & 39.)  The value of Mosaica's assets exceeds its liabilities by approximately $64 million.  (*Id.* at ¶ 34.)

In an effort to increase liquidity, Mosaica is actively marketing properties it owns.  It has hired real estate agents and taken commercially reasonable steps to market and sell these properties.  The only real estate listings that have expired are for properties Tatonka marketed for Mosaica.  These properties are not decreasing in value due to Mosaica's conduct.  (*Id.* at ¶ 41.)

Although Mosaica experienced financial and cash-flow challenges in 2013 and 2014, Mosaica's management has taken steps to address those challenges by accepting 20% pay cuts, personally investing more than $600,000 into Mosaica, incurring unreimbursed expenses, reducing corporate staff by 20%, and terminating unprofitable management agreements.  (*Id.* at ¶¶ 46-50.)  Further, although Mosaica has been sued by other creditors, it is actively defending those suits and working to resolve all claims.  (*Id.* at ¶¶ 70 & 71.)  As a result of the actions taken by management, Mosaica projects positive cash flow and profitability in the current fiscal year.  (*Id.* at ¶ 51.)

### III. ARGUMENT

"A receivership is 'an extraordinary equitable remedy that is only justified in extreme situations.'" *Otero v. Vito,* No. 5:07-CV-405, 2008 WL 4004979, at *2 (M.D. Ga. Aug. 25, 2008) (quoting *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993)).   "The power of appointing receivers should be prudently and cautiously exercised. Except in clear and urgent cases it should not be resorted to by the Court." *Sires v. Luke*, 544 F. Supp. 1155, 1161 (S.D. Ga. 1982).  Indeed, "[t]he appointment of a receiver is recognized as one of the harshest remedies which the law provided for the enforcement of rights, and is allowable only in extreme cases, and under circumstances where the interest of creditors is exposed to manifest peril." *Id.*; *see also Manufacturers & Traders Trust Co. v. Minuteman Spill Response, Inc.,* 999 F. Supp. 2d 805, 826 (W.D. Pa. 2013) ("[T]here is nothing . . . which affects a corporation with such serious consequences as does the appointment of a receiver; it is a severe, and may be termed an heroic, remedy, and the conditions that call it into action should be such as would, if persisted in, ordinarily be fatal to corporate life.").  Thus, appointment of a receiver "place[s] a heavy burden upon the party seeking the preliminary relief in question." *Wickes v. Belgian Am. Educ. Found., Inc.*, 266 F. Supp. 38, 40 (S.D.N.Y. 1967).

In deciding whether to appoint a receiver, the Court should consider a variety of factors, including "[the existence of] a valid claim by the party seeking the appointment; the probability that fraudulent conduct has occurred or will occur to frustrate that claim; imminent danger that property will be concealed, lost, or diminished in value; inadequacy of legal remedies; lack of a less drastic equitable remedy; and likelihood that appointing the receiver will do more good than harm." *Otero*, 2008 WL 4004979, at \*3; *see also* 12 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL, § 2983 (2d ed. 1973). These factors weigh against appointing a receiver in this case.

## A.   PLAINTIFF'S CLAIM IS UNCERTAIN.

The existence and amount of Plaintiff's claim is uncertain. Tatonka asserts that Mosaica owes $22,119,831.36 in principal and interest under the Loans. [DE 2] at 13-14. Although Plaintiff contends that it is likely to succeed on its breach of contract claim, the amount of Plaintiff's damages—and thus the amount of collateral a receiver is necessary to protect—is in dispute. *See* 12 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL, § 2983 (2d ed. 1973) (relevant factors include "plaintiff's probable success in the action.").

First, Defendants have fully or substantially satisfied their monetary obligations under the Loans. Specifically, in April 2014, Mosaica assigned the

Transferred Collateral to Tatonka.  (Connelly Decl., at ¶ 21.)  The Transferred Collateral has a face value of $17.2 million and a book value of approximately $15.2 million. (*Id.*, & Ex. A.)  Indeed, the Transferred Collateral accounted for a substantial portion of the collateral securing the Loans.  (*Id.*)

Although the agreements assigning the accounts receivable provide that Tatonka will reduce Mosaica's debt only in the amount actually paid to Tatonka under the accounts receivable, [*see* DE 38, 40, 42, 44, & 46], Tatonka has sued Mosaica for the full amount allegedly due under the Loans.  Because Plaintiff now controls the Transferred Collateral, Mosaica is entitled to a set off equal to the value of the Transferred Collateral.  Otherwise, Tatonka could obtain a judgment against Mosaica for the full amount of the alleged indebtedness under the Loans *and*, independently, collect on the Transferred Collateral to which it now holds title.  That outcome would result in a windfall to Tatonka in the amount of approximately  $15.2 million, the book value of the Transferred Collateral.  (*See* Connelly Decl., at ¶ 21.)  For this reason, Tatonka's damages, if any, must be reduced by the value of the Transferred Collateral.

