## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| TATONKA CAPITAL CORPORATION, a Colorado corporation, | |
| Plaintiff, | Civil Action File No.: 14-cv-3017 |
| v. | |
| MOSAICA EDUCATION, INC., a Delaware corporation; MICHIGAN EDUCATIONAL FACILITIES, LLC, a Delaware limited liability company; ASI TEXAS, LLC, a Delaware limited liability company; EFA COMPANY, LLC, a Michigan limited liability company; LORAIN-LEAVITT PROPERTIES, LLC, a Georgia limited liability company; WARREN-ELM FACILITIES, LLC, a Georgia limited liability company; and COLUMBUS-MORSE PROPERTIES, LLC, a Georgia limited liability company, | |
| Defendants. | |

### DECLARATION OF MICHAEL J. CONNELLY

I, Michael J. Connelly, pursuant to 28 U.S.C. § 1746, declare:

1.      I am the Chief Executive Officer of Mosaica Education, Inc. ("Mosaica").  I am over the age of 18.  I have personal knowledge of the matters set forth in this declaration and, if called upon, I will testify competently to them.

## Mosaica's Business

2.     Mosaica was founded in 1997 to provide high-quality educational alternatives to traditional public education.

3.     Since its inception, Mosaica has grown substantially, currently providing educational services to 95 schools in eight states and two foreign countries.

4.     Mosaica and its subsidiaries provide a variety of educational services, including managing and operating entire schools; consulting and training school teachers and administrators; offering online educational coursework and virtual schooling; providing curriculum design, support, development and licensing; and leasing facilities and financing charter schools.  For the most part, Mosaica's subsidiaries have no employees, and their activities are managed by Mosaica.

5.     As part of its school management services, Mosaica enters into management agreements with charter schools, which are publicly funded non-profit organizations licensed to operate in a specific location and regulated by the State.  Under these management agreements, Mosaica provides administrative, human resources, accounting, and educational services to charter schools.  In exchange, the charter schools pay Mosaica management fees.  As part of its

- 2 -

business relationship, Mosaica often provides financing to the charter schools it manages.

6.     Each non-profit charter school Mosaica manages must be licensed by the appropriate governmental licensing authority.   The licensing authority has broad discretion to revoke the school's charter or to place conditions upon its operations.

7.     Currently, Mosaica operates approximately 77 preschool, elementary, middle, and high-school programs in Colorado, California, Georgia, Illinois, Ohio, Michigan, Pennsylvania, and Arizona.  These schools serve approximately 10,000 students.

8.     Through foreign subsidiaries, Mosaica also operates five schools in the United Kingdom and one school in India, and it provides curriculum services to six other schools in India.   The international schools serve more than 6,000 students.

9.     Mosaica is one of the most respected educational management organizations in the country.  The schools Mosaica manages provide high quality instruction and deliver strong academic results.   On average, Mosaica-managed schools, serving primarily low-income inner city students, raise the education level

of students by an average of 1.25 years for every year of instruction. Mosaica operates the highest performing public school (out of more than 3,000 schools) in Ohio, the recent recipient of the National Blue Ribbon Award from U.S. Department of Education; one of the best charter schools in Colorado, recipient of the Governor's Award for the second consecutive year; and the 2012 "Most Outstanding" charter school in Michigan.

10. Mosaica operates online charter schools in five states and provides the online digital curriculum for students enrolled in those schools. Mosaica also licenses online educational materials to "brick and mortar" charter schools, public and private entities, and families.

11. Mosaica employs approximately 1,800 individuals.

### Mosaica Leadership's Experience

12. Dr. Dawn Eidelman and Gene Eidelman co-founded Mosaica in January 1997 and have been Chief Educational Officer and President, respectively, for almost 18 years. They have won numerous awards for their educational leadership, including the James P. Boyle Entrepreneurial Leadership Award from the Education Industry Association, which they shared in 2009. Dr. Eidelman also received the world's most prestigious distance learning award for Outstanding Leadership from the United States Distance Learning Association in 2013.

