**EXHIBIT "A"**

## PURCHASE AND SALE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS

THIS PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (this "**Agreement**") is made as of February 19, 2015 ("Effective Date"), by and between COLUMBUS-MORSE PROPERTIES LLC, a Georgia limited liability company ("**Seller**"), and RED HOOK CAPITAL PARTNERS II, LLC, a Delaware limited liability company and/or its assignee ("**Buyer**").

In consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

### ARTICLE 1 - BASIC TERMS

This Article 1 sets forth certain terms of this Agreement, subject, however, to any adjustments set forth elsewhere in this Agreement.

    1.1    Purchase Price: $6,500,000.00.

    1.2    Initial Deposit: $100,000.00

    1.3    Closing Date: 30 days after the expiration or waiver of the Approval Period.

    1.4    Approval Period: Subject to the provisions of Section 4.2, the 45-day period commencing on the Effective Date for review of the Property.

    1.5    Escrow Holder: Fidelity National Title Insurance Company

    1.6    Title Company: Fidelity National Title Insurance Company

    1.7    Seller's Broker: Continental Realty, Ltd.

    1.8    Buyer's Broker: None

### ARTICLE 2 - PURCHASE AND SALE OF PROPERTY

Upon the terms and conditions set forth in this Agreement, Seller agrees to sell, assign and convey to Buyer, and Buyer agrees to purchase and assume from Seller, the following (collectively, the "**Property**"):

    2.1    Real Property. The real property located in the City of Columbus, County of Franklin, State of Ohio commonly known as 1333 Morse Road, Columbus, Ohio, and more particularly described on Exhibit A (the "**Land**"), together with a 1-story education building of 61,314 square feet located thereon (the "**Improvements**"), together with other land as described on Exhibit A and all rights, interests, benefits, privileges, easements and appurtenances to the Land and the Improvements, if any (the Land, the Improvements and all such listed interests,

1

benefits, easements, and appurtenances are referred to collectively herein as the **"Real Property"**).

  2.2 <u>Personal Property</u>. All tangible personal property, including, without limitation, furniture and equipment, as well as all and fixtures (if any) owned by Seller that are located on the Land and/or the Improvements as of the Closing or used in the operation or maintenance of the Land and/or the Improvements (the **"Personal Property"**).

  2.3 <u>Entitlements and Permits</u>. All right, title, and interest, if any, and without any representations or warranties of any kind by Seller, in and to any transferable licenses, permits, entitlements, approvals, and rights to develop issued by any governmental agencies with jurisdiction over the Property to the extent they: (a) were issued to or are held in the name of the Seller; and (b) are related to the Land and the Improvements.

## ARTICLE 3 - PURCHASE PRICE; FUNDS HELD BY ESCROW HOLDER

  3.1 <u>Purchase Price</u>. The purchase price for the Property shall be the purchase price specified in <u>Section 1.1</u> (the **"Purchase Price"**), subject to the prorations and adjustments provided in this Agreement. Buyer shall deliver the Deposit as provided in <u>Section 3.2</u>, and the balance of the Purchase Price shall be paid by Buyer into Escrow in immediately available funds at the Closing.

  3.2 <u>Deposit</u>. Within two (2) business days after the Effective Date, Buyer shall deliver to the Escrow Holder, in its capacity as escrow holder, immediately available funds the Initial Deposit in the amount specified in <u>Section 1.2</u> (the **"Deposit"**). Time is of the essence in connection with the delivery to Escrow Holder of the Deposit, and Buyer's failure to do so shall be deemed to constitute a default by Buyer pursuant to <u>Section 13.3</u>. Upon the expiration of the Approval Period, the Deposit shall become non-refundable to Buyer except in the event that (i) Seller fails, refuses, or is unable to perform all of its obligations under this Agreement, (ii) the conditions to Buyer's obligations are not satisfied, or (iii) as otherwise set forth in this Agreement, but will at all times remain applicable to the Purchase Price at the Closing.

  3.3 <u>Interest</u>. Escrow Holder shall invest the Deposit in a federally insured account or such other account as may be approved by Seller and Buyer in writing and any interest earned thereon (the **"Interest"**) shall be for the benefit of Buyer while the Deposit remains refundable to Buyer, and for the benefit of Seller after the Deposit becomes non-refundable under the terms of this Agreement.

## ARTICLE 4 - BUYER'S DUE DILIGENCE; "AS-IS" PURCHASE

  4.1 <u>Property Documents</u>. Seller has made or within three (3) days after the Effective Date will make available to Buyer (either directly or by delivery to Buyer's counsel), copies (or, at Seller's election, originals) of any items in Seller's possession relating to the Property (collectively, the **"Property Documents"**), except for internal reports, projections, attorney-client correspondences, and other documents that Seller identifies as confidential. The Property Documents shall include, but not be limited to, the following, to the extent in Seller's possession or control: (i) a current preliminary title report, (ii) any recent books, records or

2



reports pertaining to the ownership, condition or maintenance of the Property, and (iii) all agreements, contracts, charters, operating agreements, and leases or other occupancy agreements pertaining in any way to the Property, including any agreements allowing a third party to use or operate the Parking Lots. Seller represents and warrants to Buyer that to Seller's knowledge, other than the Property Documents being delivered to Buyer, Seller does not have any other material information or documents in its possession or control relating to the Property. Buyer shall conduct its own due diligence with respect to all matters concerning the Property.

       4.2    <u>Buyer's Right to Terminate During Approval Period</u>. Buyer intends to conduct certain due diligence with respect to the Property after the Effective Date. Buyer will have the period commencing on the Effective Date and expiring at 5:00 P.M. (Pacific Time) on the date that is forty five (45) days after the Effective Date ("**Approval Period**") to conduct all due diligence of the Property. If, following Buyer's due diligence investigations as contemplated in this <u>Section 4.2</u>, Buyer is dissatisfied with any aspect of the Property for any reason or no reason at all within its sole and absolute discretion during the Approval period, Buyer may elect to terminate this Agreement by causing a written notice of such election (a "**Buyer's Termination Notice**") to be delivered to Seller and to the Escrow Holder at any time before 5:00 P.M. (Pacific Time) on the last day of the Approval Period.

       4.3    Buyer's failure to timely deliver a Buyer's Termination Notice will be deemed to be Buyer's election to approve the Property and move forward to the Closing. If, on the other hand, Buyer elects to terminate this Agreement on or before the expiration of the Approval Period, the following shall apply: (i) Seller shall have no obligation to sell Buyer the Property; (ii) Buyer shall deliver to Seller all of the due diligence materials received from Seller, including, without limitation, the Property Documents and any environmental reports; *(iii)* Escrow Holder shall return the Deposit to Buyer; and *(iv)* this Agreement shall terminate and neither party shall have any further rights or obligations under this Agreement except as provided in <u>Sections 4.3</u> and <u>11.1</u>.

       4.4    <u>Access</u>. Subject to the terms and conditions set forth in this <u>Section 4.3</u>, for so long as this Agreement remains in effect, Buyer and its authorized agents and representatives may enter upon the Land and the Improvements during normal business hours (as hereinafter defined) for the purpose of conducting Buyer's due diligence with respect to its investigation of the Property. As used in this Agreement, "**normal business hours**" means the hours between 9:00 a.m. and 5:00 p.m. (Pacific Time) on all days other than Saturday, Sunday and legal holidays.

