IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| TATONKA CAPITAL CORPORATION, a Colorado corporation, <br><br> Plaintiff, <br><br> v. <br><br> MOSAICA EDUCATION, INC., a Delaware corporation; MICHIGAN EDUCATIONAL FACILITIES, LLC, a Delaware limited liability company; ASI TEXAS, LLC, a Delaware limited liability company; EFA COMPANY, LLC, a Michigan limited liability company; LORAIN-LEAVITT PROPERTIES, LLC, a Georgia limited liability company; WARREN-ELM FACILITIES, LLC, a Georgia limited liability company; and COLUMBUS-MORSE PROPERTIES, LLC, a Georgia limited liability company, <br><br> Defendants. | CIVIL ACTION NO. 1:14-CV-03017-TCB |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On April 20, 2015 GGG Partners, LLC ("**GGG**" or the "**Receiver**"), in its capacity as court-appointed receiver for the above-captioned Defendants, including Mosaica Education, Inc. ("**Mosaica**") and certain

of its wholly owned subsidiaries (the "**Defendant Subsidiaries**," and collectively with Mosaica, the "**Companies**"), filed with the Court its *Motion to Approve Sale of Substantially All of The Assets of the Defendants, Including Real Estate* [145] (the "**Initial Sale Motion**"). Good and sufficient notice of the Initial Sale Motion was sent to interested parties on April 21, 2015 [153] setting the hearing on the Initial Sale Motion (the "**Initial Sale Hearing**") for May 5, 2015 at 10 a.m., with objections to the proposed sale or other matters set forth in the Initial Sale Motion due before the hearing date. The Initial Sales Hearing occurred on May 5, 2015.

Several days after the Initial Sale Hearing, the Court was informed that the initial proposed purchaser had decided not to pursue its initial letter of intent. The Receiver filed a second sale motion, this time for a credit bid purchase of substantially all of the assets of the Defendants to the lead secured creditor Tatonka Capital Corporation ("**Tatonka**"), *Receiver's Supplemental Motion to Approve Sale of Substantially All of the Assets of Defendants, Including Real Estate* [185] (the "**Second Sale Motion**"). The hearing on the Second Sale

2

Motion was set for and occurred on May 27, 2015, with due notice to parties in interest (the "**Second Sale Hearing**").

There were several pleadings that were timely filed in response to the Initial Sale Motion and/or the Second Sale Motion: (1) Tatonka filed its *Amended and Replacement Conditional Support for the Proposed Receiver's Sale Including Tatonka's Request for Payment of Substantially All of the Net Sales Proceeds at Closing* (Doc. 165; the "**Tatonka Conditional Support**"); (2) CXA Corporation ("**CXA**") filed two objections, its *Objection to Receiver's Proposed Sale of Substantially All of the Assets* [164]; and *CXA Corporation's Objection to Receiver's Second Bulk Sale Motion* [188] (collectively, the "**CXA Objection**"); (3) Gene Eidelman and Michael Connelly (collectively, the "**Shareholders**") filed two objections, their *Shareholders' Motion to Continue Hearing Regarding Proposed Sale, or, Alternatively, Objection to Receiver's Motion to Approve Proposed Sale* [168]) and their *Shareholders' Objection to Receiver's Supplemental Motion to Approve Proposed Sale* [189] (collectively, the "**Shareholder Objection**"); (4) Spirit Master Funding II, LLC ("**Spirit**") filed two objections, its *Objection to*

3

*Receiver's Motion for Order of Sale* [171] and its *Objection to Receiver's Supplemental Motion to Approve Sale of Substantially All of the Assets of the Defendants, Including Real Estate* [193] (collectively, the "**Spirit Objection**"); and (5) Reliant Asset Management, LLC ("**Reliant**") filed its objection, *Reliant Asset Management, LLC's Notice of Objections to Receiver's Supplemental Motion to Approve Sale of Substantially All of the Assets of the Defendants, Including Real Estate* [192] (the "**Reliant Objection**" and, together with the CXA Objection, the Shareholder Objection, and the Spirit Objection, the "**Objections**").

The Initial Sale Hearing was held at 10:00 a.m. on May 5, 2015 to consider the Receiver's Initial Sale Motion and the Second Sale Hearing was held at 1:30 p.m. on May 27, 2015. Present at the Initial Sale Hearing and/or the Second Sale Hearing were counsel for Receiver, Tatonka, CXA, the Shareholders, Columbus Humanities, Arts and Technology Academy, Inc. ("**CHATA**"), EPT DownREIT, Inc. ("**EPT**"), Spirit, and Reliant, along with potential witnesses Katie Goodman and Joseph Pegnia (for the Receiver), Mychal Harrison for Huron Transaction Advisory, LLC ("**Huron**"); Bruce Davis for the initial

4

proposed purchaser of the assets, Pansophic Learning US LLC ("**Pansophic**"), both Shareholders, and Carol Hansen for Tatonka. Goodman, Pegnia, Harrison, Davis, Connelly, Eidelman, and Hansen all testified.