Second, Tatonka has received settlement proceeds for which Mosaica is entitled to a setoff.  In August 2013, Fell Charter School ("Fell") failed to pay amounts owed to Mosaica under certain notes and management agreements.  (*Id*. at

¶ 23.)   In coordination with Tatonka, Mosaica assigned its claim under those agreements to Tatonka.   Ultimately, Tatonka and Fell reached a settlement agreement under which Fell paid approximately $1.75 million.   Despite cash flow statements submitted to Tatonka showing that Mosaica planned to receive 75% of the settlement proceeds, Tatonka ultimately distributed only approximately $450,000 to ADP, Mosaica's tax payment services company, for payment of payroll taxes.   Tatonka retained the remaining funds for itself.   (*Id.*)   Because the debt underlying the settlement arose from collateral securing the Loans, any judgment for Tatonka must be reduced by the amount Tatonka received from the Fell Settlement. Otherwise, Tatonka will obtain double recovery.

Also, Mosaica has independent counterclaims against Plaintiff that further offset any amount owed to Tatonka under the Loans.   Since in or about 2012, Mosaica has deposited payments from various charter schools into a trust account in Tatonka's name at Vectra Bank (the "Vectra Account").   (*Id*. at ¶ 25.)   In August 2014, Mosaica directed Tatonka to pay to the IRS approximately $230,000 in federal payroll taxes from the Vectra Account. (*Id.* at ¶ 26.)   Rather than pay these amounts to the IRS, Tatonka seized the balance of the funds in the Vectra Account,

approximately $300,000 in total.[1]   (*Id.*)   Tatonka had no right to convert these funds and Mosaica has a claim for conversion against Tatonka for doing so.[2]

Similarly, in August 2014, Tatonka contacted the boards of directors at five Mosaica-managed charter schools.   (*Id.* at ¶ 30.)   In those communications, Tatonka issued false and misleading statements about Mosaica and its management team, reneged on commitments previously made to the boards, and threatened to sue individual board members.   (*Id.*)   Tatonka thus tortiously interfered with Mosaica's business relationships.

Given Mosaica's satisfaction of its monetary obligations under the Loans and its counterclaims against Tatonka, the existence and value of Plaintiff's claim is uncertain.   This factor thus weighs against appointing a receiver.

---

[1] Although not alleged in its Motion or Brief, to the extent Tatonka contends that a receiver is warranted because Mosaica has failed to make certain federal payroll tax payments, Tatonka caused those failures by retaining 75% of the funds from from the Fell litigation and converting $300,000 from the Vectra Account.   Indeed, Tatonka is a "responsible person" for purposes of these tax payments because it controlled Mosaica's assets.   *See e.g., Merchants Nat. Bank of Mobile v. United States,* 878 F.2d 1382 (11th Cir. 1989); *United States v. Vaccarella,* 735 F. Supp. 1421 (S.D. Ind. 1990) (finding that lender directed funds to be paid to entity other than IRS).   Nevertheless, Mosaica is currently paying federal payroll taxes as they become due.   (Connelly Decl. at ¶ 29.)

[2] Even if Mosaica is unsuccessful on its conversion counterclaim, Tatonka's claim under the Loans must be offset by the amounts it seized from the Vectra Account.

**B.**   **THERE IS NO FRAUD.**

Plaintiff does not contend that Mosaica is engaged in fraud.  *See Comerica Bank v. State Petroleum Distributors, Inc.,* 3:08-CV-678, 2008 WL 2550553, at \*5 (M.D. Pa. June 2, 2008) (finding receiver inappropriate where there was no allegation of fraud or direct evidence that defendant was dissipating collateral); *Compare Otero*, 2008 WL 4004979, at \*3 (reasoning that receiver is appropriate where evidence suggests fraudulent conduct).   Nor does Plaintiff allege that Mosaica is wrongfully transferring, hiding, or dispersing the collateral.  Thus, this factor weighs against appointing a receiver.