13.     I have been Chief Executive Officer of Mosaica for 16 years, having joined the Company in 1998, shortly after it opened its second school.  Before joining Mosaica, I spent 17 years in the private equity business, where, among other things, I invested in several private companies in the educational business.  I have also served on the boards of various educational entities, including Children's Discovery Centers, American Family Service Corporation, Sunrise Preschools, Inc., Center for the Media Arts, New Century Education Corp., and Dance Theater Workshop.

### Mosaica's Relationship With Tatonka

14.     In or about 1999, Mosaica began a business relationship with Tatonka Capital Corporation ("Tatonka"), initially by leasing modular units financed by Tatonka that were deployed at Mosaica's school in Wilmington, Delaware.     In 2001, Mosaica acquired Advantage Schools, Inc. ("Advantage"), a long-time client of Tatonka.  Advantage was in default on its obligations to Tatonka, and Mosaica agreed to assume those obligations as part of its acquisition of Advantage.

15.     Over the course of this 15-year relationship, Tatonka has provided mortgage financing for numerous properties acquired by Mosaica and has also provided working-capital lines of credit, ultimately culminating in a fruitful strategic partnership, in which Tatonka became Mosaica's principal lender, having

loans outstanding to the Company of approximately $20 million.   Tatonka's effective interest rate was high -- in some cases as much as 15% -- and it structured its loans to include aggressive amortization schedules.   But, because of the close working relationship between the parties, capital for projects that Tatonka approved of -- and they generally approved -- was typically made available in a timely manner and with minimal bureaucratic review.   During this period, Mosaica paid Tatonka almost $3 million per year in interest and fees.   Over the course of their relationship, Mosaica has paid Tatonka a total of approximately $25 million in interest and fees.

16.     Over the course of their relationship, Mosaica and Tatonka have entered into certain revolving and term loan agreements to provide mortgages and operating  capital for Mosaica (the "Loan Documents").

17.     Pursuant to the Loan Documents, Mosaica granted Tatonka security interests in certain of Mosaica's assets, including notes, accounts receivable, and real property.

18.     Throughout Mosaica's relationship with Tatonka, Mosaica has made Tatonka aware of all Mosaica's major expenditures and investments, including

Mosaica's investments in online and digital initiatives, international schools, and various charter school projects in the United States.

19.   Mosaica considered Tatonka its close business partner.

20.   Until Tatonka wrongfully seized approximately $300,000 from Mosaica in August 2014, Mosaica provided monthly financial statements and cash-flow projections to Tatonka.   Tatonka received all documents provided to the Mosaica board, and at one point conducted weekly conference calls with Mosaica's enrollment staff.   I personally kept Tatonka informed of all material plans, the status of all material initiatives, and detailed results of operations.

21.   In April 2014, in response to demands by Tatonka, Mosaica assigned certain notes and accounts receivable from five charter schools: Columbus Art and Technology Academy, Columbus Humanities, Arts and Technology Academy, Inc., Space, Technology and Arts Academy of Colorado Springs, Cleveland Arts and Social Sciences Academy, Inc., and Columbus Preparatory Academy (the "Transferred Collateral").   The Transferred Collateral comprised a portion of the collateral securing the Loan Documents.   The Transferred Collateral has a face value of $17.2 million and a book value of approximately $15.2 million (an

accounting of the book value of the Transferred Collateral is set forth in Exhibit A).

22.    Certain of Tatonka's principals, shareholders, affiliates, and employees, including Carol Hansen, Eric Gorka, Jon Bauers, Judi Martshenko, Sarah Shin, and the L. Robert Bauers Trust, also own shares of Mosaica common stock, which they paid for with Notes aggregating $1,650,000.  The due date for those Notes has already been extended once, but the Notes remain unpaid. Moreover, at Carol Hansen's request, Mosaica agreed to employ her daughter, who taught kindergarten at one of Mosaica's charter schools in Colorado Springs for 2 years and taught in Mosaica's online division for one year.  At Carol Hansen's request, Dr. Eidelman agreed to mentor her daughter and personally intervened to create the online position for her.