       4.4.1    <u>Conditions to Entry</u>. Neither Buyer nor its agents or representatives may enter upon the Land and/or the Improvements for the purpose of inspecting or testing any portion thereof, interviewing the tenant or for any other reason without having given Seller notice of its intention to enter the Land and/or the Improvements at least one (1) business day before such entry. Seller may impose reasonable conditions and restrictions on Buyer's right to enter the Land and the Improvements under this Agreement (except that Seller may not deny Buyer entry) and Buyer agrees to comply with any such conditions and restrictions in exercising its rights hereunder. Without limiting the foregoing, Seller may require that an employee or

3



representative of Seller accompany Buyer and its agents and representatives during any such entry. Notwithstanding the preceding sentence, no Seller representative will have the right to participate in or observe interviews with the tenant at the Property; provided that Buyer covenants not to unreasonably interfere with the tenant's business or operations when Buyer conducts such interviews or any other investigations at the Property. In no event may Buyer or its representatives materially disrupt or disturb the ongoing operation of the Property or the business conducted by the tenant on the Property. Buyer may drill or bore on or through the surface of the Land, and conduct any other physical testing of the Property upon notice to Seller of such tests. After making any tests and inspections, Buyer shall promptly restore the Property to its condition before such tests and inspections were performed (which obligation shall survive the termination of this Agreement).

4.4.2   <u>Insurance</u>. Before entering the Land and/or the Improvements, Buyer shall have in place, and cause each of its contractors and agents to maintain (and shall deliver to Seller evidence thereof), general liability insurance, from an insurer reasonably acceptable to Seller, in the amount of $1,000,000 combined single limit for personal injury and property damage per occurrence, such policies to name Seller as an additional insured party, which insurance shall provide coverage against any claim for personal liability or property damage caused by Buyer or its representatives in connection with Buyer's inspections of and tests conducted on the Property.

4.4.3   <u>Indemnification</u>. Buyer shall keep the Property free from all liens resulting from or related to its entry and indemnify, defend and hold harmless, to the extent of and in proportion to Buyer's or its representatives' negligence, Seller and Seller's officers, directors, shareholders, beneficiaries, members, partners, agents, employees and attorneys, and their respective successors and assigns, from and against all claims, actions, losses, liabilities, damages, costs and expenses (including, but not limited to, reasonable attorneys' fees and costs) incurred, suffered by, or claimed against Seller by reason of any damage to the Property or injury to persons caused by Buyer and/or its agents, employees or contractors acting within the scope of their engagement arising out of their entry upon the Property and/or the performance of any inspections, tests or other due diligence related thereto; provided, however, such indemnification obligation shall not be applicable to Buyer's mere discovery of any pre-existing adverse physical condition at the Property, except to the extent Buyer and/or Buyer's agents, employees, contractors or consultants aggravate such pre-existing condition. This indemnity shall survive the Closing or any termination of this Agreement.

4.5   <u>Buyer's Investigations</u>. Buyer, either independently or through agents, representatives or consultants selected by it, may conduct all inspections, investigations, tests, analyses and evaluations of the Property as Buyer deems necessary or otherwise appropriate, at Buyer's sole cost and expense in accordance with <u>Section 4.4</u>.

4.6   <u>AS-IS</u>. BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT SELLER IS SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "AS IS WITH ALL FAULTS" BASIS AND THAT BUYER IS NOT RELYING ON ANY

4



REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS OR BROKER AS TO ANY MATTERS CONCERNING THE PROPERTY, INCLUDING WITHOUT LIMITATION: (*i*) the quality, nature, adequacy and physical condition and aspects of the Property, including, but not limited to, the structural elements, foundation, roof, appurtenances, access, landscaping, parking facilities and the electrical, mechanical, HVAC, plumbing, sewage, and utility systems, facilities and appliances, the square footage within the Improvements and within each tenant space therein; (*ii*) the quality, nature, adequacy, and physical condition of soils, geology and any groundwater; (*iii*) the existence, quality, nature, adequacy and physical condition of utilities serving the Real Property; (*iv*) the development potential of the Real Property, and the Real Property's and Personal Property's use, habitability, merchantability, or fitness, or the suitability, value or adequacy of the Real Property and the Personal Property for any particular purpose; (*v*) the zoning or other legal status of the Real Property or any other public or private restrictions on use of the Real Property and the Personal Property; (*vi*) the compliance of the Real Property and the Personal Property with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or quasi-governmental entity or of any other person or entity (including, without limitation, the Americans with Disabilities Act); (*vii*) the presence or release of any hazardous materials on, under or about the Real Property or the adjoining or neighboring property; (*viii*) the quality of any labor and materials used in any Improvements; (*ix*) the condition of title to the Property; (*x*) the condition of the Personal Property; and (*xi*) the economics of the operation of the Property.

4.7     Release.   Without limiting Sections 4.3 or 4.5, Buyer on behalf of itself and its successors and assigns waives its right to recover from, and forever releases and discharges Seller and Seller's affiliates, and the partners, trustees, shareholders, directors, officers, members, managers, attorneys, employees and agents of each of them, and their respective heirs, successors, personal representatives and assigns, from any and all demands, claims, legal or administrative proceedings, losses, liabilities, damages, penalties, fines, liens, costs or expenses whatsoever (including, without limitation, reasonable attorneys' fees and costs), whether direct or indirect, known or unknown, foreseen or unforeseen, that may arise on account of or in any way be connected with the Property unless such claims were known to Seller but not disclosed to Buyer.  The waiver and release in the preceding sentence applies to, without limitation, the physical and structural condition of the Property or any law or regulation applicable thereto.  With respect to the waiver and release set forth herein relating to claims unknown to or unsuspected by Seller or Buyer, Buyer hereby acknowledges that such waiver and release is being made after obtaining the advice of counsel:

Without otherwise limiting the effect of the release in this Section 4.7, Seller agrees that the provisions of this Section will not apply to and Seller shall remain liable for (i) any claim or cause of action arising out of a breach or alleged breach of a representation or warranty by Seller under Section 6.1 of this Agreement and  in any of the other documents and instruments executed or delivered in connection with the transactions contemplated hereby, (ii) any other breach by Seller of an express obligation of Seller under this Agreement or in any of the other documents and instruments executed or delivered in connection with the transactions contemplated hereby which by its terms survives the Closing, and (iii) any fraud, including, without limitation, the failure to disclose a material fact relating to the Property actually known

5



to Seller and not otherwise known or disclosed to Buyer or readily apparent through its own investigation of the Property (herein collectively the **"Excluded Claims"**). The Excluded Claims shall survive the Closing for a period of one year.

## ARTICLE 5 - TITLE

5.1     Title Report.   Within ten (10) days after the Effective Date, Seller shall deliver to Buyer a title commitment for an ALTA extended coverage owner's policy of title insurance from the Title Company specified in Section 1.6 (the "**Title Company**"), in a form reasonably acceptable to Buyer, for the Real Property and copies of all documents relating to the title exceptions referred to in such commitment (the "**Title Report**").

5.2     Conditions of Title.   At the Closing, Buyer will take title to the Real Property subject to the following matters (hereafter, the "**Permitted Exceptions**") unless such matters are disapproved by Buyer in accordance with the terms of Section 5.3:

        5.2.1     Taxes.     Liens for non-delinquent real property taxes and assessments.

        5.2.2     Laws and Regulations.     All applicable laws, ordinances and regulations, including, without limitation, those relating to zoning or land use.

        5.2.3     Inspection and Survey Matters.   Any matters or state of facts that would be disclosed by an inspection or accurate survey of the Real Property.

        5.2.4     Matters Created by Buyer.   Any matters or interests created or otherwise caused by Buyer or its agents and representatives.

        5.2.5     Covenants, Restrictions and Easements.   All recorded covenants, conditions, restrictions, easements and agreements affecting the Real Property which are approved by Buyer in accordance with Section 5.3.