The Court having reviewed the Second Sale Motion, the Objections filed thereto, and the record in this case, and having considered any evidence presented at the Initial Sale Hearing and at the Second Sale Hearing and the argument of counsel, and for good cause shown, and for the reasons stated by the Court on the record at the Second Sale Hearing, which are incorporated herein by reference, the Court hereby enters the following Findings of Fact:[1]

## The Prior Proceedings

1.   On September 19, 2014, Tatonka filed a Complaint [1] against Mosaica and the Defendant Subsidiaries seeking, among other things, the appointment of a receiver for the Companies to manage their assets and business.

---

[1] To the extent any findings of fact constitute conclusions of law, and to the extent any conclusions of law constitute findings of fact, they are adopted as such.

2.      On October 21, 2014, the Court entered an Order [28] granting the receivership motion and appointing GGG as Receiver for the Companies, with GGG's Managing Partner Katie S. Goodman being the primary professional of the Receiver.  On April 28, 2015, the Court entered an "Amended Order Appointing Receiver" [161] (together with [28], the "**Receivership Order**").

3.      Among other things, the Receivership Order authorized the Receiver to manage the assets and operations of each of the Defendants.

4.      The Receiver and its partners are experienced in managing businesses experiencing financial distress and, if necessary, selling the assets of those businesses. The Receiver has been appointed as receiver in several previous engagements in federal and state courts.

5.      Following its appointment the Receiver determined that there were several financial and operational issues confronting the Defendants. Among other things, the

Defendants (a) owed well over $1 million in unpaid federal payroll taxes that had been withheld from employees' paychecks but not paid to the Internal Revenue Service ("IRS"), (b) have very limited liquidity to operate their business and as a result faced severe cash-flow problems pursuant to which they risked running out of cash and having to shut down their operations, and (c) were the defendants in several lawsuits throughout the country regarding unpaid lease obligations and other issues.

6.     Moreover, Tatonka, which is the Defendants' primary lender, had declared the Defendants in default on their obligations to Tatonka.

7.     Upon exploring the possibility of refinancing the Defendants' debt, the Receiver concluded that the fair market value of the real estate owned by the Defendants was significantly less than that represented in Defendants' books and records.

8.    In addition, the Receiver concluded that much, if not most, of the accounts receivable on Defendants' books and records was uncollectible.

9.    For the foregoing reasons, among others, the Receiver determined that refinancing the Defendants' obligations would be virtually impossible and that the Defendants would be unable to continue as independent going concerns much longer.

10.   The Receivership Order provides, among other things:

> The receiver's paramount duties are to provide appropriate and quality educational services at the schools operated by the Companies and to preserve, protect, and enhance the value of the Companies. Therefore, the receiver shall do its best to retain the vast majority of the present employees so as to maintain confidence and continuity. All other duties are subordinate to these primary duties.

[161], pp.2-3.

11.   In order to fulfill its paramount duties, the Receiver has determined that the real estate and operating assets of the Defendants need to be sold.

8

12.    The Receivership Order also provides:

> **Receiver Authorized to Market and Sell the Property**.
> Receiver is authorized to market and sell pieces of the
> Property (as determined by the Receiver in its sole
> discretion) where the value of the individual asset is
> less than $50,000. The sale of any individual assets
> having a value in excess of $50,000 may be approved
> only on the prior permission of the Court, after notice
> and right to be heard to the applicable school
> authority, Defendants (…) and to Tatonka, CXA and
> any other party in interest requesting notice in writing
> and served on the Receiver. The Court will look with
> disfavor on any proposed sale of any operating school
> that would result in the closing of the school,
> particularly during the school year. Nonetheless, if
> such operation is creating financial instability, then
> the Court may permit such closure. Subject to further
> notice and approval, Receiver is authorized to sell all or
> a portion of the Property and other collateral, and
> execute on Defendants' behalf any necessary
> documents in connection with such sale and/or
> assumption and to apply any sales proceeds as
> specified in any applicable order approving such sale.
> To the extent not otherwise satisfied, all liens, claims,
> interests, and encumbrances on any Property sold shall
> attach to any and all proceeds of such sale in the
> priority they now attach to the Property.

[161], ¶ 4(g).

13.    The Receivership Order also empowered the Receiver to

appoint itself (or Ms. Goodman) as the sole director or

manager of the Companies. [161], ¶ 4(f). The Receiver

9

exercised this right on April 21, 2015 to remove all existing directors of Mosaica, to name herself as the sole director and chief executive officer of Mosaica, to remove all officers and managers of Mosaica's subsidiaries, and to name herself as the chief executive officer or sole manager of Mosaica's subsidiaries. *See* [154].