**C.**   **THERE IS NO IMMINENT DANGER TO THE COLLATERAL.**

    **1.**   **The Collateral is Not Decreasing in Value.**

There is no "*imminent* danger that property will be concealed, lost, or diminished in value."  *Otero*, 2008 WL 4004979, at \*3.[3]  In *Manufacturers and Traders Trust*, the lender sought a receiver to secure more than $12 million in defaulted loan obligations.  The plaintiff argued that "the transfer and concealing of [the plaintiff's] secured collateral, the failure of [d]efendants to properly react and manage their cash crisis, their inability to profitably operate and protect the

---

[3] Ironically, Plaintiff's inaccurate allegations regarding the nature and success of Mosaica's business present the greatest threat to the value of the collateral.

interests of creditors . . . and the general downward spiral of the business" required a receiver. *Manufacturers & Traders Trust*, 999 F. Supp. 2d at 826. The court, however, declined to appoint a receiver. Importantly, the court reasoned that there was no evidence that the defendant was concealing or improperly transferring collateral. Rather, the defendant's claims "indirectly state[d] the same thing: there [was] a concern that [the defendant could not] repay the loans." The court stated that "[n]ot only is monetary harm insufficient to show irreparable injury . . . but [the plaintiff] presented no evidence" that the value of the plaintiff's collateral would not adequately cover the judgment. *Id.*; *see also Comerica Bank*, 2008 WL 2550553, at *5 (declining to appoint receiver where defendant had defaulted on note, failed to pay almost $2 million due at maturity of note, and failed to fully provide financial information, reasoning that there was no evidence that collateral was being improperly dissipated).

Here, as in *Manufacturers and Traders Trust* and *Comerica Bank*, there is no allegation that Mosaica is concealing or improperly transferring Tatonka's collateral. Nor has Plaintiff established that its collateral is not sufficient to satisfy any judgment. *See Comerica Bank*, 2008 WL 2550553, at *5 (reasoning that plaintiff had failed to establish whether value of collateral exceeded debt). Indeed, as discussed above, Tatonka *already* holds title to the Transferred Collateral,

valued at approximately $15.2 million.  (Connelly Decl., at ¶ 21.)  Thus, Tatonka

currently controls much of the collateral a receiver would allegedly "protect."

Further, even if Tatonka were entitled to the $22,119,831.36 it claims, Plaintiff is

still over secured.  Mosaica's assets total approximately $110 million.  (*See id.* at

¶¶ 39 & 34.)

The cases Tatonka cites are inapposite.  In *Resolution Trust Corp. v.*

*Fountain Circle Associates Ltd. Partnership*, 799 F. Supp. 48 (N.D. Ohio 1992),

the plaintiff submitted evidence showing that the real estate managed by the

defendants was not being maintained.  Further, the amount due under the loan

exceeded the value of the plaintiff's collateral. *Id.* at 52. Similarly, in *New York*

*Life Insurance Co. v. Watt W. Investment Corp.*, 755 F. Supp. 287 (E.D. Cal.

1991), the plaintiff presented evidence that rent payments were being improperly

diverted.  Further, the single piece of real estate at issue was not being properly

administered, resulting in the likely departure of a major tenant.

Here, by contrast, there is no evidence that Mosaica is neglecting or failing

to maintain the collateral.  Mosaica is actively consulting, advising, or managing

95 schools worldwide.  (Connelly Decl. at ¶ 3.)  Mosaica is actively maintaining

and marketing its properties.  (*Id.* at ¶ 41.)  The only real estate listings that have

expired are for properties Tatonka marketed for Mosaica.  (*Id.*)  Tatonka's bald allegations to the contrary are untrue.

### 2.    Mosaica's Past Business Decisions Do Not Present An Imminent Risk of Harm to the Collateral.

Rather than offer evidence that the value of its collateral will decrease in the *future*, Plaintiff argues that Mosaica's *prior* business decisions indicate that it has "failed to operate its business under a stable financial model."  [DE 2-1] at 10.  As evidence of this assertion, Plaintiff references, with the benefit of hindsight, four allegedly poor business decisions: (1) investing in a charter school in Arizona, (2) investing in a charter school in Michigan, (3) investing in online educational programs, and (4) investing in international business.