## Tatonka's Conduct

23.    In August 2013, Fell Charter School ("Fell") failed to pay almost $2 million  it owed to Mosaica pursuant to certain notes and management agreements. That failure created substantial cash-flow issues for Mosaica, and Mosaica had regular discussions with Tatonka to develop negotiating strategies and collection processes.  Ultimately, we decided that the most effective strategy would be for Mosaica to assign its claims against Fell to Tatonka and for Tatonka to bring a

collection action against Fell for the amounts owed to Mosaica. Tatonka subsequently amended its complaint to add all current and former members of Fell's board of directors. In May 2014, the parties reached a settlement under which Fell paid approximately $1.75 million (the "Fell Settlement").

24.    Pursuant to cash flow projections Mosaica and Tatonka shared before and after the Fell lawsuit, Tatonka was aware that Mosaica expected to receive approximately 75% of the Fell Settlement proceeds for its use in operations, with the remainder to be used to pay down the obligations to Tatonka. Nevertheless, Tatonka seized the entire Fell settlement, initially refusing to release any funds to Mosaica. Tatonka ultimately agreed to pay approximately $450,000 of the proceeds to ADP, Mosaica's payroll and tax payment services company, for past-due payroll taxes. Tatonka also agreed to pay approximately $88,000 in real estate taxes to Midland County, Texas, from funds that it controlled from the Fell Settlement, but it ultimately reneged on that agreement and deducted funds for this payment from the Vectra Account described below. Tatonka's failure to release funds in amounts consistent with the mutually agreed-upon cash flow projections disrupted Mosaica's operations, prevented Mosaica from marketing its schools as

planned and caused Mosaica to incur additional liabilities for payroll taxes, resulting in ADP's refusal to provide tax remittance services for the Company.

25.   In or about 2012, Mosaica began depositing funds in a bank account held in Tatonka's name at Vectra Bank (the "Vectra Account").   Tatonka represented that the Vectra Account was a trust account from which Mosaica would instruct Tatonka to make withdrawals.  Tatonka represented to Mosaica that use of the Vectra account would protect the funds from creditors, and that not even Tatonka would be able access the funds in the Vectra Account without Mosaica's consent and direction.

26.   Among other things, Mosaica used the funds in the Vectra account to pay payroll and payroll taxes.  Charter schools managed by Mosaica would deposit funds in the Vectra Account, and Mosaica would transfer those funds to ADP or, after ADP ceased providing tax payment services, the IRS.

27.   On or about August 4, 2014, Mosaica directed Tatonka to pay approximately $230,000 from the Vectra Account to the IRS for employee trust fund and withholding taxes.  Rather than pay the funds to the IRS as Mosaica instructed (and to pay approximately $30,000 Mosaica directed to be paid to the Ohio state pension plan for its teachers), Tatonka took control of all funds in the

Vectra Account, totaling approximately $298,881.03, which it seized and used for its own internal corporate purposes.

28.     As a result of Tatonka's seizure of the funds in the Vectra Account, Mosaica was unable to pay federal payroll taxes due to the IRS.

29.     Although Mosaica was unable to make several federal payroll tax payments because of Tatonka's conduct, Mosaica is currently paying federal payroll taxes as they become due.

30.     Since mid-August 2014, Tatonka has been in contact with members of the boards of directors of the five public charter schools referenced in Paragraph 21.   It has issued false and misleading statements about Mosaica and its management team, sought to interfere in the business relationship between Mosaica and those schools, reneged on commitments previously made and communicated to the boards, and even threatened to sue the individual community board members (as it did in connection with the Fell litigation referenced above).

31.     I believe that Tatonka's above described conduct was wrongful, totally inconsistent with the close relationship and course of dealing between Mosaica and Tatonka over their 15-year relationship, and has resulted in substantial damage to Mosaica.

## Mosaica's Finances

32.     Since approximately 2004, Mosaica has been profitable in eight of ten years, with an aggregate profitability of approximately $3.5 million (even after expensing interest and fees paid to Tatonka).