        5.2.6     Standard Exceptions.   The printed standard exceptions listed in the Title Report.

5.3     Title Objections.    Buyer shall notify Seller in writing of any title exceptions identified in the Title Report of which Buyer disapproves.  Buyer's failure to give any such notice by the end of the Approval Period will constitute Buyer's approval of the condition of title as set forth in the Title Report and all of the exceptions in the Title Report shall be deemed to be Permitted Exceptions.   No less than 10 days after Seller's receipt of any such notice of disapproval from Buyer, Seller shall notify Buyer in writing of any disapproved title exceptions that Seller is unable or unwilling to cause to be removed or insured against prior to or at Closing; provided, however, notwithstanding anything in this Agreement to the contrary, at or before the closing Seller shall, at no cost or expense to Buyer: (i) remove any liens or encumbrances securing a debt, any mechanic's, materialman's, or other monetary liens (other than the lien for property taxes not yet due and payable) and any judgments against Seller that affect the Property; (ii) satisfy the Title Company as to Seller's power and authority to enter into

6



this Agreement and to convey the Property to Buyer and otherwise consummate the transactions contemplated hereby; and (iii) execute such affidavits as are reasonably requested by the Title Company to cause the issuance of the Title Policy as hereinafter defined.  Seller's silence as to any disapproved title exception constitutes Seller's commitment to cause such exception to be removed or insured against on or before Closing.  If Seller indicates its unwillingness or inability to cause the elimination of any disapproved title exception, Buyer will have 10 days after its receipt of Seller's notification to either: (i) waive its objection to the disapproved title exception and cause this Agreement to remain in full force and effect; or (ii) terminate this Agreement in accordance with the provisions of Section 4.2 above.  If Buyer fails to notify Seller of its election of one of the two options stated in the preceding sentence within such 10-day period, then Buyer will be deemed to have waived its objection to any disapproved title exception, and any such exception will be deemed to be a Permitted Exception.   Buyer shall have the right to update its title and survey examinations of the Property until the Closing Date, and in the event that such update or examinations disclose any matters not identified in the original Title Report delivered to Buyer (a "**New Objection**"), provided such New Objection was caused by Seller, Buyer shall deliver to Seller a statement of any New Objections and Seller shall have until the Closing Date to cure any New Objections.  In the event that Seller fails to cure all New Objections on or before the Closing Date, (i) Buyer may terminate this Agreement and receive a full refund of the Deposit from Escrow Agent, and thereafter this Agreement shall be null and void and of no further force or effect, and neither Buyer nor Seller shall have any further rights, duties, liabilities or obligations to the other by reason hereof, except for those matters this specifically survive such termination; or (ii) Buyer may cure the New Objections caused by Seller and deduct the reasonable cost thereof from the Purchase Price otherwise payable by Buyer at Closing; or (iii) Buyer may waive such objections and consummate the transaction contemplated herein without reduction of the Purchase Price.

## ARTICLE 6 – REPRESENTATIONS, WARRANTIES AND COVENANTS

6.1     Representations and Warranties of Seller.  Seller represents and warrants to Buyer that the following matters are true and correct as of the date of this Agreement and, subject to Section 6.3, will also be true and correct as of the Closing:

6.1.1     Good Standing.   Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Georgia and has full power and authority to enter into this Agreement (and the additional documents contemplated by this Agreement) and perform its obligations hereunder and complete the transaction contemplated hereby.

6.1.2     Authorization and Validity.   This Agreement is, and all the documents executed by Seller which are to be delivered to Buyer at the Closing will be, duly authorized, executed, and delivered by Seller, and is and will be legal, valid, and binding obligations of Seller enforceable against Seller in accordance with their respective terms (except to the extent that such enforcement may be limited by applicable law), and does not and will not violate any provisions of any agreement to which Seller is a party or to which it is subject.



6.1.3   <u>No Bankruptcy Proceedings</u>.   Seller has not made a general assignment for the benefit of creditors, (*ii*) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by Seller's creditors, (*iii*) suffered the appointment of a receiver to take possession of all or substantially all of Seller's assets (other than as described in <u>Section 14.19</u> of this Agreement), or (*iv*) suffered the attachment or other judicial seizure of all or substantially all of Seller's assets.

6.1.4   <u>Leases</u>.   There are no leases applicable to the Property or other licenses, use agreements, or rights of third parties to possess any portion of the Land other than as disclosed to Buyer as part of the Property Documents.

6.1.5   <u>Code Compliance</u>.   Except as disclosed to Buyer as part of the Property Documents, to Seller's knowledge Seller has not received any written notice from any governmental agency that the Property or any condition existing thereon or any present use thereof violates any law or regulations applicable to the Property.

6.1.6   <u>Contracts</u>.   Seller is not a party to any service contracts, maintenance contracts, management contracts or similar agreements relating to the Real Property that will survive the Closing.

6.1.7   <u>No Litigation</u>.   To Seller's knowledge, except as disclosed to Buyer as part of the Property Documents, Seller has not received written notice of any pending or threatened condemnation, litigation or other court proceeding against or relating to the Property, or against Seller that would (*i*) result in a judgment or other lien filed against the Real Property, (*ii*) otherwise affect the use or occupancy of the Real Property, or (*iii*) materially and adversely affect the ability of Seller to perform its obligations under this Agreement.   To Seller's knowledge, no notice of violation of any federal, state, county or municipal or other governmental agency law, ordinance, regulation, order, rule or requirement relating to any portion of the Property has been issued or entered or received by Seller, and Seller has no reason to believe that any such notice may or will be, issued, entered or received.

6.1.8   <u>Hazardous Materials</u>.   To Seller's knowledge, except as disclosed to Buyer in the Property Documents, there are no Hazardous Materials (as defined in any environmental statute) on or under the Property causing the Property to be in violation of any applicable laws, and Seller has not caused any Hazardous Materials to be stored, transported, spilled or brought on the Property.

6.1.9   <u>Material Information</u>.   To Seller's knowledge, the Property Documents constitute all documents and data relating to the Property that is within Seller's possession and that is material to the acquisition of the Property.   To Seller's knowledge, all due diligence materials delivered to Buyer are true and correct in all material respects. To Seller's knowledge, no building or other improvement outside of the Property relies on any part of the Property to fulfill any zoning, building code or other governmental or municipal requirements or for structural support or the furnishing to such building or improvement of any building system or utilities.   To Seller's knowledge, no part of the Property relies on any building, improvement or other land not included in

8



the Property to fulfill any zoning, building code or other governmental or municipal requirements or for structural support or the furnishing to such improvement of any building system or utilities.

6.1.10 <u>Consent</u>. Except as described in <u>Section 14.19</u>, the execution, delivery and performance of this Agreement by Seller and the consummation by Seller of the transaction contemplated hereby will not violate (with or without the giving of notice or the lapse of time or both), or require any consent, approval, filing or notice under any provision of any law, rule or regulation, court order, judgment, decree, contract or agreement applicable to Seller or the Property.

6.1.11 <u>Unrecorded Documents</u>. Other than as disclosed in the Property Documents, the Title Report, or any other documents delivered to Buyer, Seller has not entered into any unrecorded contracts, leases, easements or other agreements with respect to the Property that would be binding on Buyer or the Property following the Closing. Seller has no knowledge of any claim of any third party affecting the use, title, occupancy or development of the Property that has not been disclosed to Buyer. Seller has not granted any right of first refusal, option or other right to acquire all or any part of the Property.

6.1.12 <u>Insurance Notices</u>. Seller has not received any written notice from any insurance carrier relating to a claim at the Property, and to Seller's knowledge, there are no defects or inadequacies in the Land and Improvements which, if not corrected, would result in termination of insurance coverage or increase its cost.

6.1.13 <u>Non-Foreign Status</u>. Seller is not a "foreign person" as that term is defined in Section 1445 of the Internal Revenue Code, as amended, and any applicable regulations promulgated thereunder.

6.2     <u>Representations and Warranties of Buyer</u>. Buyer represents and warrants to Seller that the following matters are true and correct as of the date of this Agreement and will also be true and correct as of the Closing:

6.2.1   <u>Good Standing</u>. Buyer is a limited liability company, duly formed, validly existing, and in good standing under the laws of the State of Delaware, Buyer has the full power and authority to enter into this Agreement (and any additional documents contemplated by this Agreement) and perform its obligations hereunder and complete the transaction contemplated hereby.