14. The Receivership Order also authorized the Receiver to retain professionals to assist it in managing the Companies' assets and in selling the Property, and further provided that the fees and expenses of the Receiver and its professionals would be paid from any sale proceeds prior to the disbursement of any such sale proceeds to holders of liens or security interests in the Property. [161], ¶¶ 4.u, 6.

15. The Receiver filed the Initial Sale Motion and the Second Sale Motion pursuant to Paragraph 4(g) of the Receivership Order, proposing to sell substantially all of the operating assets of Mosaica.

## The Sales Process

16.    Prior to the filing of the instant case, by July 2014, Mosaica had retained an investment banker, First Analysis, to try to find capital for Mosaica's continuing operations. The Receiver continued to use that investment banker through at least December 2014. This first investment banker was unable to successfully close on any new debt financing or equity capital for Mosaica.

17.    By December 2014, the Receiver considered and interviewed multiple investment banking firms in order to select one to retain on behalf of Mosaica.

18.    On or about January 9, 2015, Huron was retained by the Receiver to market and sell the operating assets and real property owned by the Companies and certain of their subsidiaries (the "**Property**").

19.    Huron and its principals are experienced in selling a wide variety of businesses, including financially stressed businesses.

11

20.   Following its engagement, Huron familiarized itself with the commercial, operational, financial and related circumstances of the Companies.

21.   In Huron's initial proposal to the Receiver, Huron set forth a detailed schedule for a complete sales process that was designed to result in a sale or sales within sixteen weeks of Huron's engagement – by early May 2015 in light of Huron's engagement on January 9.

22.   The sixteen week marketing schedule was consistent with the time-frame in which Huron and its principals had successfully marketed the assets of other companies in the course of Huron's business.

23.   To initiate the sale process, Huron developed a list of approximately sixty potential purchasers. Huron, with the assistance of the Receiver, prepared a summary description of Mosaica's business to disseminate to these potential purchasers. The summary description generated interest from eighteen potential purchasers, eleven of which signed

confidentiality agreements in order to receive from Huron various diligence materials in February 2015, including both a Summary Fact Sheet and a Confidential Information Memorandum.

24. Huron then requested prospective purchasers to submit preliminary indications of interest by end of February 2015, and invited prospective purchasers to meet with Mosaica's management team, conduct additional due diligence, access the virtual data site, and continue in the sale process.

25. In March 2015, Huron followed up with the meeting participants and asked for formal letters of intent to outline with more specificity the prospective purchasers' deal points. Huron received six such letters of intent. The substance of these letters of intent were disclosed to Tatonka but not to the Shareholders and other parties in interest.

26. After extensive negotiations with potential purchasers, the Receiver and Huron concluded that Pansophic submitted the best offer for the Property. Huron was successful in causing

13

Pansophic to increase its initial offer as stated in its initial proposed letter of intent. Following this additional negotiation, Pansophic and the Receiver executed a letter of intent dated April 10, 2015 [148] (the "**Pansophic LOI**"), which was submitted in conjunction with the Initial Sale Motion.

27.   As stated in the Pansophic LOI, Pansophic offered to pay up to $24,565,000 (the "**Pansophic Purchase Price**") for all of the Property[2] which included all of the business assets owned by Mosaica and all of the real estate owned by the Defendant Subsidiaries and one real estate parcel owned by Mosaica. The Pansophic Purchase Price was apportioned such that $14,000,000 was allocated for the purchase of the Companies' operating assets and $10,565,000 was allocated

---

[2] The Property to be sold to Pansophic specifically excluded any causes of action that the Receiver may have against various parties, including but not limited to Tatonka and Mosaica's officers and directors. The assets to be retained by the Receiver and not sold to Pansophic also included cash and rights under insurance policies.

among the various parcels of real estate being sold in the amounts set forth in the Pansophic LOI.

28.  After Pansophic initially withdrew, Huron sought alternative purchasers of the assets. Tatonka made a non-binding credit bid for the Property, excluding certain assets, which Huron and Receiver determined was the best offer for the Property. At that point, Pansophic returned to the negotiating table and stated that it would purchase a defined material portion of the Defendants' assets—including some non-receivership assets—from Tatonka or its designee (i.e., the Receiver) for $16 million. As of the Second Sale Hearing Pansophic had not executed a binding document at the $16 million level, but Tatonka reported that Pansophic had said it would do so in very short order. Tatonka also reported to the Court that if Pansophic did not do so, it would find another source from which to be able to continue the operations of most of the schools following the sale. After the

15

Second Sale Hearing, Tatonka reported to the Court that Pansophic had since made that written commitment.