Notably, none of these prior investments threaten to immediately impact the value of Tatonka's capital.  Rather, Tatonka contends that these four investments show that Mosaica's management team "seems inimical to [Mosaica's] best interests."  [DE 2-1] at 10 (quoting *Warner v. Warner*, 237 Ga. 462 (1976)).  Four unrelated business decisions—selected with the benefit of hindsight—do no such thing.

First, as Mosaica's primary lender, Tatonka was well aware of each of the investments it now challenges.  Only with the benefit of hindsight can Tatonka

select these investments from the thousands of business decisions Mosaica made over the course of the parties' 15 year relationship.

Second, the business decisions Tatonka cites are not indicative of bad management.   Tatonka states that Mosaica has "repeatedly invested in a new curriculum development project and online school despite the negative cash flow created by those enterprises."   [DE 2] at 10.   Mosaica's online and digital curriculum, however, is an integral part of Mosaica's overall business and the future of the education industry.  (Connelly Decl. at ¶ 60.)   Although Mosaica's online only business produced negative cash flow in its first few years, the business is now breaking even.  (*Id.* at ¶ 63.)   Further, Mosaica licenses its digital and online products to "brick and mortar" charter schools, public and private businesses, and families.  (*Id.* at ¶¶ 10 & 61.)   Thus, Mosaica's online business has, and will continue to create value for the company.[4]

---

[4] Although not mentioned in its Brief, Tatonka asserts that Mosaica maintained staff in Abu Dhabi and Qatar after shutting down schools there.  [DE 2] at 8. Mosaica's investments in Abu Dhabi and Qatar were profitable.  (Connelly Decl. at ¶ 43.)  Although Mosaica incurred certain shut down costs in Abu Dhabi, it did not maintain unnecessary staff or facilities in either location.  (*Id.*) Staff remaining in Abu Dhabi managed Mosaica's operations elsewhere and conducted targeted business development.  (*Id.* at ¶¶ 46 & 66.)  Overall, Mosaica's international operations are cash-flow positive, as they have been in every year prior to 2013. (*Id.* at ¶ 46.)

- 14 -

Next, Tatonka claims that Mosaica's decision to invest in an underperforming school in Muskegon Heights, Michigan (the "Muskegon Heights School") is indicative of its inability to manage its affairs responsibly. Contrary to Tatonka's assertions, the Muskegon Heights School produced approximately $900,000 in gross profits for Mosaica. (*Id.* at ¶ 55.) Further, the Muskegon Heights School was a tremendous educational success for the students enrolled there. (*Id.* at ¶ 56.) Thus, management and investment in the Muskegon Heights School was a financially and socially profitable business decision.

Finally, in about 2002, Mosaica began managing a charter school in Phoenix, Arizona ("AFP"), having made Tatonka completely aware of its proposed investment. (*Id.* at ¶ 58.) In or about 2005, Mosaica obtained a nonrecourse loan to purchase the property on which AFP was located. Unfortunately, AFP was unable to make its rent payments and the lender foreclosed on the property. To avoid interrupting the school year for enrolled students, Mosaica continued to manage AFP temporarily. (*Id.*) This conduct, for the benefit of the students enrolled at AFP, does not suggest that Mosaica's management is "inimical" to the company's interests.

Tatonka has not set forth how or why its collateral will imminently decrease in value.[5]   There is no allegation that Mosaica is concealing or wrongfully transferring property.  *Compare Otero*, 2008 WL 4004979, at *3 (noting risk that defendant would transfer assets while collection efforts proceeded).  Mosaica is maintaining and actively managing all its assets, including the collateral.  Finally, Tatonka is over secured.   For all these reasons, this factor weighs against appointing a receiver.

## D.   TATONKA'S LEGAL REMEDIES ARE ADEQUATE AND NO LESS DRASTIC REMEDY IS NECESSARY.

Tatonka argues that "[a] money judgment will be insufficient, as MEI has repeatedly defaulted on its obligations to Tatonka."  [DE 2-1] at 12.  In support, Tatonka cites *Cadence Bank, N.A. v. Manausa Holdings, LLC*, No. 4:12-cv-38, 2012 WL 1252494 (N.D. Fla. Mar. 30, 2012). In *Cadence Bank*, the plaintiff sought to appoint a receiver to operate and collect rents from an apartment building.  The defendants had been diverting a substantial portion of the rents

---

[5] The absence of any *imminent* threat that the collateral will decrease in value is evidenced by Tatonka's own conduct.  Specifically, Tatonka alleges that the Loans matured, at the latest, on July 1, 2014.  [DE 2] at 11.  Tatonka, however, did not bring this suit until September 9, 2014, more than two and half months later. Tatonka does not cite any intervening event that has made the threat to its collateral any more immediate.

without providing documentation.  Further, the court noted that the defendants lacked the assets to pay the debt.