33.     Tatonka's assertion that Mosaica has lost $86 million in the aggregate is utterly false.   The allegation is presumably designed to position Mosaica's management in a harsh light.   Indeed, the "tax-loss carryforwards" Tatonka is evidently referring to relate almost exclusively to Mosaica's  2001 acquisition of Advantage.   At the time of the acquisition, Advantage carried approximately $75 million in tax-loss carryforwards.   Mosaica was also able to structure the transaction so as to generate substantial accounting goodwill, which can be amortized for tax purposes, even though it remains an asset on Mosaica's books under Generally Accepted Accounting Principles ("GAAP").   Because Mosaica is able to utilize these tax losses to reduce future corporate tax liabilities, they are valuable assets of the Company, which Tatonka's actions put at risk.   Under GAAP accounting rules, approximately $10.5 million of the deferred income tax asset is actually reflected on the Company's balance sheet.

34.    The book value of Mosaica's assets exceeds its liabilities by approximately $64 million, far exceeding the amount of Mosaica's alleged debt to Tatonka under the Loan Agreements.

35.    In addition to the deferred income tax credit referred to above, Mosaica's assets consist primarily of Notes, Accounts Receivable, Real Estate, School-Management Contracts, copyrighted curriculum and professional development modules and other intellectual property, its employee workforce in place, and other intangible assets.

36.    Currently, Mosaica holds notes and accounts receivable with a face value of almost $33 million and a book value of approximately $20 million, not including the value of the Transferred Collateral.

37.    Mosaica holds title to real estate with a book value of approximately $36 million and an appraised fair market value of almost $45 million.  Tatonka has first-mortgage liens securitizing commercial real estate loans totaling $13.7 million on real estate with appraised fair market value of $19 million.

38.    Mosaica's balance sheet also reflects intangible assets, including business goodwill with a book value of approximately $35 million.

39.   Thus, the total book value of Mosaica's assets, not counting the Transferred Collateral, is approximately $110 million.

40.   Mosaica's assets securing its debt to Tatonka are not decreasing in value.  There is no threat that those assets will be destroyed, lost, or decrease in value in the near future, except that Tatonka's actions, including its efforts to secure the appointment of a receiver, threaten to undermine Mosaica's business, which could reduce or destroy the value of the assets on its balance sheet.

41.   In an effort to increase liquidity, Mosaica is actively marketing the properties it owns.   It has hired real estate agents and taken commercially reasonable steps to market and sell those properties.   Mosaica is actively maintaining those properties.  The only real estate listings that have expired are for properties Tatonka markets for Mosaica.  These properties are not decreasing in value due to Mosaica's conduct.

## Mosaica's Response to Financial Challenges

42.   Despite Mosaica's historical profitability, in 2013 and 2014, Mosaica faced financial challenges and even greater cash-flow challenges.

43.   First, in 2012, the government of the Abu Dhabi ("AD") assumed control over schools for which Mosaica was providing consulting services (as it did for all other companies involved in the Public Private Partnership project

Mosaica participated in).  As a result, Mosaica's consulting contracts were not renewed.  Mosaica's business in AD had consistently provided positive cash flow to Mosaica, and the loss of those contracts reduced Mosaica's cash-flow. Moreover, because there was no ongoing business relationship, (i) the government of AD delayed final payments on the consulting, ultimately forcing Mosaica to settle the obligation for less than had been projected, and (ii) Mosaica became liable to its employees for "end-of-service" payment mandated by AD law and other shutdown expenses.  Contrary to Ms. Hansen's assertions, Mosaica did not retain the staff servicing the contracts beyond the contract termination date, although several employees based in AD performed other consulting services in the Middle East and/or oversaw Mosaica's expansion in India and the United Kingdom after Mosaica's government contracts in AD were terminated.

44.   Second, during 2013 and early 2014, because of a downturn in the municipal bond market for unrated charter school bonds, Mosaica did not sell as much real estate as had been projected, again, reducing cash flow relative to projections.

45.     Third, in calendar 2014, Mosaica's cash flow was impacted by Tatonka's decision to retain substantially all of the proceeds from the Fell Settlement and Tatonka's seizure of almost $300,000 from the Vectra Account.