6.2.2   <u>Authorization and Validity</u>. This Agreement is, and all the documents executed by Buyer which are to be delivered to Seller at the Closing will be, duly authorized, executed, and delivered by Buyer, and is and will be legal, valid, and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms (except to the extent that such enforcement may be limited by applicable law), and does not and will not violate any provisions of any agreement to which Buyer is a party or to which it is subject. After the expiration of the Approval Period, Buyer will require no further consent of any person, administrative body, governmental authority or

9



other party in connection with the performance of its obligations under this Agreement and the instruments referenced herein and the consummation of the transaction contemplated by this Agreement.

6.2.3   No Bankruptcy Proceedings.  Buyer has not (*i*) made a general assignment for the benefit of creditors, (*ii*) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by Buyer's creditors, (*iii*) suffered the appointment of a receiver to take possession of all or substantially all of Buyer's assets, or (*iv*) suffered the attachment or other judicial seizure of all or substantially all of Buyer's assets.

6.3   General Provisions.

6.3.1   Definition of "Seller's Knowledge".  All references in this Agreement to the phrase "Seller's knowledge" or words of similar import shall refer only to the present actual knowledge of Katie Goodman, the managing partner of the receiver appointed to oversee Seller's assets (the "**Designated Owner**").  The use of the phrase "Seller's knowledge," or words of similar import, will not be construed to refer to the knowledge of any other officer, agent or employee of Seller except the Designated Owner or any affiliate thereof or to impose or have imposed upon the Designated Owner any duty to investigate the matters to which such knowledge, or the absence thereof, pertains, including, but not limited to, the contents of the files, documents and materials made available to or disclosed to Buyer or the contents of files maintained by the Designated Owner or Seller's counsel.  There shall be no personal liability on the part of the Designated Owner arising out of any representations or warranties made herein.

6.3.2   Update of Seller's Representations and Warranties.  Seller's representations and warranties in Section 6.1 shall be deemed to have been remade at and as of the Closing Date with the same force and effect as if first made on and as of such date, and Seller shall execute at Closing in favor of Buyer a certification to that effect at least 2 business days prior to the Closing (a "**Closing Certificate**").  If the Closing Certificate discloses any new matters (i.e. a matter which was not disclosed in the original representations and warranties set forth in this Agreement (or on the original schedules and exhibits to this Agreement) arising out of circumstances first occurring after the Effective Date, which inaccuracy does not constitute a breach of any of Seller's representations or warranties as of the Execution Date, but does make any of Seller's representations or warranties inaccurate in any material respect as of the date of the Closing Certificate, and as a result of such inaccuracy (each an "**Inaccuracy**") Buyer would reasonably be expected to incur damages for which such Buyer would otherwise be entitled to pursue a claim under this Agreement, then the Buyer shall elect by written notice to Seller and Escrow Agent given on or before the Closing Date, to either (i) waive such Inaccuracy and complete the purchase of the Property in accordance with the terms of this Agreement; or (ii) terminate this Agreement, receive a return of the Deposit and pursue other remedies available to Buyer hereunder.  Buyer's failure to timely deliver such a notice to Seller and Escrow Agent shall be deemed Buyer's election to waive such

10



Inaccuracy and complete the purchase of the Property in accordance with the terms of this Agreement, in which event Seller shall have no liability for such Inaccuracy.

      6.3.3    <u>Seller's Representations Deemed Modified</u>.   To the extent that Buyer actually knows or learns before the Closing that Seller's representations and warranties are inaccurate, untrue or incorrect in accordance with <u>Section 6.3.2</u>, above, such representations and warranties shall be deemed modified to reflect Buyer's knowledge, but without limiting any of Buyer's rights pursuant to <u>Section 6.3.2</u>.

      6.3.4    <u>Notice of Breach by Seller; Seller's Right to Cure</u>.   If, prior to the Closing, Buyer or any representative, attorney, consultant, engineer or agent of Buyer obtains actual knowledge that any of the representations or warranties made herein by Seller are untrue, inaccurate or incorrect in any material respect, Buyer shall give Seller written notice thereof within 5 business days of obtaining such knowledge (but, in any event, prior to the Closing). If, prior to the Closing, Seller obtains knowledge that any of the representations or warranties made herein by Seller are untrue, inaccurate or incorrect in any material respect, Seller shall give Buyer written notice thereof within 5 business days of obtaining such knowledge (but, in any event, prior to the Closing). In either such event, Seller shall have the right to cure such inaccuracy or breach of a covenant and shall be entitled to a reasonable adjournment of the Closing (not to exceed 30 days) for the purpose of such cure. If Seller is unable to cure any such material inaccuracy, then Buyer, as its sole remedy for any and all such materially untrue, inaccurate or incorrect material representations or warranties, shall elect either (*i*) to proceed to the Closing without any reduction of or credit against the Purchase Price, or (*ii*) to terminate this Agreement by written notice given to Seller on the Closing Date, in which event: (*a*) Seller shall have no obligation to sell the Property to Buyer; (*b*) Buyer shall deliver to Seller all of the materials received from Seller, including without limitation, the Property Documents and any documents relating to the Property prepared or commissioned by Buyer (without any representation or warranty as to their accuracy or completeness); (*c*) Escrow Holder and Seller, as applicable, shall deliver the Deposit to Buyer, (*d*) Seller shall reimburse Buyer for Buyer's actual out-of-pocket expenses (including without limitation reasonable attorney's fees) in connection with negotiating and preparing this Agreement and Buyer's due diligence review of the Property in an amount not to exceed $75,000, and (*e*) this Agreement shall terminate and neither party shall have any further rights or obligations under this Agreement.

      6.3.5    <u>Material Breach</u>. Notwithstanding the provisions of <u>Section 6.3.4</u> above, if Buyer learns (either as a result of a disclosure by Seller or by its own investigations) that any representation or warranty by Seller is untrue, but such inaccurate or incorrect representation or warranty is not untrue, inaccurate or incorrect in any material respect (as defined below), Buyer shall be deemed to waive such misrepresentation or breach, and Buyer shall be required to consummate the transaction contemplated by this Agreement without any reduction of or credit against the Purchase Price. If the untrue, inaccurate, or incorrect representation or warranty is determined to be material by a trier of fact or by an agreement of the parties, and if Seller elects to proceed to the Closing under clause (*i*) in <u>Section 6.3.4</u> above, then Buyer will maintain



the right to bring an action against Seller for any losses suffered or damages incurred by Buyer as a result of such untrue, inaccurate or incorrect representation or warranty; provided that in no event will the maximum aggregate liability of Seller exceed $100,000. The untruth, inaccuracy or incorrectness of a representation or warranty shall be deemed "material" only if Buyer's aggregate damages resulting from the untruth, inaccuracy or incorrectness of any of the representations or warranties are reasonably estimated by Buyer to exceed $10,000.

6.4     Seller's Operating Covenants.  From the Effective Date until the Closing Date or earlier termination of this Agreement, Seller covenants and agrees to operate and maintain the Property in the same manner as Seller has historically maintained and operated the Property prior to the Effective Date. Seller shall not take any material action with respect to the operation of the property without Buyer's prior written consent, which consent (i) will not be unreasonably withheld conditioned or delayed before the end of the Approval Period, and (ii) may be withheld in Buyer's sole and absolute discretion following the end of the Approval Period.

## ARTICLE 7 - CONDITIONS TO CLOSING

7.1     Conditions to Buyer's Obligations.  Buyer's obligation to consummate the purchase and sale transaction contemplated by this Agreement is subject to the satisfaction or waiver of the following conditions (the "**Buyer's Conditions Precedent**"):

7.1.1     Title Policy.  The Title Company shall have committed to issue, as of the Closing, an ALTA owner's policy of title insurance on the form issued in the State of Ohio, insuring Buyer's interest in the Real Property with liability in the amount of the Purchase Price, subject only to the Permitted Exceptions and including any endorsements reasonably requested by Buyer (the "**Title Policy**").

7.1.2     No Breaches.  Seller will not have materially breached any of its representations, warranties or covenants set forth in this Agreement, and none of Seller's representations or warranties, though true when made, will have become inaccurate as of the Closing.