29.    At the Second Sale Hearing, it was announced that Tatonka was changing its previously non-binding offer in two respects: it was lowering the credit bid amount to $21.8 million (the "**Credit Bid Price**"), and it was not purchasing Defendants' commercial tort claims. The Property proposed to be retained by the Receiver and not sold to Tatonka (collectively, the "**Retained Assets**") is limited to the following: (a) Defendants' counterclaims against Tatonka[3]; (b) causes of action that the Receiver may have against Mosaica's officers and directors, including any rights under certain insurance policies; and (c) certain real estate in which Tatonka does not hold a first mortgage, namely (i) the

---

[3] The parties agree that to the extent the counterclaims are commercial tort claims, they are excluded from the Purchased Assets. Although Tatonka seeks to include contract claims—including contract claims asserted by Defendants against Tatonka—as part of the Purchased Assets, the Court agrees with the Shareholders that it would be inequitable or against public policy to allow Tatonka to credit bid to purchase claims against it on the facts presented here. Therefore, all of Defendants' counterclaims against Tatonka —whether sounding in tort or contract—are excluded from the Purchased Assets.

real property located at 1408 Rigby Street, Youngstown, Ohio 44506, in which EPT holds the first lien, and (ii) the real property located at 500 Griswold Street, Jackson, Michigan 49203 and 91609 22 North 3rd Street, Harrisburg, Pennsylvania 17102, in both of which CXA holds the first lien. Thus, Tatonka's credit bid, as revised in the Second Sale Hearing (the "**Tatonka Credit Bid**"), is to acquire all of the Property other than the Retained Assets (collectively, the "**Purchased Assets**") at the Credit Bid Price.

30. Based on the foregoing the Court finds that the Property was properly and fully marketed for sale by Huron and the Receiver and that the sales process was fair and reasonable.

31. The Tatonka Credit Bid is the best price that could realistically be achieved from a sale of the Property particularly given the distressed nature of the Property in this matter. The proposed sale of the Purchased Assets is in the best interest of the receivership estate and its creditors.

32.   The Pansophic offer and the Tatonka offer are both the
      result of an arms-length, negotiation occurring in good faith
      by at least the Receiver and Tatonka, in which all sides were
      represented by competent professionals. The Tatonka Credit
      Bid is the best offer for the Purchased Assets.

33.   There was no collusion between any of the parties to reduce
      or minimize the Credit Bid Price ultimately agreed to by the
      parties or to steer the transaction to Pansophic or to
      Tatonka.

### Tatonka's Perfected Secured Liens and Amount Due

34.   At the beginning of the case Tatonka filed numerous
      authenticated exhibits [4] that purported to establish that
      Tatonka holds a first lien on all of the Property other than
      three parcels of real property. At the May 5, 2015 hearing
      Tatonka introduced certain of those exhibits and other
      exhibits to further prove its lien position and the amounts it
      is owed from the Companies. Tatonka has met its burden to
      prove the indebtedness it is owed, its perfected liens, and its

entitlement to its share of the proceeds of the sale of the Property at the closing.

35.    Tatonka has a perfected security interest and mortgages in substantially all the Property other than three parcels of real estate[4] and the Defendants' commercial tort claims. No other party has asserted it has a lien on any of the Companies' personal property other than Reliant has asserted a lessor's interest in certain "**Modular Buildings**", which interest no one contests (and which buildings Reliant is now free to repossess).[5] No party contests that Tatonka has a first mortgage on any of the real or personal property in which Tatonka claims a first lien.

---

[4] EPT holds the first lien on the real property located at 1408 Rigby Street, Youngstown, Ohio 44506. CXA holds a first lien on the real property located at (a) 500 Griswold Street, Jackson, Michigan 49203 and (b) 9160922 North 3rd Street, Harrisburg, Pennsylvania 17102. All three of these parcels of real estate are included in the Retained Assets and are not subject to the Tatonka Credit Bid.

[5] In addition, Spirit alleges that it registered a certain judgment against Mosaica in the State of New York that allegedly created a security interest in Mosaica's assets held in the State of New York. The only such asset that Spirit was able to identify was an account with Wells Fargo, which the Receiver has represented currently has no funds. Any other assets of Mosaica in the State of New York are of inconsequential value and, in any event, would be subject to Tatonka's superior lien.