Here, by contrast, there is no evidence that Mosaica is diverting a large portion of its revenue without documentation.  Further, as discussed above, the amount of Tatonka's claim is uncertain.  Even if Tatonka were to recover the amount is seeks, notwithstanding that it already controls a large portion of the collateral securing that debt, Tatonka is over secured.  Thus, Tatonka's legal remedies are adequate.  For this reason, no less drastic equitable remedy is required.  Both factors weigh against appointing a receiver.

## E.   A RECEIVER WILL DO MORE HARM THAN GOOD.

Appointing a receiver will have disastrous consequences for Mosaica's business and the value of Tatonka's collateral.  Unlike the single asset entities in *Cadence Bank*, *New York Life*, and *Resolution Trust*, Mosaica does much more than rent real estate.  Mosaica manages, advises, and operates a diverse array of charter, private, and online schools, as well as licensing digital and online curriculums to schools and individuals.

### 1.   Appointing a Receiver Will Harm Mosaica's Business.

First, because Mosaica has complex and long-standing relationships with various non-profit schools, a receiver will damage Mosaica's existing business.

- 17 -

Importantly, each of the charter schools Mosaica manages must obtain and maintain a charter from the appropriate government agency. (Connelly Decl. at ¶ 6.) These agencies have extensive discretion to dictate and control the activities of the schools they license. (*Id.*) If a receiver is appointed, licensing agencies could require charter schools to terminate their management agreements or impose conditions that diminish the value of those agreements. (*Id.* at ¶ 75.) Much of Mosaica's revenue comes from schools licensed by government agencies. Although Tatonka alleges that Mosaica's "constituencies need to be assured that the schools will be open for the near and long term," [DE 2] at 10, a receiver will make it much more likely that these schools *will not* be open for the near and long term. Far from assuring its "constituency," the appointment of a receiver will irreparably harm Mosaica's relationship with that constituency. Any action that threatens Mosaica's relationship with its charter schools will be devastating to Mosaica's business and the value of Tatonka's collateral. (*Id.* at ¶ 75.)

Second, appointing a receiver will cripple Mosaica's efforts to attract new business. School districts, charter schools, and other educational entities will be unwilling to do business with Mosaica under receivership. (*Id*. at ¶ 76.) Although Tatonka argues that a receiver is needed because Mosaica's "financial distress is becoming widely known," [DE 2] at 10, Tatonka's own conduct has done much to

publicize and exaggerate that distress.  A receiver would only make things worse. More than any factor enumerated by Tatonka, the inability to attract new business under  a receiver poses the greatest threat to the collateral in the immediate future.

Similarly, if a receiver is appointed, Mosaica will be less able to sell the properties it is currently marketing.  (*Id.* at ¶ 77.)  Many real estate purchasers require Mosaica to guarantee schools' lease payments as a condition of sale. Potential purchasers will question the financial viability of the schools and their ability to make lease payments if Mosaica is placed in receivership.  (*Id.*) Mosaica's inability to effectively market and sell real estate will negatively impact the value of Mosaica's business and the collateral securing the Loans.

### 2.   The Receiver Has No Experience Managing A Business Like Mosaica.

As discussed above, Mosaica operates, manages, and advises 95 schools domestically and internationally.  (*Id.* at ¶ 3.)  Additionally, Mosaica develops and licenses digital and online curriculum to a variety of corporate and individual consumers.  (*Id.* at ¶ 10.)  Mosaica has approximately 1,800 employees.  (*Id.* at ¶ 11.)

Mosaica's current management team has more than 50 years combined experience in the education industry.  Mosaica's management team has worked to develop and maintain complex and diverse business relationships across the globe.

- 19 -

They continue to do so.  Since approximately 2004, Mosaica has achieved aggregate profitability of approximately $3.5 million.[6]  (*Id.* at ¶ 32.)