46.     Mosaica has taken numerous steps to address these financial challenges.  In response to the loss of its consulting contracts in AD, Mosaica significantly downsized its personnel in the region.  In doing so, however, as outlined above, Mosaica incurred certain shutdown costs associated with eliminating unnecessary staff.  Mosaica personnel remaining in AD pivoted to managing other schools in India, the UK and elsewhere.  Mosaica's international operations are now cash-flow positive (as they have been in every year prior to 2013).

47.     Mosaica has also cut costs by reducing staff across the company.  In the past two years, Mosaica has reduced its corporate staff by almost 20%.

48.     Mosaica's senior management team, including Gene Eidelman, Dawn Eidelman, and me, has voluntarily accepted 20% salary reductions.

49.     Since June 2013, Mosaica's management team has loaned more than $600,000 to Mosaica and has incurred more than $40,000 in unreimbursed expenses.

50.   In further attempts to control costs, Mosaica has suspended the operations of one of its online schools, and it closed one of its Ohio charter schools in June 2014.   Also, Mosaica has terminated its management contract for the charter school system in Muskegon Heights, Michigan, in response to its inability to fully pay Mosaica's fee.

51.   As a result of the actions taken by management, Mosaica is projecting positive cash flow and profitability in the current fiscal year.

## Mosaica's Business Decisions

52.   Over its 18 years of business, Mosaica has developed and managed almost 200 charter schools, operating under more than 70 charters in 15 states.   In Ms. Hansen's affidavit, she alleges that two of them were mismanaged.   I would like to address those two situations.

53.   In July 2012, after winning a contested RFP bid, Mosaica entered into a management agreement with an underperforming school district in Muskegon Heights, Michigan, thereby creating the first all-charter school district in the nation.   As Mosaica's primary lender, Mosaica made Tatonka aware of the planned partnership with the Muskegon Heights School District, and, indeed, after conducting its due diligence, Tatonka issued a commitment letter to lend the

charter district $5 million, secured in part by Mosaica's guarantee.  That line of credit was never drawn.

54.     From an academic and school-culture standpoint, Mosaica's operation of the Muskegon Heights system was incredibly successful – arguably the greatest turnaround of an urban school district in American history.   Unfortunately, the financial results to Mosaica, while positive, were not as great as had been projected, and Mosaica rejected the charter board's demand that Mosaica incur even greater financial risk to retain the management contract beyond the second year of the contract.  As a result, the contract was ended by mutual agreement, effective June 30, 2014.

55.     Mosaica was awarded the Muskegon Heights contract in July 2012, and in six weeks, Mosaica recruited and trained more than 200 teachers and other staff members; upgraded and outfitted four buildings to meet current building codes and the technology requirements of Mosaica's Educational Model; recruited more than 1,100 students to enroll in the school; and otherwise prepared to open a four-building system under unprecedented time constraints and despite unrelenting political pressure from the unions, segments of the press and outspoken politicians opposed to the idea of "chartering" an entire school district.  Due to out-migration

from the City of Muskegon Heights, enrollment at the Muskegon Heights School was less than projected that first year, and it decreased approximately 20% more in the second year of operations (it did not decrease "over 30%" as Ms. Hansen avers in her affidavit).   Moreover, the expenses that the District and the State of Michigan required the charter school system to assume were greater than budgeted, and the financing alternatives were more limited than had been agreed to.   As a result, Mosaica was required to advance funds to the schools to enable them to make payroll -- advances subsequently reimbursed by the State -- and management fees paid to Mosaica were less than projected.   But, Mosaica did not lose $2 million on the Muskegon Heights contract as Ms. Hansen concludes.   Indeed, over the course of Mosaica's management, the Muskegon Heights Public School Academy System generated approximately $900,000 in gross profits for Mosaica. Thus, the decision to enter into the management agreement and to provide the needed cash investment in the Muskegon Heights School District was a financially profitable business decision, and I would argue, an example of the strengths of Mosaica's management team, not an example of "mismanagement" in any way.