7.1.3     Seller Deliveries.  Seller shall have delivered to the Escrow Holder the items described in Section 8.4.

7.1.4     No Termination of this Agreement.  Neither Seller nor Buyer shall have terminated this Agreement in accordance with the terms hereof.

7.1.5     Post-Closing Leases.  Buyer and Seller shall have executed the Charter Lease (defined in section 14.18 below).

The conditions set forth in this Section 7.1 are solely for the benefit of Buyer and may be waived only by Buyer and no such waiver is effective unless specifically contained in a written instrument executed by Buyer and delivered to Seller or Escrow Holder.

12

18992850v.4



7.1.6  Necessary Approvals.  All necessary approvals and consents to the sale have been received by Seller and delivered to Buyer, including the court approval described in Section 14.19.

7.2  Conditions to Seller's Obligations.  Seller's obligation to consummate the purchase and sale transaction contemplated by this Agreement is subject to the satisfaction of the following conditions (the "**Seller's Conditions Precedent**"):

7.2.1  No Breaches.  Buyer shall not have materially breached any of Buyer's representations, warranties or covenants set forth in this Agreement, as of the Closing.

7.2.2  Buyer Deliveries.  Buyer shall have delivered to Escrow Holder the items described in Section 8.5.

7.2.3  No Termination of this Agreement.  Neither Seller nor Buyer shall have terminated this Agreement in accordance with the terms hereof.

The conditions set forth in this Section 7.2 are solely for the benefit of Seller and may be waived only by Seller.

## ARTICLE 8 - ESCROW AND CLOSING

8.1  Opening of Escrow.  Buyer and Seller have selected the Escrow Holder to act as escrow holder with respect to the transaction contemplated by this Agreement. Concurrently with the execution of this Agreement, Buyer and Seller each shall deposit a duplicate original of this Agreement executed by such party (or either of them shall deposit a duplicate original executed by both Buyer and Seller) with Escrow Holder.  This Agreement, together with such further instructions, if any, as the parties shall provide to Escrow Holder by written agreement, shall constitute the escrow instructions with respect to the escrow for the transaction contemplated by this Agreement (the "**Escrow**").  If any requirements relating to the duties or obligations of Escrow Holder hereunder are not acceptable to Escrow Holder, or if Escrow Holder requires additional instructions, the parties agree to make such deletions, substitutions and additions hereto as counsel for Buyer and Seller shall mutually approve, which additional instructions shall not materially alter the terms of this Agreement unless otherwise expressly agreed to by Seller and Buyer.  Escrow Holder, by executing this Agreement, hereby acknowledges that this Agreement constitutes the escrow instructions for the sale of the Property and agrees to follow the escrow instructions provided herein.

8.2  Closing Date.  Subject to the rights of either party to specify the Closing Date as expressly provided in this Agreement, the purchase and sale transaction contemplated by this Agreement shall close on the date specified in accordance with Section 1.3 of this Agreement (the "**Closing Date**").  For purposes of this Agreement, the "**Closing**" shall be deemed to occur when the Deed (as defined in Section 8.5.1) is recorded in the Official Records in Ohio (the "**Official Records**") and the "Closing Date" will be the date on which such recording occurs.  Seller must provide no less than ten days' notice to Buyer in order to specify the date on which the Closing Date will occur.

13



8.3     Seller's Deliveries to Escrow.  At least 1 business day prior to the Closing Date, Seller shall deliver or cause the following items (the original of each in form and substance acceptable to Buyer) to be delivered to Escrow Holder:

8.3.1   Deed.   One original limited warranty deed in a form that is customary in real estate transactions consummated in the State of Ohio, executed by Seller and acknowledged by a notary (the "**Deed**").

8.3.2   Certificates of Non-Foreign Status.  One original affidavit in the form of Exhibit B executed by Seller (collectively, the "**Certificates of Non-Foreign Status**")

8.3.3   Representations and Warranties.  A certificate certifying to Buyer that all representations and warranties of Seller contained herein are true and correct in all material respects as of the Closing or identifying any material changes to the representations and warranties discovered by Seller during the term of this Agreement.

8.3.4   Other Documents.    Any other documents, instruments or agreements reasonably necessary to effectuate the transaction contemplated by this Agreement.

8.4     Buyer's Deliveries to Escrow.  On or prior to the Closing Date, Buyer shall deliver or cause the following items to be delivered to Escrow Holder:

8.4.1   Funds.  The Purchase Price, less the amount of the Deposit held by Escrow Holder, together with such other sums as Escrow Holder shall require to pay Buyer's share of the closing costs, prorations, reimbursements and adjustments as set forth in Article 9, in immediately available funds.

8.4.2   Assignment.  Two originals of the Assignment executed by Buyer.

8.4.3   Other Documents.    Any other documents, instruments or agreements reasonably necessary to effectuate the transaction contemplated by this Agreement.

8.5     Disbursements and Other Actions by Escrow Holder.  Upon the Closing, Escrow Holder shall promptly undertake all of the following:

8.5.1   Calculation and Disbursement.  Disburse all funds deposited with Escrow Holder by Buyer as follows:

(a)     Deduct all items chargeable to the account of Seller pursuant to Article 9.

(b)     Disburse the balance of the Purchase Price and any additional amounts owed to Seller under this Agreement to Seller

14

18992850v.4



promptly upon the Closing by wire transfer in accordance with instructions received from Seller.

(c)     Disburse the remaining balance of the funds, if any, to Buyer promptly upon the Closing.

8.5.2   <u>Recordation of Deed</u>.  Cause the Deed and any other documents which the parties hereto may mutually direct to be recorded in the Official Records and obtain conformed copies thereof for distribution to Buyer and Seller.

8.5.3   <u>Deliveries to Seller</u>.  Deliver to Seller: an original Assignment and a conformed copy of the recorded Deed.

8.5.4   <u>Deliveries to Buyer</u>.  Deliver to Buyer: an original Assignment; the original Certificates of Non-Foreign Status; and a conformed copy of the recorded Deed.

8.5.5   <u>Title Policy</u>.  Direct the Title Company to issue the Title Policy to Buyer.

8.5.6   <u>Real Estate Reporting Person</u>.  Escrow Holder is designated the "real estate reporting person" for purposes of section 6045 of title 26 of the United States Code and Treasury Regulation 1.6045-4 and any instructions or settlement statement prepared by Escrow Holder shall so provide.  Upon the consummation of the transaction contemplated by this Agreement, Escrow Holder shall file Form 1099 information return and send the statement to Seller as required under the aforementioned statute and regulation.

## ARTICLE 9 - ADJUSTMENTS AND PRORATIONS

9.1   <u>Closing Costs</u>.  Seller shall pay (i) one-half of the cost of the premium of the Title Policy, (ii) all documentary, transfer and other taxes, (iii) all recording fees, and (iv) one-half of the Escrow Holder fees.  Buyer shall pay (a) one-half of the cost of the premium of the Title Policy, (b) one-half of the Escrow Holder fees, (c) the cost of the ALTA survey, if any, (d) all costs and expenses incurred in connection with obtaining any financing for the purchase of the Property, including title, escrow, documentation and appraisal costs relating thereto; and (e) all costs and expenses incurred in connection with Buyer's due diligence review of the Property pursuant to <u>Section 4</u>.

9.2   <u>Cancellation Fees</u>.  Unless otherwise specified herein, if the sale of the Property contemplated hereunder does not occur because of a failure of a Seller's Condition Precedent or a default on the part of Buyer, all escrow cancellation and title cancellation fees shall be paid by Buyer, and if the sale of the Property does not occur because of a failure of a Buyer's Condition Precedent or a default on the part of Seller, (*i*) all escrow cancellation and title cancellation fees shall be paid by Seller and (*ii*) in such event, notwithstanding any statement herein that the Deposit is non-refundable, all Deposit shall be returned to Buyer by Seller and the

15



Escrow Holder, as applicable.