36.  Mosaica and the Companies are obligated to Tatonka under the following loans and guaranties, with each amount being secured by Tatonka's perfected liens:

    i.  Secured loan by Tatonka to Mosaica dated October 30, 2007 (the Revolver) – as of March 31, 2015, the amount outstanding, including late fees, was $7,743,841.46; this (and other) indebtedness of Mosaica was guaranteed by Columbus-Morse Properties, LLC in the Unlimited Guaranty and Security Agreement dated October 30, 2007.

    ii.  Secured loan by Tatonka to EFA Company, LLC dated December 27, 2007, which was guaranteed by Mosaica in the Guaranty Agreement dated December 27, 2007 – as of March 31, 2015, the amount outstanding, including late fees, was $4,368,010.66.

    iii.  Secured loan by Tatonka to Warren-Elm Facilities, LLC dated May 24, 2011, which was guaranteed by Mosaica in the Guaranty Agreement dated May 24,

2011 – as of March 31, 2015, the amount outstanding, including late fees, was $2,508,776.54.

iv.     Secured loan by Tatonka to Michigan Educational Facilities, LLC dated December 27, 2007, which was guaranteed by Mosaica in the Guaranty Agreement dated December 27, 2007 – as of March 31, 2015, the amount outstanding, including late fees, was $3,258,565.79.

v.     Secured loan by Tatonka to Mosaica dated August 14, 2012 – as of March 31, 2015, the amount outstanding, including late fees, was $43,465.68.

vi.     Secured loan by Tatonka to Lorain-Levitt Properties, LLC dated July 24, 2007, which was guaranteed by Mosaica in the Guaranty Agreement dated July 24, 2007 – as of March 31, 2015, the amount outstanding, including late fees, was $453,222.25.

vii.     Secured loan by Tatonka to Columbus-Morse Properties, LLC dated April 13, 2011, which was

21

guaranteed by Mosaica in the Guaranty Agreement dated April 13, 2011 – as of March 31, 2015, the amount outstanding, including late fees, was $4,321,579.80.

viii. Pursuant to many Exhibits, Mosaica also owes Tatonka its attorney fees for seeking to enforce Mosaica's defaulted obligations held by Tatonka. From June 1, 2014 through March 31, 2015, the amount of attorneys' fees incurred by Tatonka and billed by Burr & Forman LLP seeking to enforce Tatonka's rights against Mosaica is $728,745 plus expenses in the amount $12,749.

ix. Interest and attorneys' fees continue to accrue. Tatonka also holds cash credits in the amount of $439,070.81 which are a credit against these amounts due.

x. The total amount due from Mosaica to Tatonka (exclusive of accruing charges after March 31, 2015) is

22

$22,999,855.37, with charges (interest and legal expenses) continuing to accrue.

37.     There is no evidence that suggests these amounts are not due and owing to Tatonka. However, certain parties assert that the amount of Mosaica's indebtedness to Tatonka should be reduced due to (i) the receivables that had been assigned by Mosaica to Tatonka in April of 2014, and/or (ii) certain counterclaims recently filed by the Shareholders (purportedly on behalf of Mosaica) against Tatonka.

## The Receivables Assigned by Mosaica to Tatonka

38.     The receivables of CPA, CATA, CASSA, CHATA and STAR that were assigned by Mosaica to Tatonka in April 2014 had an aggregate face value of approximately $16.5 million (the "**Receivables**"). However, the evidence establishes that these Receivables are not worth their face value, though that they have some undetermined value. Tatonka has applied all cash collections on account of these Receivables to reduce

Mosaica's indebtedness to Tatonka, but has not applied the face amount of the Receivables to the indebtedness.

39.    In support of its allegation that Tatonka's claim against Mosaica should be reduced by the Receivables, CXA offered as evidence several "Assignment and Agreement" documents that evidenced the assignments of the Receivables from Mosaica to Tatonka. However, these Assignment and Agreement documents include the following provision at paragraph 3(h):

In no way is [Tatonka's] acceptance of the assignment hereunder a full and final satisfaction of the Indebtedness. If and when [Tatonka] is paid any amounts by [applicable school] under the [applicable school] Note and/or the [applicable school] AR, [Tatonka], in its sole and absolute discretion, shall apply such amounts against any of the amounts outstanding under the Indebtedness as [Tatonka] shall choose, after [Tatonka] has reimbursed itself for its costs associated with such collection efforts, including, without limitation, the costs of reasonable attorney's fees.

40.    This provision establishes that the Receivables were taken as additional collateral for, and not payment of, Mosaica's indebtedness to Tatonka. Tatonka must credit the

24

indebtedness due only to the extent it receives cash payments made on these Receivables.