The proposed receiver, Katie Goodman, has negligible experience operating such large and complex school management companies.  Although Ms. Goodman has financial and turnaround experience, her limited experience in the education industry is inapplicable to managing an entity like Mosaica.  *See Manufacturers & Traders Trust*, 999 F. Supp. 2d at 825 (finding that "[proposed receiver] has extensive experience as a court-appointed receiver but has little to no familiarity with environmental regulatory agencies or the natural gas industry.").

Ms. Goodman claims that she was a financial adviser to Vail Christian Academy and Palm Bay Schools.  [DE 2-3] at 3.  Ms. Goodman apparently had no managerial position at either school.  Also, from its website,[7] it appears Vail Christian Academy has 16 employees and less than 200 students.  Palm Bay

---

[6] Tatonka's claim that Mosaica has "in excess of $86 million in net operating losses," [DE 2] at 10, is misleading and untrue.  In 2001, Mosaica acquired Advantage Schools, Inc. ("Advantage").  (Connelly Decl. at ¶ 14.)  At the time of the acquisition, Advantage carried approximately $75 million in tax loss carryforwards.  (*Id.* at ¶ 33.)  Mosaica assumed this tax loss carryforwards to reduce its future corporate tax liability.  (*Id.* at ¶ 33.)

[7] http://www.vailchristianacademy.org/

Schools has only 734 students.[8]  Neither school is comparable in size or business model to Mosaica, which develops and licenses its own curriculum and provides educational services to 95 schools and approximately 16,000 students worldwide.

Further, Ms. Goodman claims that she served as the Director of Reorganization and Interim CFO of Life University.  [*Id.*]  Although Life University is an educational institution, the college shares little else in common with an international company that contracts with, manages, and advises 95 schools.  Thus, as compared to Mosaica's current management team, Ms. Goodman does not have the expertise and experience to successfully manage Mosaica.

### 3.   Tatonka Seeks to Appoint a Receiver for Only A Portion of Mosaica's Subsidiaries.

Mosaica's corporate structure further emphasizes the danger of the proposed receiver.  Specifically, Tatonka seeks to appoint a receiver over Mosaica and only its subsidiaries that are named as Defendants in the lawsuit.  Mosaica Education, Inc. has other subsidiaries, including international subsidiaries, that are not party to this suit.  Tatonka contends that it declined to sue these entities "due to cross-

---

[8] http://www.education.com/schoolfinder/us/florida/palm-bay/palm-bay-community-charter-patriot-campus/

border concerns." [DE 2-2] at 6.  While Tatonka's cross-border concerns may be legitimate, it is unclear how a receiver will operate some, but not all of Mosaica's subsidiaries.  To the extent the receiver assumes control of subsidiaries not named in this lawsuit, it is unclear what responsibilities or authority the receiver will have with respect to such entities. Such fragmentation would harm Mosaica's business.

### 4.    A Receiver Authorized to Sell the Business Will Irreparably Harm Mosaica.

Finally, Tatonka asks not only that this Court appoint a receiver, but that it authorize and encourage the receiver to sell Mosaica's business before the merits of the suit are adjudicated. [DE 3-1] at 10-11 & 21 and [DE 2] at 3. *See* 12 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL, § 2983 (2d ed. 1973) (in considering whether to appoint receiver, courts should consider "the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment.").  Further, the Proposed Order contains many other objectionable provisions that would in essence provide for pre-judgment collection of a disputed claim.  Nothing could be more harmful to Mosaica's interests.  *Compare Otero*, 2008 WL 4004979, at *3 (reasoning that receiver was appropriate where "[t]he receivership [was] temporary and [would] be dismissed when the litigation in this case is fully resolved.").  Ultimately, Tatonka's proposed remedy would allow a receiver to sell an entity with $110

million in assets in order to protect a disputed debt *allegedly* worth only a small fraction of that amount. Indeed, it would pay her up to a 2% commission for doing so. [*See* DE 3-1] at 21.

For these reasons, the harm to Mosaica if a receiver is appointed clearly outweighs any benefit to Tatonka. *See* 12 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL, § 2983 (2d ed. 1973) (courts should balance harm to plaintiff if receiver is denied with harm to defendant if receiver is appointed). Indeed, as discussed above, appointing a receiver would harm Tatonka's collateral. Thus, this factor weighs strongly against appointing a receiver.