56.    Aside from the financial benefits derived from the Muskegon Heights contract, the system was also an educational success for Mosaica and, more

importantly, for the students in Muskegon Heights.   Before Mosaica began managing the Muskegon Heights School District, the average student increased only .5 education levels for every year of instruction – falling further behind every year.  93% of the high school students and 46% of the middle-school students were at least three years behind grade level.   In the first year under Mosaica's management, the average student gained a full year of academic growth, and by the second year, the average student increased 1.42 years of academic growth for every year of instruction.   As stated above, I am not aware of an academic turnaround of an urban school district in this country that was as successful.

57.    In any event, because the Muskegon Heights School District failed to fully honor its commitments to Mosaica, Mosaica negotiated a termination of its contract in an orderly fashion that did not impact students or create any adverse consequences for Mosaica.

58.    The one other school referred to in Ms. Hansen's affidavit is a charter school in Arizona formerly known as Ahwatukee Foothills Prep ("AFP").  In or about 2002, Mosaica began managing that school, and in or about 2005, Mosaica received a non-recourse loan to purchase AFP's property and facilities at what was then a below-market option price. AFP then rented the facilities from Mosaica,

although because the school was under-enrolled, it frequently was unable to meet its obligations to Mosaica.  Mosaica advanced funds to the school to enable it to meet its obligations, but it eventually stopped making payments on the underlying non-recourse loan.  By that time, as a result of the real estate crash – which affected commercial property in Phoenix more than any other market in the country – the property was worth substantially less than the amount of the loan.

59.     As a result, the lender foreclosed on the property.  Mosaica offered to reclaim the property at a discount to the face value of the non-recourse loan, and Tatonka agreed to finance that purchase, but the receiver rejected the Mosaica/Tatonka offer, demanded that the students vacate the building mid-semester, and ultimately sold the property for substantially less than we had offered.  From a financial perspective, AFP was the costliest school opening in Mosaica's history – indeed, I believe that it is the only one of the 200+ charter schools Mosaica has opened that has not generated a positive contribution to overhead – but it seems hardly credible to claim rampant mismanagement given the overall track record of the Mosaica management team.  Moreover, Tatonka is well aware that Mosaica had targeted a marketing campaign for the Chandler area (where AFP is now located) for last spring that was to be funded with a portion of

the Fell proceeds, but because Tatonka took control of those proceeds and refused to allow any spending for marketing, that campaign could not be implemented, which has, of course, negatively affected enrollment at AFP this year.

60.    Ms. Hansen also criticizes Mosaica for its investment in online educational services.  Specifically, in the past few years, Mosaica has invested in converting traditional curriculums and educational materials to digital formats, and it has established the infrastructure for a six-state online school network. Although the process required significant investment of time and resources, online educational content is currently an integral part of the educational services industry, and will be even more critical in the future.  In my view, the investment in digital curriculum and infrastructure was the proper management response to the technology changes currently impacting K-12 education.

61.    Mosaica now provides online and digital content to physical charter schools, virtual schools, and individual students and families in the United States and abroad.  Mosaica's online content is used by students not only in Mosaica's online and virtual schools, but also in its "brick and mortar" schools.  Mosaica's digital and online curriculum provides a competitive advantage in the industry.

62.    Currently, Mosaica serves more than 400 students through purely online charter schools.

63.    Like any new business venture, Mosaica's online business did not immediately produce a return on investment.   Although Mosaica's online operations produced negative cash flow in the past three fiscal years, the amount of those losses has decreased each year, and the online business is currently breaking even.   Indeed, as was the case with AFP, if Tatonka had not seized control of the Fell Settlement monies targeted for online enrollment marketing, we believe that our online business would be even more profitable this year.   In any event, Mosaica expects the online business to produce profits and positive cash flow going forward.

64.    Since 2004, Mosaica has provided educational services outside the United States, consulting and managing schools in the United Kingdom, India, Qatar, and AD.  This international presence differentiates Mosaica in the industry and provides diversification for Mosaica's business.

65.    From 2004 through 2012, Mosaica's international business generated significant profits and positive cash flow for Mosaica.

66.    In 2013, Mosaica incurred certain shutdown costs associated with winding down its business in AD.  As a result, Mosaica downsized its staff and facilities in AD, retaining only the staff necessary to manage its international operations in other countries, and to execute targeted business development initiatives.  Mosaica did not retain unnecessary staff or facilities in the AD after Mosaica's contracts in that country terminated.