9.3 <u>Insurance Not Prorated</u>. Escrow Holder shall not prorate insurance premiums under Seller's existing policies of insurance relating to the Property. None of Seller's insurance policies (or any proceeds payable thereunder, except as expressly provided for in <u>Article 12</u>) will be assigned to Buyer at the Closing. Buyer shall be solely obligated to obtain any and all insurance that it deems necessary or desirable.

### ARTICLE 10 - COVENANTS

10.1 <u>Seller's Covenants</u>. Seller covenants with Buyer that from the date of this Agreement until the earlier of the Closing or any termination of this Agreement:

10.1.1 <u>Insurance</u>. Seller shall maintain the same insurance with respect to the Property that is in effect as of the date of this Agreement.

10.1.2 <u>Maintenance</u>. Subject to <u>Article 12</u>, Seller shall maintain or cause its tenant to maintain, the Property in the same manner that it is being maintained on the date of this Agreement until the Closing Date. Seller shall cure any violations of applicable laws, regulations or other requirements for the Property that are required to be cured by any governmental agency with jurisdiction over the Property if such violation becomes known to Seller up until the date of the Closing. Seller will not enter into any new contracts which will survive Closing or otherwise affect the use, operation or enjoyment of the Property after Closing without Buyer's prior written consent, which consent may be withheld in Buyer's reasonable discretion, and which consent will be deemed to have been given by Buyer if Buyer does not notify Seller in writing to the contrary within three (3) business days after Seller provides written notice to Buyer of such new contract.

### ARTICLE 11 BROKERS AND EXPENSES

11.1 <u>Brokers</u>. If the Closing occurs, Seller shall be responsible for paying the broker specified in <u>Section 1.9</u> of this Agreement (the "**Seller's Broker**") a commission pursuant to a separate agreement; Seller has no obligation to pay any other brokerage fees, commissions or finder's fees or other compensation that is due or payable with respected to the transaction contemplated in this agreement  Seller shall indemnify, defend and hold Buyer harmless from and against any claims, losses, damages, costs and expenses (including, but not limited to, reasonable attorneys' fees and costs) incurred by Buyer by reason of any commission claimed to be owed as a result of Seller's actions or agreements, except as set forth in this <u>Section 11.1</u>. Buyer will have no obligation to pay any brokerage fees, commissions, finder's fees, or other compensation that is due or payable with respect to the transaction contemplated in this Agreement. The provisions of this <u>Section 11.1</u> shall survive the Closing.

11.2 <u>Legal and Other Fees</u>. Subject to <u>Sections 9.2</u>, <u>9.3</u> and <u>14.11</u>, each party shall pay its own expenses incurred in connection with this Agreement and the transaction contemplated hereby. Without limiting the generality of the foregoing, each party shall bear the



expense of its own counsel and consultants in connection with this transaction.

## ARTICLE 12 - RISK OF LOSS

12.1   <u>Condemnation</u>.  If Seller receives written notice of pending or threatened condemnation relating to all or any portion of the Real Property ("**Condemnation Notice**"), then: (*i*) Seller shall notify Buyer in writing of such fact promptly after obtaining knowledge thereof, and (*ii*) Seller may elect to terminate this Agreement by delivering written notice thereof to Buyer within 15 business days of Seller's receipt of the Condemnation Notice, in which event: (*a*) Seller shall have no obligation to sell the Property to Buyer; (*b*) Buyer shall deliver to Seller all of the due diligence materials received from Seller, including, without limitation, the Property Documents *(c)* Seller and the Escrow Holder as applicable shall deliver the Deposit to Buyer and neither party shall have any further rights or obligations under this Agreement except as provided in <u>Sections 4.3</u> and <u>11.1</u>.  If Seller does not elect to terminate this Agreement in accordance with the immediately preceding sentence and all or any portion of the Real Property is taken by eminent domain prior to the Closing, then this Agreement shall remain in effect and there shall be no abatement of the Purchase Price; <u>provided</u>, <u>however</u>, that, at the Closing, (*1*) Seller shall pay to Buyer the amount of any award for or other proceeds on account of such taking which have been actually paid to Seller prior to the Closing as a result of such taking less all costs and expenses, including reasonable attorneys' fees and costs, incurred by Seller as of the Closing in obtaining payment of such award or proceeds, or (*2*) to the extent such award or proceeds have not been paid, Seller shall assign to Buyer at the Closing, without recourse to Seller, the rights of Seller to, and Buyer shall be entitled to receive and retain, all awards for the taking of the Property or such portion thereof.

12.2   <u>Destruction or Damage</u>.  No "Material Loss" shall have occurred to the Property prior to the Closing Date.  For purposes of this Agreement, "Material Loss" means damage, loss, or destruction of the Property after the Effective Date in excess of $250,000.00. If, before the Closing Date, the Property suffers a Material Loss, Buyer may either terminate this Agreement and the rights and obligations of the parties hereunder while receiving a refund of the Deposit (the "**Termination Right**") or the right to accept the Property in its existing condition (the "**Acceptance Right**").  If Buyer exercises its Acceptance Right, Buyer will receive an assignment of all insurance proceeds, or other recoveries related thereto, at the Close of Escrow. If Buyer exercises its Termination Right, Buyer must notify Seller of this election within ten (10) business days after Buyer receives notice of the damage or destruction, and following such notice this Agreement will be terminated in accordance with the provisions of <u>Section 4.2</u>.

## ARTICLE 13 - DEFAULTS AND REMEDIES

13.1   <u>Notice of Default</u>.  If either party defaults in any of its obligations under this Agreement, the non-defaulting party shall give written notice of such default to the defaulting party.  If the defaulting party fails to cure such default within 10 business days after its receipt of the written default notice, then the non-defaulting party may elect, in addition to its other remedies permitted under this Agreement, including without limitation <u>Sections 13.2</u> and <u>13.3</u>, to terminate this Agreement by delivering written notice thereof to the defaulting party

17



within 5 business days after the expiration of such cure period, in which event this Agreement shall be of no further force or effect except for the those provisions which are expressly stated to survive the termination of this Agreement; provided, however, that Buyer shall not be entitled to any cure period on account of its failure to make the Deposit or due to its failure to deliver the Purchase Price to Escrow Holder as required under Section 8.6. This Section 13.1 does not apply to any alleged breach of a representation or warranty by Seller and any such alleged breach shall be governed by Sections 6.3.4 and 6.3.5.

      13.2   Seller's Default; Failure of Buyer's Conditions Precedent.

      13.2.1 Seller's Default. If the Closing fails to occur solely because of Seller's default, Buyer may elect, as its sole and exclusive remedy, to (i) terminate this Agreement as provided in Section 13.1, in which event, the Deposit shall promptly be delivered to Buyer or (ii) maintain an action for specific performance. If Buyer elects to proceed under clause (i) above, Buyer may bring a claim against Seller, and if Buyer is the prevailing party in such action, then Seller shall be responsible for all documented and reasonable out-of-pocket costs inspection, financing and other costs related to Buyer's entering into this Agreement, including, without limitation, Buyer's reasonable attorneys' fees, which return and recovery following such termination shall operate to release Seller from any and all further liability hereunder. If Buyer elects to proceed under clause (ii) above, and Buyer is the prevailing party in the specific performance action, Seller shall promptly pay to Buyer all costs incurred in enforcing its right to specific performance, including, without limitation, attorneys' fees. Under no circumstance shall Buyer have any right to seek or collect punitive or speculative damages under this Agreement.

      13.2.2 Failure of Buyer's Condition Precedent. If one or more of Buyer's Conditions Precedent is not satisfied on the Closing Date (other than a failed Buyer's Condition Precedent due to a default by Seller under this Agreement, which is covered by Section 13.2.1), Buyer may as its sole and exclusive remedy (i) waive the condition and proceed to close the transaction without any reduction in the Purchase Price, or (ii) terminate this Agreement following notice to Seller and providing Seller a reasonable opportunity to cure such failed condition. If, after a reasonable period, Seller refuses or is unable to satisfy such Condition Precedent, Buyer may terminate this Agreement in which case: (a) Seller shall have no obligation to sell the Property to Buyer; (b) Buyer shall deliver to Seller all of the due diligence materials received from Seller, including, without limitation, the Property Documents; (c) Seller and the Escrow Holder shall deliver the Deposit to Buyer; and this Agreement shall terminate and neither party shall have any further rights or obligations under this Agreement except as provided in Sections 4.3 and 11.1.