## The Objections

41.   Three parties in interest filed objections to the Initial Sale Motion and the Second Sale Motion, and a fourth party in interest filed an objection to the Second Sale Motion. Each of these objections is overruled, except as otherwise provided below:

42.   CXA argues that the proposed sale does not comply with the statutory requirements set forth in 28 U.S.C. §§ 2001 and 2004. [164, 188]. The Court disagrees. The assets to be sold are a combination of real and personal property and are being sold at at a private sale.

   a.   28 U.S.C. § 2001(b) governs the private sale of realty by a federal receiver and sets forth various requirements for notice, appraisals and other matters. On March 4, 2015 the Court entered an order [88] (the "**Sales Procedures Order**") establishing procedures for

25

the sale of real estate by the Receiver in this case that complied with the statute. The Receiver has introduced evidence showing that it complied with § 2001(b) and the Sales Procedure Order with respect to the sale of real estate, including appraisals, affidavits of appraisers, and evidence of notices published in various newspapers.

b.  28 U.S.C. § 2004 governs the sale of personal property by a federal receiver and provides that such property "shall be sold in accordance with [28 U.S.C. § 2001] unless the court orders otherwise." In the Receivership Order, the Court previously authorized the Receiver "to sell all or a portion of the Property and other collateral" subject to notice and approval as specified therein. [Receivership Order, ¶ 4.g]. The Receiver has complied with these notice requirements. *See* [153, 187]. Moreover, the Receiver presented substantial testimony of its multi-month efforts to market the

26

Property, including its retention of experienced investment bankers to assist with the sale process. The receipt of multiple competing bids from multiple bidders through a sophisticated sales process does more to establish the value of the property then could an appraisal. Nevertheless, CXA argues that this Court can authorize a deviation from the specific requirements of § 2001(b) in connection with the sale of personal property only if the Receiver demonstrates the existence of "extraordinary circumstances." *See*, *e.g.*, *Tanzer v. Huffines*, 412 F.2d 221, 222 (3d Cir. 1969). The Court disagrees and holds that the specific requirements of § 2001(b) can be waived in connection with the sale of personal property even in the absence of "extraordinary circumstances." Regardless, however, the Court finds that this case does present "extraordinary circumstances" that warrant a departure from the strictures of § 2001(b) even if that

27

were the proper standard. The Receiver has shown, among other things, that if the proposed sale of the Property is not consummated on an expedited basis, Defendants will run out of cash and need to shut down, which will materially impair the value of the Property. Furthermore, if the schools managed by Defendants are not sold well in advance of the upcoming school year to an entity sufficiently qualified to manage them, those schools will either close or seek alternative management, further impairing the value of the Property and to the detriment of the students and employees of those schools. For these reasons, the Court finds that the requirements of 28 U.S.C. § 2001 are not warranted for the sale of the Defendants' personal property and that the Receiver's efforts to market such property is sufficient under the extraordinary circumstances presented here.

28

43. CXA also contends that the proposed sale of the Property is not in the best interest of the receivership estate and parties in interest. Again, the Court disagrees. The evidence shows that Defendants' financial status is dire, that Defendants lack the means to continue operations as independent going concerns, and that the Property must be sold in order to preserve and maximize the value of Defendants' assets, to keep the schools managed by Defendants in operation, and to protect and preserve the interests and jobs of Defendants' employees and students. The Receiver has shown that the Property has been extensively marketed by a qualified investment banker and that the proposed sale of the Property pursuant to the terms of the Tatonka Credit Bid (as modified at the hearing) represents the highest and best price for the Property that can realistically be obtained. Moreover, following the proposed sale, the receivership estate would retain the Defendants' interest in certain causes of action, from which funds could potentially be

realized for the benefit of the Defendants' unsecured creditors. Accordingly, the Court finds that the proposed sale of the Property is in the best interest of the receivership estate and the creditors.

44. Gene Eidelman and Michael Connelly (collectively, the "Shareholders") object to the proposed sale on multiple grounds [169, 189]. Among them is their contention that Tatonka should not be permitted to credit bid for claims asserted against it, thereby foreclosing investigation and resolution of those claims for the possible benefit of non-Tatonka creditors and other stakeholders. Those objections have been addressed elsewhere in this document and are overruled, except to the extent the Shareholders object to the proposed sale of any and all counterclaims asserted against Tatonka.

45. Reliant Asset Management, LLC ("**Reliant**") filed an objection [192] with a supporting affidavit showing that it leases modular buildings to one or more Defendants and that

said Defendants are in default. It appears that Reliant is therefore an unsecured creditor of Defendants. Reliant contends it received inadequate notice of the sale hearing and seeks more time to understand the details of the proposed sale. As discussed above, service was appropriate and sufficient under the circumstances. To the extent Reliant is an unsecured creditor it will retain its right to assert its claim against the receivership estate. To the extent it is a lessor of the modular buildings, it retains whatever interest it currently has in such buildings.

46.   Spirit Master Funding II, LLC ("Spirit") also objects to the proposed sale [171, 193], arguing that the sale will adversely affect Spirit's ability to collect on a judgment it obtained against certain of the Defendants. But this is not true. The sale of the Property will have no effect on Spirit's right to pursue and collect on a judgment against any of the Defendants. Spirit's problem is that the Property is subject to first-priority security interests of Tatonka (and, in some

31

instances, other entities). Any judgment lien obtained by Spirit is junior to Tatonka's and other parties' prior liens. Because Defendants are in default on their obligations to Tatonka, Tatonka has the right to foreclose on its collateral. To the extent the value of that collateral is not sufficient to satisfy Tatonka's superior claim, there would be nothing left with which to satisfy Spirit's judgment claim, *regardless* of whether Defendants' assets are sold by the Receiver or through a foreclosure sale. Following the proposed sale, Spirit will retain whatever rights and interest it has in those assets of the Defendants that are not being sold.