## F.   THE LOANS THEMSELVES DO NOT ENTITLE TATONKA TO A RECEIVER.

Tatonka contends that the language in the Loans, combined with Mosaica's alleged default, entitle it to a receiver. The Loans do no such thing. Although the Loans provide Tatonka the right to seek a receiver, the Loans do not strip the Court of its responsibility to consider whether such an extreme remedy is appropriate.

In support of its argument, Plaintiff cites *Garden Homes, Inc. v. United States*, 207 F.2d 459 (1st Cir. 1953), *Lemans Associates Ltd. P'ship v. Lemans Apartments*, 268 Ga. 396 (1997), and *Pioneer Capital Corp. v. Environamics Corp.*, No. CIV. 02-217, 2003 WL 345349 (D. Me. Feb. 14, 2003). These cases do not support Tatonka's position.

- 23 -

*Garden Homes* is a sixty-year old case from the First Circuit.  Like many of the cases Tatonka cites, the court appointed a receiver to collect rents from a single piece of real estate.  Although the court noted that the contract between the parties authorized the court to appoint a receiver, the court did not indicate that the contract mandated the appointment of a receiver outside the court's discretion.

Similarly, in *Leman*, the court noted that a note and security agreement authorized the appointment of a receiver.  The Supreme Court of Georgia, however, *independently* determined that the trial court did not abuse its discretion in applying the equitable factors set forth under Georgia law.  *Leman* implies that if the trial court had abused its discretion in balancing the equities, the Supreme Court would have reversed, notwithstanding the language in the contracts.  Thus, *Leman* contradicts Plaintiff's position.

Finally, in *Pioneer Capital*, the agreement between the parties specifically provided that the defendant "acknowledge[d] and agree[d] that [the plaintiff's] said right to appointment of a receiver is a bargained-for contractual remedy, and is not intended to be circumscribed by principles of equity."  *Pioneer Capital*, 2003 WL 345349, at *9; *but see Fortress Credit Corp. v. Alarm One, Inc.,* 511 F. Supp. 2d 367, 371 (S.D.N.Y. 2007) ("[T]he court's power to appoint a receiver is

- 24 -

discretionary in nature and. consequently, courts may deny receivership applications "regardless of a specific [contract] provision for such.").

Here, unlike in *Pioneer Capital*, the agreement between the parties does not specifically abrogate the principles of equity necessary to appoint a receiver. *See Fortress Credit*, 511 F. Supp. 2d at 371; *Comerica Bank*, 2008 WL 2550553 (finding receiver was inappropriate despite contract language contemplating appointment of receiver). Rather, the Loans merely acknowledge that Tatonka may exercise "all rights and remedies . . . under law, equity or otherwise, including obtaining appointment of a receiver." [DE 4-21] at 28. Therefore, the Loans do not independently authorize a receiver, but simply list the appointment of a receiver as an equitable remedy available to Tatonka. Although such a remedy may be available in this Court, Tatonka must establish that the equities favor such a harsh remedy. As discussed above, they do not.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, the Court should deny Plaintiff's Motion for Appointment of Receiver.

This 10th day of October, 2014.

By: _/s/ Jeffrey A. Zachman_____

Gary W. Marsh
Georgia Bar No. 471290
gmarsh@mckennalong.com
Nathan L. Garroway
Georgia Bar No. 142194
ngarroway@mckennalong.com
Jeffrey A. Zachman
Georgia Bar No. 254916
jzachman@mckennalong.com

McKenna Long & Aldridge LLP
303 Peachtree Street, NE. Suite 5300
Atlanta, GA  30308
Telephone:  (404) 527-4000
Facsimile:   (404) 527-4198

*Attorneys for Defendants*

## **CERTIFICATE UNDER LOCAL RULE 7.1(D)**

Pursuant to Local Rule 7.1(D), I certify that the foregoing pleading is a computer-generated document, prepared in Times New Roman, 14-point font, in accordance with Local Rule 5.1(B).

This 10th day of October, 2014.

*/s/ Jeffrey A. Zachman*
Gary W. Marsh
Nathan L. Garroway
Jeffrey A. Zachman

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2014, I electronically filed the foregoing *Defendants' Response to Motion for Appointment of Receiver* with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Graham H. Steiglitz
gstiegli@burr.com
BURR & FORMAN, LLP

/s/ Jeffrey A. Zachman
Gary W. Marsh
Nathan L. Garroway
Jeffrey A. Zachman