67.    Mosaica has not done business in Qatar since 2010. Mosaica's business operations in Qatar generated a substantial aggregate profit for Mosaica. Mosaica did not incur any unnecessary shutdown costs associated with its business in Qatar.

68.    Mosaica's international schools in the United Kingdom and India are currently generating positive cash flow.

69.    Overall, Mosaica's international business is projected to break even in the current fiscal year.  Going forward, Mosaica's online business is predicted to again produce positive cash flow, as it has in the past.

## Mosaica's Response to Lawsuits

70.    Mosaica is appearing and defending all lawsuits that have been filed against it.

71.    Mosaica is working with all its creditors, including Tatonka, to resolve outstanding claims.

**The Harm to Mosaica if a Receiver is Appointed**

72.    Mosaica's current management team has more than 50 years' combined experience in the education industry.  This experience yields business relationships and institutional expertise that the proposed receiver lacks.

73.    Mosaica's business is complex and requires intimate knowledge regarding charter school operations, international relations, technology, curriculum development, real estate management, public school compliance, and regulatory requirements.

74.    I believe that there is substantial risk that Mosaica's assets will decrease in value if a receiver is appointed and that the appointment could jeopardize Mosaica's ability to continue as a going concern.

75.    First, Mosaica's current business relationships will be jeopardized if a receiver is appointed.  The non-profit charter schools Mosaica manages must be licensed by government agencies, known as authorizers or sponsors.  These licensing agencies have broad discretion to impose conditions upon charter schools, including dictating charter schools' payment obligations and influencing whether charters will be renewed (or cancelled) and whether the schools will be

allowed to renew Mosaica's management contracts (and the terms under which they can be renewed).  If a receiver is appointed, I believe that licensing agencies will cause certain charter schools not to renew their contracts or will impose restrictions that will diminish the value of those contracts, any real property associated with the school, and the charter schools' ability to repay the notes and receivables.  The non-renewal of management contracts would substantially and negatively impact the value of Mosaica's business and the collateral securing the Loan Documents.

76.    Second, if a receiver is appointed, Mosaica will be unable to attract new business.  Mosaica is currently seeking and/or negotiating several new management agreements.  School districts, charter schools and other educational entities will be unwilling to do business with Mosaica under receivership.  Mosaica's inability to attract new business will negatively impact the value of Mosaica's business and the collateral securing the Loan Agreements.

77.    Similarly, if a receiver is appointed, Mosaica has reason to believe that it will be less able to sell the properties it is currently marketing.  Potential purchasers will question the financial viability of the schools occupying those facilities and their ability to make lease payments if Mosaica is placed in

receivership.  Mosaica's inability to effectively market and sell real estate will negatively impact the value of Mosaica's business and the collateral securing the Loan Agreements.  Indeed, the threat of a receiver is currently harming Mosaica's efforts to market and sell a property.

78.  Mosaica has subsidiaries operating internationally as well as domestic subsidiaries that are not a party to this lawsuit.  If a receiver is appointed to operate only Mosaica and the other Defendants, Mosaica's non-Defendant subsidiaries and international operations will be unable to operate.  This will negatively impact the value of Mosaica's business as a whole and the collateral securing the Loan Agreements.

79.  The proposed receivership order would allow the receiver to sell Mosaica's business, or parts thereof, to Tatonka or a third party with very little oversight.  Such a fire sale would substantially and irreparably harm Mosaica and its other creditors and shareholders.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _10TH_ day of October, 2014.

By: _Michael J. Connelly_
Michael J. Connelly

- 27 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 10, 2014, I electronically filed the foregoing

***Declaration of Michael J. Connelly*** with the Clerk of the Court using the

CM/ECF system which sent notification of such filing to the following:

Graham H. Steiglitz
gstiegli@burr.com
BURR & FORMAN, LLP


/s/ Jeffrey A. Zachman
_____
Gary W. Marsh
Nathan L. Garroway
Jeffrey A. Zachman