      13.3   BUYER'S DEFAULT. IF THE CLOSING FAILS TO OCCUR BECAUSE OF BUYER'S DEFAULT, THE DEPOSIT SHALL BE RETAINED BY SELLER AS LIQUIDATED DAMAGES. THE PARTIES HERETO EXPRESSLY AGREE AND ACKNOWLEDGE THAT SELLER'S ACTUAL DAMAGES IN THE EVENT OF A DEFAULT BY BUYER WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO

18



ASCERTAIN BECAUSE OF THE NATURE OF THE PROPERTY AND THAT THE AMOUNT OF THE DEPOSIT REPRESENTS THE PARTIES' REASONABLE ESTIMATE OF SUCH DAMAGES.   THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO APPLICABLE LAW.  NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS SECTION 13.3, SELLER AND BUYER AGREE THAT THIS LIQUIDATED DAMAGES PROVISION IS INTENDED TO BE SELLER'S SOLE AND EXCLUSIVE REMEDY FOR A DEFAULT BY BUYER, BUT IS NOT INTENDED AND SHOULD NOT BE DEEMED OR CONSTRUED TO LIMIT IN ANY WAY BUYER'S INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT. SELLER WAIVES ANY RIGHTS THAT IT MAY HAVE UNDER RELEVANT STATUTORY LAW TO SEEK SPECIFIC PERFORMANCE OR ANY OTHER REMEDY IN LAW OR IN EQUITY OTHER THAN THE RECEIPT OF THE DEPOSIT.

**SELLER'S INITIALS:**          **BUYER'S   INITIALS:**

## ARTICLE 14 - MISCELLANEOUS

14.1   Assignment.   Buyer may only assign this Agreement or its rights hereunder with Seller's prior written consent, unless the assignment is (i) to an entity controlling, controlled by, or under common control with Borrower, (ii) an affiliate of with Buyer, or (iii) to a special purpose entity in which Buyer holds an interest or is a direct or indirect member; provided that Buyer may not be released from its obligations under this Agreement in connection with such assignment. To the extent that Seller's consent is required in connection with an assignment, Seller agrees that its consent will not be unreasonably withheld or delayed.  Any assignee shall assume all of Buyer's obligations hereunder and succeed to all of Buyer's rights and remedies hereunder and any assignment and assumption must be in writing and delivered to Seller at least five (5) business days prior to the Closing Date.

14.2   Entire Agreement.  This Agreement is the entire Agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, whether oral or written, between the parties with respect to the matters contained in this Agreement.  Any waiver, modification, consent or acquiescence with respect to any provision of this Agreement shall be set forth in writing and duly executed by or in behalf of the party to be bound thereby.  No waiver by any party of any breach hereunder shall be deemed a waiver of any other or subsequent breach.

14.3   Counterparts.   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  The signature page of any counterpart may be detached therefrom without impairing the legal effect of the signature(s) thereon provided such signature page is attached to any other counterpart identical thereto except having additional signature pages executed by other parties to this Agreement attached thereto.

19

18992850v.4

14.4    Time of Essence.    Time is of the essence in the performance of and compliance with each of the provisions and conditions of this Agreement.

14.5    Survival.    Subject to Section 14.16, the covenants and releases of the parties expressly set forth in this Agreement shall survive the Closing and recording of the Deed.

14.6    Notices.    Any communication, notice or demand of any kind whatsoever which either party may be required or may desire to give to or serve upon the other shall be in writing and delivered by personal service, by an express delivery (such as Federal Express) or courier service that provides receipted delivery service, delivery charges prepaid, by electronic communication, whether by telex, electronic mail or telecopy (and, if the communication, notice or demand seeks to a declare a default under or terminate this Agreement, confirmed in writing sent on the same day by express delivery (such as Federal Express) or courier service that provides receipted delivery service), or by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

Buyer:                          Red Hook Capital Partners II, LLC
                                777 South Figueroa Street, Suite 800
                                Los Angeles, California 90071
                                Attention: Craig Underwood or John Ghiselli
                                Telephone: (213) 612-2463 or (310) 874-2008
                                cunderwood@redhookcap.com or
                                jghiselli@redhookcap.com

With a copy to:                 Seyfarth Shaw LLP
                                333 South Hope Street, 39th Floor
                                Los Angeles, California  90071
                                Attention:  Dana S. Treister, Esq.
                                Telephone:  (213) 270-9723
                                e-mail: dtreister@seyfarth.com

Seller:                         Columbus Morse Road Properties, LCC
                                c/o GGG Partners, LLC as Receiver
                                3400 Peachtree Road, Suite 550
                                Atlanta, GA 30305
                                Attention: Katie Goodman
                                Telephone: 404-293-0137
                                e-mail: kgoodman@gggmgt.com

Escrow Holder:                  Scroggins & Williamson
                                Attn: Hayden Kepner
                                The Candler Building
                                127 Peachtree Street, NE, Suite 1500
                                Atlanta, GA 30303



18992850v.4

404 893 3880
e-mail: hkcpncr@swlawfirm.com

Any party may change its address for notice by written notice given to the other in the manner provided in this Section 14.6. Any such communication, notice or demand shall be deemed to have been duly given or served on the date delivered, or if delivery is refused on the date of such refusal, provided, however, that any communication, notice or demand received by courier delivery or electronic communication that is received after 5:00 p.m. (local time for the addressee) shall be deemed to have been received on the next business day.

14.7    Further Assurances.  The parties agree to execute such instructions to the Escrow Holder and the Title Company and such other instruments and to do such further acts as may be reasonably necessary to carry out the provisions of this Agreement; provided, however, that Seller shall not be required to execute any affidavits, certificates or instruments in favor of the Title Company other than an owner's affidavit disclosing the tenants in possession of the Real Property and any possible mechanic's lien claims.

14.8    Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be valid under applicable law, but, if any provision of this Agreement shall be invalid or prohibited thereunder, such invalidity or prohibition shall be construed as if such invalid or prohibited provision had not been inserted herein and shall not affect the remainder of such provision or the remaining provisions of this Agreement.

14.9    Interpretation.  The language in all parts of this Agreement shall be in all cases construed simply according to its fair meaning and not strictly for or against any of the parties hereto.  Section headings of this Agreement are solely for convenience of reference and shall not govern the interpretation of any of the provisions of this Agreement.  References to "Sections" or "Articles" are to Sections or Articles of this Agreement, unless otherwise specifically provided.

14.10   Governing Law.  This Agreement shall be governed by, and interpreted and enforced in accordance with, the laws of the State of Ohio without giving effect to the conflicts of law principles of said state.

14.11   Attorneys' Fees.  For purposes of this Agreement, the term "**attorneys' fees**" or "**attorneys' fees and costs**" means the fees and expenses of counsel to the parties hereto, which may include printing, duplicating and other expenses, air freight charges, and fees billed for law clerks, paralegals and other persons not admitted to the bar but performing services under the supervision of an attorney. If any action be commenced (including an appeal thereof) to enforce any of the provisions of this Agreement or to enforce a judgment, whether or not such action is prosecuted to judgment ("**Action**"), *(i)* the unsuccessful party therein shall pay all costs incurred by the prevailing party therein, including reasonable attorneys' fees and costs, court costs and reimbursements for any other expenses incurred in connection therewith, and *(ii)* as a separate right, severable from any other rights set forth in this Agreement, the prevailing party therein shall be entitled to recover its reasonable attorneys' fees and costs incurred in enforcing

21



any judgment against the unsuccessful party therein, which right to recover post-judgment attorneys' fees and costs shall be included in any such judgment. The right to recover post-judgment attorneys' fees and costs shall (a) not be deemed waived if not included in any judgment, (b) survive the final judgment in any Action, and (c) not be deemed merged into such judgment. The rights and obligations of the parties under this Section 14.11 shall survive the termination of this Agreement.