47. Spirit also argues that the proposed sale of the Property by the Receiver is an improper attempt to avoid a bankruptcy sale. This objection is overruled. Defendants are not in bankruptcy and there is no requirement that that Defendants' assets be sold only through a bankruptcy sale. The Bankruptcy Code does not prohibit a Receiver from selling assets in a receivership proceedings.

## The Counterclaims

48.   The Receivership Order allows the Shareholders, on behalf of Mosaica, to assert claims against Tatonka. [161], p.1. On May 4, 2015—the day immediately prior to the Initial Sale Hearing—two Shareholders timely filed counterclaims against Tatonka.

49.   The Shareholders and CXA contend that the Shareholders' success on these claims, if any, would entitle Mosaica to damages from Tatonka.[6] They therefore argue that Tatonka should not be paid proceeds at the closing of the sale to Pansophic but instead that Tatonka's share of the sale proceeds should be held in escrow until the counterclaims are resolved. The Court finds no compelling reason to hold Tatonka's share of the sale proceeds in escrow pending a resolution of the counterclaims.

50.   As established by the evidence presented at the Initial Sale Hearing and the Second Sale Hearing, there is an urgent

---

[6] The Court is not at this time making any decision on the merits of the counterclaims, or whether they sound in tort or contract.

and compelling need for the proposed sale to Tatonka or its designees in accordance with the Tatonka Credit Bid to close quickly. There are at least two primary reasons why this is so.

a. First, this is the time of the year when teachers, parents, and students decide where they will spend the next school year. Attendance at charter schools is voluntary. Charter schools also need to decide with whom their management contracts will reside for the 2015-2016 school year. Continued uncertainty as to whether a school can or will open for the 2015-2016 school year and who will manage the school will negatively affect the number of students enrolling in the schools currently operated by Mosaica, and will presumably cause schools to secure new operators in lieu of Mosaica. Thus, if the closing is delayed, the value of the Properties will likely decline precipitously.

b. Second, the Receiver's witnesses testified that the receivership estate will run out of cash at some point soon and that the Receiver must either close the Companies or sell their assets promptly. Closing the Companies instead of closing the sale of the Companies' assets to Tatonka or its designees in accordance with the Tatonka Credit Bid benefits no interested party. Accordingly, the Court finds that there is an urgency for the sale to close quickly and that such a closing is clearly in the best interests of the students, parents, teachers, schools, creditors, and the receivership estate.

51. The Shareholders and CXA have not persuaded the Court that Tatonka should not be paid its share of the sales proceeds at closing and have not brought any claims seeking to assert or claim a property interest or specific right to the proceeds of the sale. The Shareholders are essentially asking for a prejudgment writ of garnishment or a prejudgment writ of attachment. *See Mitsubishi Int'l Corp. v. Cardinal*

*Textile Sales, Inc.*, 14 F.3d 1507, 1521 (11th Cir. 1994) (stating that "[w]hen faced with motions appearing to call for an attachment but labelled [sic] something else, federal courts again look past the terminology to the actual nature of the relief requested" and finding a prejudgment motion to freeze property as actually a motion for attachment and therefore subject to the state court law of prejudgment attachment under Rule 64 of the Federal Rules of Civil Procedure). The Shareholders have not met their burden of establishing their right to either remedy, nor have they posted the bond that would be required under Georgia law for either such remedy. *See* O.C.G.A. §§ 18-4-43 (requirement of prejudgment garnishment is posting a bond in an amount of two times that at issue), 18-3-10 (same for prejudgment attachment). Even if they had met their burden and could post such a bond, the result they seek would cause the sale to Tatonka or its designees to fail.

52.   The evidence shows that Tatonka has pledged at least some
      of the funds from the closing of the sale to its own creditors.
      The Shareholders speculate that this might render Tatonka
      unable to pay any judgment issued against it relating to the
      Shareholders' counterclaims. The risk of a defendant
      becoming judgment-proof is, to some extent, present in all
      litigation. But the Supreme Court has made clear that a
      district court has "no authority" to enjoin a party from
      disposing of its assets pending adjudication of claims against
      that party. *Grupo Mexicano de Desarrollo S.A. v. Alliance
      Bond Fund, Inc.*, 527 U.S. 308, 333 (1999) (noting that
      allowing prejudgment injunctions to freeze property pending
      unsecured claims for damages would eviscerate "local
      attachment and garnishment statutes" and holding that
      "before judgment (or its equivalent) an unsecured creditor
      has no rights at law or in equity in the property of his
      debtor"). The Shareholders' request to freeze the funds
      pending adjudication of their claims for damages does not

meet the standards under Georgia law for prejudgment remedies, nor does it meet the standard for a preliminary injunction. The Court will thus deny the requested relief.