14.12 Successors and Assigns. Subject to Section 14.1, this Agreement shall be binding upon and inure to the benefit of each of the parties hereto and to their respective transferees, successors and assigns.

14.13 No Third-Party Beneficiaries. No third party shall have any rights hereunder.

14.14 No Recordation. Neither this Agreement nor any memorandum or notice hereof shall be recorded.

14.15 Business Days. If any of the dates specified in this Agreement shall fall on a Saturday, a Sunday or a holiday, then the date of such action shall be deemed to be extended to the next business day.

14.16 Exhibits. Exhibits A through D, inclusive, attached hereto are incorporated herein by reference.

14.17 Reports. Notwithstanding any other provision of this Agreement, Buyer will have no obligation to deliver to seller any document that contains a prohibition on Buyer's ability to deliver the report to Seller (or any third party); provided that Buyer demonstrates in writing that it has made a commercially reasonable effort (which will include copies of any relevant correspondence) to obtain the consent of the person or entity that prepared the document to consent to its delivery to Seller.

14.18 Post-Closing Operations.

14.18.1 Columbus Humanities, Arts and Technology Academy Lease. During the Approval Period, Buyer shall attempt to execute (or reach a binding agreement to execute) a lease (the "Academy Lease") between Buyer, as landlord, and the Columbus Humanities, Arts and Technology Academy as tenant ("Academy Tenant"). The Academy Lease will continue to permit Academy Tenant to operate a charter school at the Property. The Academy Lease will: (i) lease the premises that the Academy Tenant is currently occupying at the Property, (ii) provide for a term of twenty (20) years, (iii) commence on or about the Closing Date (the "Lease Effective Date"), (iv) include rent of at least 99 cents per square foot, (v) allow Academy Tenant to abate up to $5,000 per month in rent for the first twelve (12) months of the term, (vi) include 3% annual rent escalations during the term, and (vii) require the establishment of a lock box account into which all payments from the State of Ohio will be made for the benefit of Buyer, as landlord, and from which rental payments will be swept before remaining funds are delivered to Academy Tenant.

22



14.18.2   Loan Abatement.   Seller agrees that any outstanding indebtedness payable by Academy Tenant to Seller or Mosaica Education Inc., or their successors or assigns (all such indebtedness, collectively the "**Seller Loan**") will be abated for a period of at least one year from the Lease Effective Date (the "**Abatement Period**"). During the Abatement Period, (i) no interest will accrue on the Seller Loan, (ii) no amounts (whether in the form of principal and interest payments or otherwise) will be due and payable with respect to the Seller Loan, and (iii) Seller shall not enforce any of its remedies with respect to the Seller Loan or any documents evidencing or securing the Seller Loan ("**Seller Loan Documents**"). If, after the Abatement Period, Academy Tenant has achieved a ratio of gross revenues to expenses of at least 1.20 to 1.00 for a trailing twelve month period ("**Specified Coverage**"), all of Academy Tenant's obligations and Seller's rights under the Seller Loan Documents will resume. At all times during the term of the Academy Lease, all payments payable to Seller pursuant to the Seller Loan Documents will be subordinate to Academy Tenant's obligations under the Academy Lease and Seller shall not collect any payments on account of the Seller Loan until Academy Tenant has paid any rent (including operating expenses) that is then due and payable under the Academy Lease and Academy Tenant is able to demonstrate that the Specified Coverage has been obtained. If Buyer transfers the Property to a third party during the term of the Academy Lease, and any obligations remain outstanding under the Seller Loan Documents, Seller shall execute a customarily reasonable subordination agreement in favor of such third party transferee or the holders of any tax exempt bonds issued in connection with any such purchase.

14.19   Receivership   Acknowledgement.   BUYER UNDERSTANDS AND ACKNOWLEDGES THAT ALL ASSETS OF SELLER, INCLUDING THE PROPERTY, ARE SUBJECT TO THAT CERTAIN ORDER APPOINTING RECEIVER ENTERED ON OR ABOUT OCTOBER 21, 2014, IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA (THE "COURT"), CIVIL ACTION NO. 1:14-CV-03017-TCB, AND THAT THE SALE OF THE PROPERTY IS SUBJECT TO THE COURT'S APPROVAL. SELLER, THROUGH ITS RECEIVER, AGREES TO PROMPTLY SEEK APPROVAL OF THE PROPOSED SALE OF THE PROPERTY WHEN THE PURCHASE AGREEMENT IS FINALIZED. Until the Seller seeks such approval, the parties agree that Buyer's identity, the negotiations between Seller and Buyer and the terms of the transaction contemplated by the Agreement will be confidential and shall not be disclosed to third parties except for necessary disclosure to legal counsel, other economic advisors or lenders, and in connection with Buyer's discussions with potential investors, and in connection with any regulatory or their legal proceedings.

*[Signatures on Next Page]*

23



**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

SELLER:                         **COLUMBUS-MORSE PROPERTIES, LLC,**
                                a Georgia limited liability company

                                By and through its Receiver GGG Partners, LLC

                                By: _____
                                Name: Katie S. Goodman
                                Its: Managing Partner

BUYER:                          **RED HOOK CAPITAL PARTNERS II, LLC,**
                                a Delaware limited liability company

                                By: _____
                                   Name: John Ghiselli
                                   Its: Member

                                By: _____
                                   Name: Craig Underwood
                                   Its: Member

## ACKNOWLEDGMENT OF RECEIPT AND AGREEMENT OF ESCROW HOLDER

Fidelity National Title Insurance Company acknowledges receipt of this Agreement and agrees to act as Escrow Holder in accordance with the terms of this Agreement.

                                **FIDELITY NATIONAL TITLE INSURANCE COMPANY**

                                By: _____
                                      Authorized Officer

                                Dated as of: _____, 2015

S-1

18992850v.3

**EXHIBIT A**

**LEGAL DESCRIPTION OF THE LAND**

18992850v.4

**EXHIBIT B**

**CERTIFICATE OF NONFOREIGN STATUS**

**COLUMBUS-MORSE PROPERTIES LLC,** a Georgia limited liability company ("**Seller**"), is the transferor of that certain real property located in and more particularly described on Exhibit A attached hereto (the "**Property**").

Section 1445 of the Internal Revenue Code of 1986 (the "**Code**") provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax will not be required in connection with the disposition of the Property pursuant to that certain Purchase and Sale Agreement and Joint Escrow Instructions dated as of _____, 2015, by and between Seller and RED HOOK CAPITAL PARTNERS II, LLC, a Delaware limited liability company, the undersigned certifies the following on behalf of Seller:

1.      Seller is not a foreign corporation, foreign partnership, foreign trust or foreign estate, as those terms are defined in the Code and the regulations promulgated thereunder;

2.      Seller is ~~not~~ a disregarded entity ~~as defined in §1.1445-2(b)(2)(iii);~~ *and is included in the tax return of Mjaica*

3.      ~~Seller's U.S. employer identification number is _____; and~~ *Education*

4.      Seller's address is 150 East Broad Street, Suite 500 Columbus Ohio 43215. *Inc: tax id 91-1759387*

5.      It is understood that this certificate may be disclosed to the Internal Revenue Service and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined the foregoing certification and, to the best of my knowledge and belief, it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Seller.

Date:      _____, 2014   Signature: _____

B-1

18992850v.4

# PURCHASE AND SALE AGREEMENT
# AND JOINT ESCROW INSTRUCTIONS

by

and

between


**COLUMBUS-MORSE PROPERTIES LLC,**
**a Georgia limited liability company**


"Seller"

and


**RED HOOK CAPITAL PARTNERS II, LLC**
**a Delaware limited liability company**

"Buyer"


**Dated as of**
**February 19, 2015**

18992850v.4