### The Unpaid Federal Taxes

53. Prior to the Receivership, Mosaica failed to pay employment taxes due to the Internal Revenue Service ("IRS") for a substantial portion of the second and third quarters of 2014. These unpaid taxes included both the employer and employee (trust fund) portion of the employment taxes. The Receiver's witness testified that she has received a payoff amount from the IRS for these past due taxes— approximately $1.47 million.

54. On May 18, 2015 the IRS filed a proof of claim in this case asserting tax liens totaling $1,392,413.99. Nevertheless, the lien positions of each of Tatonka, CXA and EPT are superior to the position of the IRS in all respects.

55. Under the now withdrawn original Pansophic LOI, these unpaid taxes were to be paid to the IRS at closing of the sale.

But in the Tatonka Credit Bid transaction now being approved, the taxes will not be paid and the IRS will continue to have its claim against the Defendants and any other person the IRS can prove is liable for same. The Purchased Assets are being sold free and clear of any and all claims of the IRS (and all claims of the other creditors of Defendants).

## Conclusory Findings

56. The Court has jurisdiction over this proceeding and the Property.

57. An urgent and compelling reason exists to sell the Property.

58. The Property has been adequately marketed by experienced professionals.

59. The Tatonka Credit Bid for the Purchased Assets (a subset of the Property), constitutes the highest and best offer for the Purchased Assets.

60. Good and adequate notice of the Initial Sale Motion and the Second Sale Motion, the proposed sale of the Purchased

Assets to Tatonka, the First Sale Hearing and the Second Sale Hearing was provided to parties in interest.

61. A full and fair hearing on the Initial Sale Motion was held, in which CXA, on behalf of itself and other similarly situated junior lienholders and unsecured creditors, and the Shareholders, on behalf of themselves and other similarly situated shareholders, fully participated and contested the proposed sale to Pansophic.

62. All objections to the Initial Sale Motion and the Second Sale Motion are overruled, except that the Shareholders' objection to sale of commercial tort claims and contract claims against Tatonka is granted.

63. The sale of the Purchased Assets to Tatonka reasonably consistent with the Tatonka Credit Bid is in the best interest of the receivership estate, the creditors of the Companies, the employees of Mosaica, the teachers and students at the schools managed by Mosaica, and other parties in interest.

64.     The Receiver has the full authority and power, without
        further approval from the Court, to consummate a sale (or
        sales) that is (or are) reasonably consistent with the terms of
        the Tatonka Credit Bid, whether to Tatonka or to its
        designees or other alternate purchasers (the "**Authorized
        Sales**").

65.     The Authorized Sales will maximize both (a) the financial
        recovery to the Companies' creditors and (b) the continuation
        of appropriate and quality educational services at the schools
        currently managed by Mosaica.

66.     No Orders of the Court have been or will be violated if the
        Purchased Assets are sold on terms reasonably consistent
        with the Tatonka Credit Bid.

67.     The terms of the Authorized Sales have been negotiated in
        good faith, at arms lengths and without any collusion or
        undue influence.

68.     The sale process and proposed sale of the Purchased Assets
        will comply with the applicable provisions of the

41

Receivership Order, 28 U.S.C. §§ 2001, 2002, and 2004, and all other applicable statutes and orders.

69. The terms of the Authorized Sales are fair and reasonable under the circumstances and reflect the Receiver's prudent and informed business judgment.

70. The Receiver is directed to close the Authorized Sales as soon as possible, and any stay of or delay in closing the Authorized Sales shall be eliminated.

71. The claimed lien and indebtedness amounts, positions, and priorities of each of Tatonka, CXA, and EPT discussed above are fully supported by the evidence and each is entitled to its collateral and/or the net sales proceeds realized from the sale of its collateral.

72. The Receiver and each of its professionals are entitled to be paid at closing all of their court approved or contractual based fees and expenses at closing, ahead of all other payments. Such payments will be paid in full at closing or as otherwise agreed by each professional.

73.   Neither the Receiver nor any of its professionals have acted with gross negligence or bad faith in connection with the Authorized Sales or the administration of the receivership estate. Accordingly, the Receiver and each of its professionals are entitled to the liability protections provided in the Receivership Order and as otherwise may be ordered by this Court.

74.   The Court will contemporaneously enter an order consistent with these Findings of Fact and Conclusions of Law.

Done and entered this 11th day of June, 2015.

Timothy C. Batten, Sr.
United States District Judge